John B. Sganga, Jr. (SBN 116,211)
john.sganga@kmob.com
Douglas G. Muehlhauser (SBN 179,495)
doug.muehlhauser@kmob.com
Perry D. Oldham (SBN 216,016)
perry.oldham@kmob.com
Mark Lezama (SBN 253,479)
mark.lezama@kmob.com
Alan G. Laquer (SBN 259,257)
alan.laquer@kmob.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street
Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiff
NOMADIX, INC.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| NOMADIX, INC.,<br><br>Plaintiff,<br><br>v.<br><br>HEWLETT-PACKARD COMPANY et al.,<br><br>Defendants.<br><br>AND RELATED COUNTERCLAIMS | ) Civil Action No.<br>) CV09-08441 DDP (VBKx)<br>)<br>) **NOMADIX, INC.'S OPENING**<br>) **CLAIM CONSTRUCTION**<br>) **BRIEF**<br>)<br>) Honorable Dean D. Pregerson<br>)<br>)<br>)<br>)<br>)<br>) |

# TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ................................................................................. 1

II.   OVERVIEW OF NOMADIX'S ASSERTED PATENTS ....................... 3

    A.   The '892, '995, '009 and '727 patents ............................................ 3

        1.   The '892 and '995 patents ..................................................... 3

        2.   The '009 patent ..................................................................... 4

        3.   The '727 patent ..................................................................... 5

    B.   The '894, '554 and '716 patents ...................................................... 5

    C.   The '399 patent ................................................................................ 6

III.  LEGAL STANDARDS FOR CLAIM CONSTRUCTION ...................... 7

IV.   CONSTRUCTION OF DISPUTED CLAIM TERMS ........................... 10

    A.   Terms related to "home" versus "foreign" networks .................... 11

        1.   "home" and "foreign" networks ('892, '727 and
           '009 patents) ......................................................................... 11

        2.   "the user host device is configured to communicate
           through a home gateway . . ." ('995 patent) ...................... 14

        3.   "a foreign gateway"  ('995 patent) ..................................... 16

    B.   Terms that the defendants incorrectly construe as relating
        to "home" versus "foreign" ('727 and '716 patents) .................... 18

        1.   "first network" ('727 patent) .............................................. 19

        2.   "network location of the user host device" ('716
           patent) ................................................................................. 20

        3.   "external network location" ('716 patent) ........................... 21

    C.   Incompatibility and incorrect configurations ('727 patent) .......... 23

        1.   "incompatible private IP address" terms ('727
           patent) ................................................................................. 23

        2.   "incorrectly configured messages" ('727 patent) ............... 26

1
2
3

**TABLE OF CONTENTS**
*(cont'd)*

**Page No.**

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

D.   The '894 patent ....................................................................... 27

   1.   The order of steps of all claims ('894 patent) .................... 27

      a.   The method claims do not require all their steps to be performed in order ................................ 28

      b.   To the extent the defendants' position could even apply to system claims, claims 6–11 also do not require a strict order ............................... 30

   2.   "administrator" ('894 patent) ............................................. 31

E.   The '554 patent ....................................................................... 32

   1.   "determining access" terms ('554 patent) ......................... 32

   2.   "regardless of network configurations" ('554 patent) .................................................................................. 35

F.   The '399 patent ....................................................................... 37

   1.   "management system" ('399 patent) .................................. 37

   2.   "absent additional agents" terms ('399 patent) ................. 38

   3.   "call accounting record" terms ('399 patent) .................... 40

   4.   "predetermined" terms ('399 patent) ................................. 41

   5.   "physical location" ('399 patent) ....................................... 44

   6.   "collecting data corresponding to the user's access . . ." ('399 patent) ................................................................ 46

G.   The '009 patent ....................................................................... 47

   1.   "single connection . . ." ('009 patent) ................................ 47

V.   CONCLUSION ................................................................................ 48

# TABLE OF AUTHORITIES

**Page No(s).**

*Altiris, Inc. v. Symantec Corp.*,
   318 F.3d 1363 (Fed. Cir. 2003) ............................................................28, 30

*B. Braun Med., Inc. v. Abbott Labs.*,
   124 F.3d 1419 (Fed. Cir. 1997) ..................................................................9

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*,
   616 F.3d 1249 (Fed. Cir. 2010) ....................................................7, 32, 33, 42

*Bicon, Inc. v. Straumann Co.*,
   441 F.3d 945 (Fed. Cir. 2006) ....................................................................8

*CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co.*,
   224 F.3d 1308 (Fed. Cir. 2000) ..............................................................9, 42

*Computer Docking Station Corp. v. Dell, Inc.*,
   519 F.3d 1366 (Fed. Cir. 2008) ..................................................................9

*Every Penny Counts, Inc. v. Am. Express Co.*,
   563 F.3d 1378 (Fed. Cir. 2009) ...........................................................passim

*Free Motion Fitness, Inc. v. Cybex Int'l*,
   423 F.3d 1343 (Fed. Cir. 2005) .................................................................19

*Gillette Co. v. Energizer Holdings, Inc.*,
   405 F.3d 1367 (Fed. Cir. 2005) .................................................................19

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
   527 F.3d 1379 (Fed. Cir. 2008) ..................................................................9

*Interactive Gift Express, Inc. v. Compuserve, Inc.*,
   256 F.3d 1323 (Fed. Cir. 2001) .................................................................28

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.*,
   106 F.3d 1563 (Fed. Cir. 1997) ..................................................................9

*Jones v. Hardy*,
   727 F.2d 1524 (Fed. Cir. 1984) .................................................................34

**TABLE OF AUTHORITIES**
*(cont'd)*

**Page No(s).**

*Kara Tech. Inc. v. Stamps.com, Inc.*,
   582 F.3d 1341 (Fed. Cir. 2009) ............................................................passim

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) ......................................................................8

*Markman v. Westview Instruments*,
   517 U.S. 370 (1996) ....................................................................................7

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................7, 8, 9, 13

*Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*,
   620 F.3d 1305 (Fed. Cir. 2010) ..........................................................9, 38, 39

*SRI Int'l v. Matsushita Elec. Corp.*,
   775 F.2d 1107 (Fed. Cir. 1985) (en banc) ....................................................8

*Sulzer Textil A.G. v. Picanol N.V.*,
   358 F.3d 1356 (Fed. Cir. 2004) ..................................................................10

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
   247 F.3d 1316 (Fed. Cir. 2001) ..................................................................34

*Terlep v. Brinkmann Corp.*,
   418 F.3d 1379 (Fed. Cir. 2005) ........................................................7, 13, 23

*Texas Instruments Inc. v. Int'l Trade Comm'n*,
   988 F.2d 1165 (Fed. Cir. 1993) ....................................................8, 15, 32, 34

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997) ............................................................passim

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
   473 F.3d 1173 (Fed. Cir. 2006) ..................................................................8

**OTHER AUTHORITIES**

35 U.S.C. § 112 ¶ 6 ..............................................................................9

## I.  INTRODUCTION

For more than a decade, Nomadix's innovations have been making it easier and easier for mobile computer users to obtain Internet access while traveling away from home.  Nomadix's innovations have also made it easier for hotels, restaurants, airports and others to provide Internet access to these traveling users.  Over the years, Nomadix has obtained many patents to protect its innovations, including the eight patents that Nomadix has asserted in this case to address the defendants' infringing conduct.

The scope of Nomadix's patent rights is defined by the language of the claims in the patents-in-suit.  The proper construction of these claims is a question of law.  Nomadix has reached agreement with the defendants on the construction of over thirty different claim terms, many of which are the constructions this Court adopted in *Nomadix, Inc. v. Second Rule LLC*, Case No. CV07-01946 DDP (VBKx).  These agreed-upon constructions are set forth in the Amended Joint Claim Construction Statement filed on February 22, 2011, and the parties respectfully request that the Court adopt them.  This brief addresses the proper construction of twenty-six claim terms from Nomadix's patents on which the parties could not reach agreement.

With few exceptions, claim terms are to be given their ordinary meaning, and the Federal Circuit has repeatedly warned that this ordinary meaning may not be narrowed by importing limitations into the claim language.  In every one of the twenty-six disputes now before this Court—without exception—the defendants violate these fundamental precepts and seek to import limiting language into Nomadix's patent claims.  In every single dispute, the defendants thus seek to depart from the ordinary meaning of the claim language and to narrow the scope of the claims with the apparent goal of advancing their non-infringement positions.

There are only four recognized exceptions to the principal rule that claim

terms must be given their ordinary meaning:  1) the patent applicants exhibited a clear intent to assign a special meaning to the term; 2) the patent applicants unambiguously limited the claim term, thereby surrendering claim scope; 3) the claim term has no ordinary meaning; or 4) the term is in means-plus-function format.   None of these circumstances supports any of the narrowing constructions proposed by the defendants.

For example, in ten of the disputes, the defendants' constructions would read an "internet [or IP] address" or "permanent IP address" requirement into the claim.   In each case, however, the disputed claim language says nothing about any address.   This is exactly the type of improper narrowing that the Federal Circuit has warned against.

In many cases, the defendants' improper narrowing blurs the clear distinctions in scope from patent claim to patent claim.  Like most patents, each of Nomadix's patents includes multiple claims, each using different words to set forth a different invention.  But the defendants simply disregard these linguistic differences and propose that the Court construe different words from different claims to mean the same thing.  The defendants thus want to reduce Nomadix's many inventions to just a few.  A few examples illustrate this point:

| First claim term | Second, different claim term | Defendants propose the same construction for both terms |
|---|---|---|
| foreign network | first network | network to which the user device is not normally connected and which corresponds to a local internet [or IP] address that is not the home internet [or IP] address |
| predetermined protocol | a call accounting record | a protocol that can be used to organize data related to telephone calls that includes fields corresponding to charged amount and phone number called |

The defendants' approach is inconsistent with the basic axiom that claim terms should receive their ordinary meaning.  The defendants' blatant attempt to equalize the scope of Nomadix's distinct patent claims by ignoring the differences in their wordings should be flatly rejected.

The defendants also fail to give due consideration to the fact that the Court's claim constructions will be used to instruct a jury.  Indeed, as illustrated by the examples above, the vast majority of the defendants' constructions make the patent claim longer, more complicated and more difficult to understand.

In contrast to the flawed approach taken by the defendants, Nomadix only proposes a construction in the few cases where further elaboration would assist a jury.  And when Nomadix does propose a construction, it consistently applies the ordinary meaning to the claim terms, maintains their original scope and uses language that would be understandable and helpful to jurors.

## II.  OVERVIEW OF NOMADIX'S ASSERTED PATENTS

Nomadix's patented inventions are widely used at hotels, airports and other public locations where mobile computer users demand Internet access.

### A.  The '892, '995, '009 and '727 patents[1]

Several of the patented inventions permit users to access the Internet even though their computers are not configured for the particular network they are visiting.  There are various reasons a computer might not be configured for a network, and Nomadix has patents addressing many of these distinct problems.

#### 1.  The '892 and '995 patents

When one computer needs to send data over the Internet to another computer that is not directly connected to it, it will send the data to an intermediate network device so that the intermediate device can forward it on to

---

[1]  Nomadix has asserted U.S. Patent Nos. 6,130,892; 7,554,995; 6,857,009; 7,088,727; 6,636,894; 7,194,554; 7,689,716; and 6,868,399.  For brevity, Nomadix refers to each by its last three digits.

1   the target.  In many cases, this intermediate network device is a "gateway" that

2   serves as the link to the rest of the Internet.

3       Laptops and other portable computers may be configured to connect to

4   only a certain network and to look only for their default gateway on that "home"

5   network.  When such laptops move to a new or "foreign" network and attempt

6   to connect to the Internet, they may have problems because their home gateway

7   will likely be unreachable.  *See*, *e.g.*, Ex. 1 ('892 patent) col.6, ll.9–14.[2]  The

8   laptops would normally have to be manually reconfigured for the foreign

9   network.  *See*, *e.g.*, *id.* at col.1, ll.49–59.

10       To facilitate connecting to foreign networks without reconfiguration, the

11   inventors of the '892 and '995 patents conceived of having a gateway on a

12   foreign network pretend to be the home network of a visiting computer.  *See*

13   *generally* Exs. 1 ('892 patent) and 3 ('995 patent).  By intercepting data packets

14   intended for the home network, the gateway on the foreign network can provide

15   Internet access to visiting computers without any need to reconfigure the

16   visiting computers.  Thus, for example, business travelers using company

17   laptops can readily use a hotel's network as easily as if they were at their

18   office's home network.

19   ## 2.   The '009 patent

20       The '009 patent addresses a different problem that a computer configured

21   for a home network might face.  A user's computer is often configured to use a

22   "proxy server" in the computer's home network.  A proxy server often makes

23   web page requests on behalf of the user, masking the user's identity from the

24   rest of the Internet.

25       When the user travels and attempts a web page request on a foreign

26   network, the user's computer will seek out its home proxy server, which does

27   

28   _____
   [2] All exhibits are attached to the declaration of Mark Lezama submitted
herewith.

not reside on the foreign network.  The inventors of the '009 patent conceived of
a gateway on the foreign network that pretends to be and fills in for the user's
home proxy server.  This innovation allows network access as expected by the
user's computer.  Without this solution, the user would need to reconfigure the
computer to access the Internet when traveling and connecting to a foreign
network.  *See generally* Ex. 4 ('009 patent).

### 3.     The '727 patent

Although continuing in the same vein of achieving network access for
users despite their computers' configurations, the inventors of the '727 patent
focused on still different problems.  Several of the inventions claimed in that
patent address situations where a user's computer has settings that are
incompatible with the network to which the user is trying to connect.  *See, e.g.*,
Ex. 2 ('727 patent) claim 11.  This problem can arise regardless of whether the
user's computer is configured for a home network.  For example, the user's
computer may simply have an Internet Protocol (IP) address that does not
belong on the network the user is connected to.  Like a normal postal address,
the user's IP address indicates where the user's requests were sent from and
where replies should be sent.  But if the user's IP address does not belong on a
network, then any expected replies will not reach the user.  Some of the
inventions of the '727 patent address this problem by replacing the incompatible
IP address with one that is compatible with the network.

### B.     The '894, '554 and '716 patents

Building on the innovation of a gateway that network operators could use
to ensure that all visitors will be able to use the network, the inventors of the
'894, '554 and '716 patents conceived that network operators could also use a
gateway to control and customize network access.  For example, the inventors
of the '894 patent conceived that the gateway could force a computer's web
browser to access a login web page (e.g., Hotel Login Page) instead of the

1   browser's home page (e.g., Google).  *See, e.g.*, Ex. 5 ('894 patent) col.3, ll.42–
2   59.  Among other things, this innovation has made it easy for hotel operators to
3   grant network access to guests only after they agree to pay for the service at the
4   hotel's login page.  The inventors of the '554 patent extended these concepts
5   and conceived of ways to use certain types of databases and data translations to
6   control access to the network.  *See generally* Ex. 6 ('554 patent).

7        The login page concept was further refined in the '716 patent, which
8   focuses on presenting the user with a web page that includes information based
9   on the user's location.  *See, e.g.*, Ex. 7 ('716 patent) col.35, ll.3–11.  For
10  example, the login page for a hotel could indicate different amenities available
11  to the guest based on the particular floor on which the user is located.

12       Importantly, these inventions are focused on controlling and customizing
13  network access, as opposed to the separate objective of facilitating access
14  despite obstacles presented by a visiting computer's configuration.   As a result,
15  these inventions generally apply whether or not the user's device is configured
16  for a home network.

17  **C.   The '399 patent**

18       Continuing to build on their innovations, Nomadix's inventors conceived
19  of integrating the gateway with existing, computer-based management systems,
20  including management systems used to track telephone usage like those found at
21  hotels.   The inventors of the '399 patent conceived that the gateway could
22  collect network usage data and communicate that information to the
23  management system as if it were telephone call information. Thus, the gateway
24  can format the network usage data to look like a telephone call record that the
25  management system is capable of processing.  *See, e.g.*, Ex. 8 ('399 patent)
26  col.7, ll.53–55.   The management system can then process the data to
27  automatically add network usage charges to users' bills.  The inventors of the
28  '399 patent also conceived of variations on this idea where the gateway does not

necessarily format the data to look like a telephone call record but instead simply organizes it according to a predetermined format that the management system expects. *See, e.g.*, *id.* at col.8, ll.13–19.

### III.  LEGAL STANDARDS FOR CLAIM CONSTRUCTION

Claim construction is an issue of law for the Court to decide. *Markman v. Westview Instruments*, 517 U.S. 370, 388 (1996). "The construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Terlep v. Brinkmann Corp.*, 418 F.3d 1379, 1382 (Fed. Cir. 2005). But often elaboration is neither necessary nor helpful. When the claim language is already clear, the Court need not construe the term just because one party has asked it to do so. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Claim construction "is not an obligatory exercise in redundancy." *Id.*

When construing a claim term would be helpful, the words of a claim are generally given their ordinary and customary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). This is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. That person is presumed to have read the patent's specification and prosecution history to better understand the context of the invention. *Id.* Thus, in determining the ordinary meaning of a claim term, the Court should consult all of the intrinsic evidence, including the claims themselves, the specification, and the prosecution history. *Id.* at 1313, 1316-17.

While the specification and prosecution history are useful guides in some cases, they do not define the legal scope of the invention. That is the function of the claims. *Id.* at 1312. Indeed, "[c]laim construction begins and ends in all cases with the actual words of the claim," *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (internal quotation marks omitted). The Federal Circuit has stressed the importance of the claims

in defining the scope of the invention:

- "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (internal quotation marks omitted).

- "Specifications teach. Claims claim." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985) (en banc).

- "The claims, not the specification embodiments, define the scope of patent protection." *Kara Tech. Inc. v. Stamps.com, Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009).

In *Phillips*, the Federal Circuit stressed that the plain meaning of the claim language is not to be narrowed by importing limiting language:

> [T]he line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms.  For instance, although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.  In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.

*Phillips*, 415 F.3d at 1323 (internal citations omitted); *see also Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906–08 (Fed. Cir. 2004); *SRI*, 775 F.2d at 1121.

Every word in the body of a claim limits the claim's scope, and so a construction should not read out claim terms or otherwise treat them as superfluous.  *Texas Instruments Inc. v. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993); *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed.

-8-

Cir. 2006).  Not only should each word be given meaning, but different words are presumed to have different meanings. *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co.*, 224 F.3d 1308, 1317 (Fed. Cir. 2000).

In short, claim terms are entitled to their ordinary meaning, nothing more, nothing less.  There are only four exceptions to this rule.

1) Patent applicants may exhibit a clear intent to assign a special meaning to a claim term.  *E.g.*, *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008); *see also Phillips*, 415 F.3d at 1316.

2) A claim term will not receive the full breadth of its ordinary meaning if the patent applicants unambiguously limit the claim term, thereby surrendering claim scope.  *E.g.*, *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374–75 (Fed. Cir. 2008); *see also Phillips*, 415 F.3d at 1316.  However, "an express disclaimer sufficient to limit the scope of the claims . . . requires expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1315 (Fed. Cir. 2010) (citations omitted).

3) A claim term may have no ordinary meaning.  *E.g.*, *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1568 (Fed. Cir. 1997).

4) If a claim term is expressed in "means-plus-function" format, then its meaning is determined according to special claim construction rules.  35 U.S.C. § 112 ¶ 6; *see also, e.g.*, *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).

None of these exceptions applies to the terms at issue here.

/ / /

/ / /

## IV.  CONSTRUCTION OF DISPUTED CLAIM TERMS

The defendants consistently propose constructions that would import limitations from the specification and thereby narrow the scope of Nomadix's patent claims.  Because they add unwarranted limitations and depart from the ordinary meaning of the claims, the defendants' constructions are often complicated and themselves in need of further clarification.  They would therefore not assist a jury in understanding the scope of the claims.

That unhelpfulness is problematic because "it is the duty of trial courts in patent cases in which claim construction rulings on disputed claim terms are made prior to trial and followed by the parties during the course of the trial to inform jurors both of the court's claim construction rulings on all disputed claim terms and of the jury's obligation to adopt and apply the court's determined meanings of disputed claim terms to the jury's deliberations of the facts." *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004).  And when a court uses constructions to instruct the jury, it must ensure that the jurors are not left with questions concerning the scope of the inventions.  *Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009).

Indeed, in most cases, the claim language in Nomadix's patents is already clear and does not require construction.  Accordingly, Nomadix only proposes constructions when clarification would actually help a jury.  In those cases, Nomadix uniformly proposes constructions that give the claim terms their ordinary meaning.

/ / /

/ / /

A.      Terms related to "home" versus "foreign" networks

      1.      "home" and "foreign" networks ('892, '727 and '009 patents)

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| home network<br><br>'892: claim 1<br>'727: claim 20<br>'009: claims 1, 23 | network to which the user device is configured to be connected | network to which the user device is configured to be connected and which corresponds to the home internet [or IP] address |
| foreign network<br><br>'892: claims 1, 5, 8<br>'009: claims 1, 23 | a network other than the home network | network to which the user device is not normally connected and which corresponds to a local internet [or IP] address that is not the home internet [or IP] address |

A device's "home" network is the network that it is configured for.  Any other network is a "foreign" network.  The defendants complicate these simple concepts by introducing extra limitations that the claims do not require.

This Court considered each of the '892, '727 and '009 patents in the *Second Rule* case, and while it did not formally construe "home network" or "foreign network," the Court properly captured the ordinary meanings of those terms in its claim construction order:

> Most computers are configured so that they communicate with a "home" network. When a user travels with his laptop computer, he is no longer connected to the home network. Thus, when the user seeks to connect to the internet in, for example, an airport, his computer will send data addressed to the home network. Some of the claimed inventions intercept and/or modify data coming from a user's device as the device seeks to connect as usual to its home network, and then facilitate automatic and transparent connections to a foreign network.

Ex. 9 (*Second Rule* Am. Claim Constr. Order) at 2–3.

-11-

The claim language itself confirms the Court's understanding.  Claim 1 of the '892 patent recites "a user device configured to communicate with a home network."  Very similarly, claim 20 of the '727 patent recites that "the user device is configured to communicate over a home network."  And claim 1 of the '009 patent recites "a device having network settings configured for communication over a home network."  Many of the claims contrast the home network with a "foreign network" to which the user is trying to connect.  *E.g.*, Ex. 1 ('892 patent) claim 1; Ex. 4 ('009 patent) claim 1.

The specifications of these patents further confirm that a "home" network is simply a network to which the user device is configured to connect and that any network distinct from the home network is "foreign."  For example, both the '892 and '727 patents are directed to providing network access to "a laptop computer . . . which is configured to be connected to a local home network" but that has traveled outside its home network.  Ex. 1 ('892 patent) col.1, l.67 – col.2, l.2 (emphasis added); Ex. 2 ('727 patent) col.2, ll.6–8.  The patents further describe embodiments where the user device is "configured to communicate with a particular gateway or other **home** device at its base location."   Ex. 1 ('892 patent) col.6, ll.7–9 (emphasis added);  Ex. 2 ('727 patent) col.6, ll.9–11.  Similarly, the '009 patent describes that, to access a network at its base location, a laptop may be "configured in accordance with [a] standard" required by a network administrator.   Ex. 4 ('009 patent) col.1, ll.19–26.  The network that the laptop is configured for is the "home" network and when the user travels to a "different (foreign)" network he may need to reconfigure his laptop.  *Id.* at col.1, ll.27–32.

The defendants depart from the ordinary meanings by importing limitations that the claims do not require.  Specifically, the defendants urge that a home network must "correspond" to "the home internet [or IP] address."  The defendants similarly urge that a foreign network must "correspond" to "a local

-12-

internet [or IP] address" that is not the "the home internet [or IP] address."  But the claims do not require that a home or foreign network "correspond" to any address, let alone the particular addresses mentioned in the defendants' constructions.  Importing these limitations is improper.  *Phillips*, 415 F.3d 1323 ("[W]e have repeatedly warned against confining the claims to [specific] embodiments."); *Kara Tech.*, 582 F.3d at 1345 (same).

Not only do the defendants import limitations, they introduce ambiguity and complexity:

- The defendants use "home" to define "home network," which is circular and will not help a jury.

- The defendants also would require a home or foreign network to "correspond to" an address.  But it is unclear what it means for a network to "correspond to" an address.

- The claims do not recite a "home internet [or IP] address," so a jury would not understand what the defendants mean by "**the** home internet [or IP] address."

- It is unclear what the "local internet [or IP] address" is "local" to.

- A network ordinarily has many devices associated with it, each of which has an address, so it is unclear to which "local internet [or IP] address" the defendants are referring.

- It is unclear what the square brackets in the defendants' constructions signify or how the defendants intend they would be communicated to a jury.

Introducing these ambiguities defeats the point of construing the claims.  Claim construction should clarify claim scope, not obscure it.  *See Terlep*, 418 F.3d at 1382; *see also Every Penny*, 563 F.3d at 1383 (party's vague construction itself needed interpretation).

/ / /

1

2

### 2. "the user host device is configured to communicate through a home gateway . . ." ('995 patent)

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| the user host device is configured to communicate through a home gateway by using an IP address of the home gateway<br><br>'995: claims 1, 17, 24, 40 | No construction is necessary | user device is configured with a permanent IP address to communicate through a home gateway |
| home gateway<br><br>'995: claims 1, 17, 24, 40 | No construction is necessary | gateway to which the user device is configured to be connected and which corresponds to the home internet [or IP] address |

The defendants argue that the phrase "the user host device is configured to communicate through a home gateway by using an IP address of the home gateway" should be construed. The defendants also urge that the term "home gateway" within this phrase needs to be construed.

These terms do not require construction because their meaning is evident from the claim language itself. The "home gateway" is the gateway through which "the user host device is configured to communicate." Ex. 3 ('995 patent) claims 1, 17, 24, 40. The claim language also specifies how the user host device is configured to communicate through the home gateway: "by using an IP address of the home gateway." *Id.* Thus, the claim language is clear on its face. Further elaboration is unnecessary.

The defendants' proposed constructions distort the claim language and make it harder to understand, which is exactly why it would be unhelpful to

construe these already clear terms.  Combining the defendants' construction of "home gateway" with their construction of the larger phrase results in the following:

| Claim Language | Defendants' Combined Construction |
|---|---|
| the user host device is configured to communicate through a home gateway by using an IP address of the home gateway | user device is configured with a permanent IP address to communicate through a gateway to which the user device is configured to be connected and which corresponds to the home internet [or IP] address |

The result is convoluted and twice as long as the original claim language.  It will not help a jury.

In addition to being unhelpful, the defendants' constructions are incorrect.  The defendants import limitations, improperly narrowing "IP address" to "permanent IP address" and requiring that the gateway "correspond" to "the home internet [or IP] address."  As with the '892, '727 and '009 patents, the claims of the '995 patent do not recite a "home internet [or IP] address."  The defendants also change the meaning of the claim language by omitting that the IP address is the IP address "of the home gateway." But "courts can neither broaden nor narrow claims to give the patentee something different than what he has set forth."  *Texas Instruments*, 988 F.2d at 1171.

Claim construction "is not an obligatory exercise in redundancy," and the Court should decline the defendants' invitation to muddle and distort the already clear claim language.  *U.S. Surgical Corp.*, 103 F.3d at 1568.

/ / /

/ / /

-15-

### 3.     "a foreign gateway"  ('995 patent)

| Term | Nomadix's Construction | Defendants' Construction[3] |
|---|---|---|
| a foreign gateway<br><br>'995: claims 1, 17, 24, 40 | a gateway not on a network of the home gateway | gateway to which the user device is not normally connected and which corresponds to a local internet [or IP] address that is not the home internet [or IP] address<br><br>*Wayport's alternative:* gateway that does not correspond to the permanent IP address for which the user host device is configured |

The parties agree that "foreign gateway" in the '995 patent should be construed.  Nomadix's construction gives the term its ordinary meaning, while the defendants' two constructions both sharply depart from it.

The '995 patent uniformly indicates that "foreign" refers to a network different or remote from the home network that the user's device is configured for.  For example, some embodiments of the invention "provide a translation between the host computer configuration and the configuration of the **remote or foreign network** to which the host computer is currently attached."  Ex. 3 ('995 patent) col.7, ll.6–12 (emphasis added).  As another example:  "when utilized as a fixed nomadic router in a hotel or multiple dwelling unit, the nomadic router will have already learned (or been manually configured for) the **remote/foreign network**."  *Id.* at col.11, ll.59–65 (emphasis added).  Thus, the intrinsic record indicates that a "foreign gateway" is a gateway on a foreign network, i.e., a gateway not on the home network that the user device is configured for.

---

[3] The defendants construed "foreign gateway" (without the "a").

1        The claims of the '995 patent do not explicitly recite a "home network"
2 but do specify that the user host device is configured to communicate with a
3 "home gateway."  *Id.* at claims 1, 17, 24, 40.  Accordingly, in the context of the
4 claims, "a foreign gateway" is "a gateway not on a network of the home
5 gateway."

6        The defendants' first construction narrows this ordinary meaning by
7 importing unwarranted limitations.  Just as with the "home" and "foreign"
8 network terms, the defendants again inject a requirement relating to "the home
9 internet [or IP] address," even though the claims neither refer to nor require
10 such an address.  And it is again unclear what the "local internet [or IP] address"
11 is "local" to.  The defendants' construction must be rejected.  *Kara Tech.*, 582
12 F.3d at 1345 (importing limitations is improper); *Every Penny*, 563 F.3d at 1383
13 (party's vague construction would have needed its own construction).

14        Wayport, recognizing that the other defendants' construction is
15 problematic, proposes an alternative construction that eliminates the references
16 to "the home internet [or IP] address" and "local."  But Wayport's construction
17 is ultimately no better, as it impermissibly imports a "permanent" IP address
18 limitation.  *See Kara Tech.*, 582 F.3d at 1345.

19        Still worse, neither of the defendants' constructions adequately describes
20 a gateway that is "foreign."  The defendants first propose that a foreign gateway
21 is one that the user host device is not "normally" connected to.  That is too
22 vague: it is unclear how often a device must connect to a network to be
23 "normally connected" to it.  *Cf. Every Penny*, 563 F.3d at 1383 (constructions
24 should not leave jurors with questions as to the scope of the claim).  Moreover,
25 "normally" appears to narrow the claims so that they only apply when a user
26 does not frequent a particular location.  Simply put, "not normally connected to"
27 is neither equivalent to nor as precise as "not on a network of the home
28 gateway."

1    Wayport's alternate proposal is again no better.  While Wayport avoids

2    the ambiguity of "normally," it incorrectly specifies that a gateway is "foreign"

3    if it "does not correspond to the permanent IP address for which the user host

4    device is configured."  A gateway is not "foreign" simply because it does not

5    have a particular IP address.  What makes a gateway "foreign" is that it is on a

6    different network than the home gateway.  *See* Ex. 3 ('995 patent) col.11, ll.59–

7    65 (describing embodiment of the invention as a router installed at a

8    "remote/foreign network").

9    The Court should preserve the claim's ordinary meaning and construe "a

10   foreign gateway" as "a gateway not on a network of the home gateway."

11   **B.    Terms that the defendants incorrectly construe as relating to "home"**

12   **versus "foreign" ('727 and '716 patents)**

13   While the inventions disclosed in the '892, '995 and '009 patents address

14   home versus foreign configuration problems, many inventions in the '727 and

15   '716 patents are not limited to addressing such problems.  Accordingly, these

16   inventions apply not only to user devices that are configured for home networks,

17   but also to those that are not so configured.  In particular, most of the claims that

18   Nomadix has asserted from the '727 patent do not assume anything about

19   whether a device is configured for a home network.  Rather, the claimed

20   inventions generally correct for various incompatibility problems, including

21   some incompatibilities that do not arise out of a device being configured for a

22   home network.  Furthermore, the inventions in the '716 patent are focused on

23   presenting a user with a web page containing information based on the location

24   at which the user device is connected to the network.  The claims of the '716

25   patent are entirely indifferent as to whether the user device is configured for a

26   home network or misconfigured for any network.

27   Despite the clear conceptual differences among Nomadix's inventions,

28   the defendants seek constructions that would impose a home versus foreign

-18-

network framework on both the '727 and '716 patents.  By trying to impose the same interpretation on terms from these patents and on different terms from the '892, '995 and '009 patents, the defendants are trying to blur the distinctions among the differing inventions claimed in these separate patents.  Not only does this ignore that the claims of the '727 and '716 patents set forth different inventions from those of the other patents, it improperly narrows the scope of the '727 and '716 patent claims.  Nor do the defendants stop there.  The defendants import even further limitations that the intrinsic evidence does not support.

### 1.   "first network" ('727 patent)

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| first network<br><br>'727: claims 19, 20 | No construction is necessary | network to which the user device is not normally connected and which corresponds to a local internet [or IP] address that is not the home internet [or IP] address |

The term "first network" in claims 19 and 20 of the '727 patent is easily understood and does not require construction.   Indeed, the defendants' construction uses the word "network," which means that the defendants really only seek to construe "first."  But using ordinal phrases like "first" and "second" in a patent claim "is a common patent-law convention to distinguish between repeated instances of an element or limitation."  *Free Motion Fitness, Inc. v. Cybex Int'l*, 423 F.3d 1343, 1348 (Fed. Cir. 2005) (internal quote marks omitted); *see also Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1373 (Fed. Cir. 2005).  In other words, "first" does not carry any significance except to help distinguish a referenced "network" from a subsequently referenced "network."  Accordingly, "first" need not be construed.  *U.S. Surgical Corp.*,

1    103 F.3d at 1568.

2         Even if the Court were to find construction warranted, the defendants'

3    construction must be rejected.   The defendants' proposed construction is

4    identical to the construction they proposed for "foreign network."   In other

5    words, the defendants seek to equate "first network" with "foreign network,"

6    which constitutes an obvious and improper departure from the ordinary meaning

7    as well as an improper blurring of the plain distinction that should be preserved

8    between linguistically different claim terms.

9         Simply put, "first network" by itself refers to any network, not necessarily

10   a foreign network.

11        **2.    "network location of the user host device" ('716 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| network location of the user host device<br><br>'716: claim 1 | No construction is necessary. However, if the Court is inclined to construe the term, Nomadix proposes:<br><br>a location at which the user host device is connected to the network | connection port through which the user host device configured with a permanent IP address of the home network accesses the network |

19        The defendants ask the Court to construe the term "network location of

20   the user host device" in claim 1 of the '716 patent.   "Network location of the

21   user host device" is easily understood and does not require construction.   *U.S.*

22   *Surgical Corp.*, 103 F.3d at 1568.   Nonetheless, if the Court is inclined to

23   construe the term, it should construe it as "a location at which the user host

24   device is connected to the network."

25        The intrinsic record confirms this understanding.   Claim 1 is directed to a

26   gateway that determines the user host device's network location.   The

27   specification describes corresponding embodiments that identify "the location

28   from which requests for access to the network are transmitted."   Ex. 7 ('716

-20-

patent) col.5, ll.59–61.  Claims 25–35 depend from claim 1 and give examples of the user host device's network location.  For example, the network location can be "a hotel room," "an apartment address," a "floor within a building" or the "building" itself.  *Id.* at claims 25, 26, 30, 32.  In short, "network location of the user host device" simply means "a location at which the user host device is connected to the network."

The defendants' construction improperly narrows the scope of claim 1 in at least three ways.  In particular, the defendants are trying to insert a "home network" limitation, a "permanent IP address" limitation, and a "connection port" limitation.  However, nothing about claim 1 requires the user host device to be configured for a home network.  Nothing in the claim or other intrinsic evidence requires the user host device to have a permanent IP address.  And nothing in the intrinsic evidence establishes that the location must be limited to a port.  To the contrary, "network location" is broader and can refer to a floor within a building or even the entire building.  Ex. 7 ('716 patent) claims 30, 32; *Kara Tech.*, 582 F.3d at 1345 (claims are not limited to specific embodiments).

If the Court is inclined to construe this term, it should give it its ordinary meaning of "a location at which the user host device is connected to the network."

### 3. "external network location" ('716 patent)

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| external network location<br><br>'716: claims 1, 55 | No construction is necessary. However, if the Court is inclined to construe the term, Nomadix proposes:<br><br>a network location external to the network location of the user host device | location for a network to which the user device is not normally connected and which corresponds to a local internet or IP address that is not the home internet [or IP] address |

-21-

1      The defendants also ask the Court to construe "external network location"

2   in claims 1 and 55 of the '716 patent.  This is another easily understood term

3   that does not require construction.  *U.S. Surgical Corp.*, 103 F.3d at 1568.

4   However, if the Court is inclined to construe the term, "external network

5   location" means "a network location external to the network location of the user

6   host device."

7      "External network location" appears in claim 1 along with a reference to

8   the user device's network location:

9          1. A network gateway . . . comprising:

10         a user-device-location-detection module that determines **a network**

11             **location of the user host device** . . . ; and

12         a network-packet-translation module configured to modify at least one

13             user network packet transmitted from the user host device to an

14             **external network location** . . . .

15   By juxtaposing these two "network locations," the claim language itself

16   establishes that "external" means external relative to the user host device's

17   location.  In particular, a packet is transmitted "from" the user host device "to"

18   the external network location.  Thus, "external network location" means "a

19   network location external to the network location of the user host device."

20      The defendants' construction drastically narrows the plain meaning of

21   "external network location" by importing at least five limitations.  According to

22   the defendants, 1) the location must be a location of an entire network; 2) that

23   network must be one that the user host device is not "normally" connected to; 3)

24   the network must "correspond to" an address; 4) that address must be a "local"

25   address; and 5) that local address cannot be "the home internet [or IP] address."

26   Thus, in yet another attempt to blur the distinctions among Nomadix's

27   inventions, the defendants are trying to force a "home network" versus "foreign

28   network" framework on the claim.

-22-

But these limitations do not appear anywhere in the claims, nor are they required by the other intrinsic evidence.  Moreover, nothing in the claim language, specification or prosecution history permits restricting the claim to apply only where the user host device is configured for a home network. Indeed, whether the user host device has a home network is completely irrelevant to providing a login page that includes information based on the user host device's network location.  *E.g.*, Ex. 7 ('716 patent) col.28, ll.12–16.  The defendants' importation of limitations to shoehorn the claims into a home/foreign framework is improper.  *Kara Tech.*, 582 F.3d at 1345 (claims are not limited to specific embodiments).

Furthermore, it is again unclear how to determine when a network is one that the user device is not "normally" connected to, how a network "corresponds to" an address, what the "local internet or IP address" is "local" to, and which address is "**the** home internet [or IP] address."  Once more, adopting a construction that makes the claim language less clear defeats the very point of claim construction.  *See Terlep*, 418 F.3d at 1382; *see also Every Penny*, 563 F.3d at 1383.

In short, if the Court is inclined to construe "external network location," it means "a network location external to the network location of the user host device."

**C.** **Incompatibility and incorrect configurations ('727 patent)**

    **1.** **"incompatible private IP address" terms ('727 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| user device having an incompatible private IP address<br><br>'727: claim 11 | user device configured with a private IP address not compatible with the network | User device configured with a permanent IP address from the home network |

-23-

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| incompatible private IP address<br><br>'727: claim 11 | private IP address not compatible with the network | a unique IP addresses that can never match the unique private IP address of the user device |

The parties agree that "user device having an incompatible private IP address" in claim 11 of the '727 patent requires construction. The parties further agree that, in this context, "user device having" means "user device configured with." Thus, the parties' dispute focuses on the meaning of "incompatible private IP address." Nomadix's proposed construction gives the term its ordinary meaning, whereas the defendants propose two constructions that conflict with one another. Neither of the defendants' constructions preserves the ordinary meaning of the claim.

In its entirety, claim 11 recites:

11. A method for providing access to a network utilizing private IP addresses for a user device having an incompatible private IP address, the method comprising:

intercepting data transmitted by the user device containing the incompatible private IP address;

modifying the data using a private IP address compatible with the network private IP addresses; and

transmitting the modified data on the network.

Claim 11 thus recites a method where data containing the user device's "incompatible" private IP address is intercepted and modified with a compatible private IP address. The modified data is transmitted on the network. Therefore, the claim language itself strongly suggests that "incompatible" means "not compatible with the network." The specification confirms this meaning. *See* Ex. 2 ('727 patent) col.1, ll.23 – col.2, l.2 (when mobile computers visit a

-24-

network they likely will be not be configured to successfully communicate on that network).

The defendants' constructions depart from the ordinary meaning of the claim term by failing to include the claimed incompatibility and also by failing to include that the address must be private.  Whereas the defendants read out "incompatible" and "private," they import limitations that are not supported in the claims, like that the IP address must be "permanent" and "unique."  Moreover, the defendants' construction of the larger phrase inexplicably refers to "the home network," which does not appear in the claim.  Thus, the defendants once again seek to shoehorn the claim into a home versus foreign network framework, and once again improperly blur distinct inventions that are defined by different words in different claims.  In addition, the defendants' construction of "incompatible private IP address" is inconsistent with their construction of the larger phrase—they appear to give two distinct definitions to the term.

Apart from being inconsistent with their construction of the larger phrase, the defendants' construction of "incompatible private IP address" simply makes no sense.  The defendants urge that the incompatible private IP address "can never match the unique private IP address of the user device."  But claim 11 plainly specifies that the incompatible private IP address *is* the IP address of the user device.

The Court should construe "user device having an incompatible private IP address" to mean "user device configured with a private IP address not compatible with the network."

/ / /

/ / /

## 2. "incorrectly configured messages" ('727 patent)

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| incorrectly configured messages<br><br>'727: claim 19 | No construction is necessary | messages addressed to an incorrect address. |

The term "incorrectly configured messages" is easily understood and does not require construction. The defendants seek to improperly limit this term to just one kind of incorrectly configured message: one that is "addressed to an incorrect address."

As an initial matter, the defendants seek to limit claim 19 so that it applies only in absurd circumstances. By "incorrect address," the defendants propose that the user's computer made a mistake in picking the destination of the message: e.g., the user typed in "www.google.com" but his browser addressed the resulting message to a Yahoo web server. The defendants' construction is contrary to the specification, which makes plain that "incorrectly configured" just means that the message is not properly configured for use with the network (the "first network" recited in clam 19). *E.g.*, Ex. 2 ('727 patent) col.13, l.24 – col.14, l.57 (describing packet translation that serves to correct messages not properly configured for use with the network).

Indeed, claim 19 itself indicates that in at least some instances it will be the user device's own address, though it is in no way itself incorrect, that causes a message to be incorrectly configured:

19. A method for providing connectivity to a first network for a user device, the user device having a permanent address, the method comprising:

intercepting user device messages . . . having the permanent address of

the user device as a source address; and

modifying incorrectly configured messages . . . , wherein modifying . . . includes **substituting the permanent address of these messages with a router address as the source address, wherein the router address is an address recognized by the first network**.

Claim 19 thus plainly contemplates that, in at least some cases, messages are incorrectly configured based on the user's address, which is rectified by replacing the user's address with an address recognized by the first network. Thus, while the message may be incorrectly configured for compatibility, the user's address is not "incorrect." The defendants' attempt to limit the claim to messages with an "incorrect address" is thus contrary to the claim language itself.

Moreover, the defendants seek to limit the claim to apply only to messages "addressed to" an incorrect address, meaning that the incorrect configuration would have to appear in a **destination** or **target** address field. But as the claim language itself shows, the configuration problem may stem from a **source** address. Ex. 2 ('727 patent) claim 19 (reciting "substituting the permanent address of these messages with a router address as the source address").

In short, the defendants' construction is improperly narrow and, in any event, no construction is necessary.

**D.    The '894 patent**

**1.    The order of steps of all claims ('894 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| [the order of steps of all claims]<br><br>'894: claims 1–11 | No construction is necessary | The steps of all the claims must be performed in the order listed |

1    The defendants argue that the Court should construe all of the claims in
2    the '894 patent to require that each "step" be performed in precisely the order in
3    which it is recited in the claim.  The defendants are wrong.  As an initial matter,
4    the '894 patent includes two categories of claimed inventions.  Half the claims
5    recite methods (claims 1–5), while the other half recite systems (claims 6–11).
6    The recited systems are made up of components, not steps, so the defendants'
7    position does not make sense for claims 6–11.  And while the methods of claims
8    1–5 are made up of steps, requiring all of those steps to be performed in the
9    order listed would improperly narrow the claims.

10             a.       **The method claims do not require all their steps to be**
11                      **performed in order**

12    The Federal Circuit has repeatedly observed that, as a general rule, it is
13    erroneous to construe the steps of a method claim as necessarily occurring in the
14    order in which they are recited.  *See, e.g.*, *Altiris, Inc. v. Symantec Corp.*, 318
15    F.3d 1363, 1369–71 (Fed. Cir. 2003);  *Interactive Gift Express, Inc. v.*
16    *Compuserve Inc.*, 256 F.3d 1323, 1343 (Fed. Cir. 2001).  In determining
17    whether to depart from the general rule, a court must start with the claim
18    language itself and assess whether an order not expressly recited must
19    nonetheless be inferred; if not, then the court looks to the specification to
20    determine whether it requires such a narrow construction—all while exercising
21    care not to import any limitation from any particular embodiment.  *See*
22    *Interactive Gift*, 256 F.3d at 1343.

23    Here, claim 1 of the '894 patent recites:

24    1. A method for redirecting an original destination address access
25       request to a redirected destination address, the method comprising the
26       steps of:

27       receiving, at a gateway device, all original destination address access
28            requests originating from a computer;

-28-

1      determining, at the gateway device, which of the original destination

2          address requests require redirection;

3     storing the original destination address if redirection is required;

4     modifying, at the gateway device, the original destination address

5          access request and communicating the modified request to a

6          redirection server if redirection is required;

7     responding, at the redirection server, to the modified request with a

8          browser redirect message that reassigns the modified request to an

9          administrator-specified, redirected destination address;

10     intercepting, at the gateway device, the browser redirect message and

11          modifying it with the stored original destination address; and

12     sending the modified browser redirect message to the computer, which

13          automatically redirects the computer to the redirected destination

14          address.

15      As an initial matter, there is no language in claim 1 that explicitly requires

16 that each of its steps be performed in the order recited. Nor is there any implicit

17 order that applies to all steps.[4] Examining a few of the steps as examples makes

18 this clear.

19      First, the "receiving" step expressly refers to the receiving of "all original

20 destination address access requests originating from a computer." This would

21 include receiving, for example, each of the requests issued from a web browser

22 to access particular web sites, such as www.google.com or www.yahoo.com or

23 www.facebook.com. The very next step expressly refers to "determining"

24 which access requests require redirection. But the claim language does not

25 require that the "determining" step occur only after all access requests are

26 received. For example, if the Yahoo and Facebook requests are received after

27

---

    [4] In fact, the claim language makes clear that the claimed method
28 performs some of the steps only conditionally.

-29-

the Google request, there is no reason that determining whether to redirect the Google request cannot occur before or at the same time as receiving the Yahoo and Facebook requests.  Similarly, claim 1 does not require "storing" to occur only after all the access requests are received.

As another example, there is nothing in the claim language that requires that the first "modifying" step be performed only after the "storing" step.  These examples make clear that the defendants' proposed construction of requiring all steps to be performed in the order recited is incorrect and would thus improperly narrow the scope of the claim 1.  *See Altiris*, 318 F.3d at 1369.

The defendants' proposed construction is also incorrect in requiring that all steps be performed in recited order in claims 2–5.  These are dependent claims that include all of the steps of claim 1.  Nothing in claims 2–5 affects whether the steps incorporated from claim 1 must be performed in any order and thus the defendants' contention fails for claims 2–5 for at least the reasons it fails for claim 1.

**b.      To the extent the defendants' position could even apply to system claims, claims 6–11 also do not require a strict order**

Claim 6 is a "system" claim.  Rather than listing a series of steps as claim 1 does, claim 6 recites a number of items or components that comprise the claimed system.  Thus, as an initial matter, the defendants' proposed construction that "the steps" of claim 6 must be performed in the order listed is nonsensical.  The same is true for claims 7–11, which are dependent claims based on claim 6, and which also recite systems and not methods.

Even if one were to treat as "steps" the actions that are recited in claim 6 in association with the identified components, there is still no language in the claim requiring that these actions be performed in the order listed.  The absence

/ / /

-30-

of strict ordering language is evident simply from examining an excerpt of the claim language associated with the gateway device:

> a gateway device in communication with the computer, that . . . stores the original destination address request if redirection is required and modifies the original destination address request if redirection is required

Nothing in the above claim language (or in any other language of claim 6) requires the gateway device to modify the original destination address request only after storing it.  Thus, even if the actions are improperly treated as claimed "steps," the proper scope of claim 6 includes modifying before storing, modifying during storing, and modifying after storing.  Like the other examples identified above, this example plainly shows that the defendants' proposed construction cannot be correct.  Because claims 7–11 include the entire system recited in claim 6 and do not narrow the system of claim 6 to any particular order, the example applies equally to claims 7–11 to show that the defendants' proposed construction is incorrect.

For all of the above reasons, it would be improper to limit any of claims 1–11 to require that each step be performed in the order recited.  Accordingly, the Court should reject the defendants' proposed construction.

### 2. "administrator" ('894 patent)

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| administrator<br><br>'894: claims 1, 5, 6 | No construction is necessary | a person who administers the gateway device |

The term "administrator" is well understood and needs no construction. The defendants seek to improperly narrow the claimed "administrator" by reading into the claim "a person who administers the gateway device."  It is fundamental that "[c]laim construction begins and ends in all cases with the

1    actual words of the claim," *Becton*, 616 F.3d at 1254 (Fed. Cir. 2010) (internal

2    quotation marks omitted), and there is nothing in the present claim language that

3    characterizes or limits the claimed "administrator."   "[C]ourts can neither

4    broaden nor narrow claims to give the patentee something different than what he

5    has set forth." *Texas Instruments*, 988 F.2d at 1171.

6        Additionally, the defendants' proposed construction itself shows that

7    "administrator" needs no construction.   Indeed, the defendants use the term

8    "administer" to define "administrator."   The defendants' own position that the

9    term "administer" would be clear and helpful to a jury completely undercuts

10   their principal assertion that the term "administrator" requires construction in

11   the first place.  The term "administrator" is in fact well understood and needs no

12   construction.

13   **E.    The '554 patent**

14        **1.    "determining access" terms ('554 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| determines the access rights of the source, wherein access rights define the rights of the source to access destination sites via the network<br><br>'554: claim 10 | No construction is necessary | once the source is authenticated to access the network, determines the rights of the source to access particular destination sites via the network based upon the identity of the source and the content and/or destination requested |

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| determining the access rights of the source based upon the identification of the source, wherein the access rights define the rights of the source to access destination sites via the network<br><br>'554: claim 17 | No construction is necessary | once the source is authenticated to access the network, determining the rights of the source to access particular destination sites via the network based upon the identity of the source and the content and/or destination requested |

The defendants seek construction of terms in claims 10 and 17 of the '554 patent that are directed toward the determination of rights to access destination sites via a network. But these terms are well understood and need no construction. Indeed, the defendants' proposed constructions do nothing to clarify the claim language. The defendants just re-order the words that already appear in the claim limitations. The only words in the original claim limitations that do not appear in the defendants' proposed constructions are "wherein" and "define," and the defendants make no attempt to construe either of those words.

Since the defendants' constructions repeat the original claim limitations, the additional language in their constructions only serves to improperly narrow the claims. Indeed, the defendants would spuriously require authenticating a source as a precondition to the determination of access rights. More particularly, according to the defendants, it is only "once the source is authenticated to access the network" that access rights can be determined. But, again, "[c]laim construction begins and ends in all cases with the actual words of the claim," *Becton*, 616 F.3d at 1254 (internal quotation marks omitted), and there is no mention anywhere in claim 10 or claim 17 of any "authenticating" or that anything need be "authenticated." Thus, the precondition that the defendants seek to import is improper.

Moreover, the defendants would further improperly narrow claims 10 and 17 by requiring that the recited determination of access rights be "based upon the identity of the source and the content and/or destination requested."   But no language in either of the claims suggests that any determination of access rights is based on "content" or "destination requested."   And indeed, nothing in claim 10 suggests that any "identity of the source" plays any role in determination of access rights.   Importing limitations to narrow the scope of Nomadix's patent claims is improper.  *Texas Instruments Inc.*, 988 F.2d at 1171.

Finally, the defendants wholly ignore the differences between the term from claim 10 and the term from claim 17.  Claim 17 requires "determining the access rights of the source **based upon the identification of the source**," whereas claim 10 is silent as to a basis for the determination.  Claim 10 simply requires "determin[ing] the access rights of the source."   Despite the unmistakable linguistic distinction between these claim limitations, the defendants seek to assign the limitations virtually identical meanings.  It is fundamental that each claim of a patent is a distinct invention, *Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984), and it is also fundamental that words in patent claims may not be considered mere surplusage, *e.g.*, *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1325 (Fed. Cir. 2001).   Thus, the defendants' attempt to collapse the separate inventions of claims 10 and 17 into a single invention must be rejected.

/ / /

/ / /

## 2.     "regardless of network configurations" ('554 patent)

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| regardless of network configurations<br><br>'554: claims 10, 17 | No construction is necessary. However, if the Court is inclined to construe the term, Nomadix proposes:<br><br>regardless of network address settings | regardless of the hardware, MAC addresses, IP addresses, and networking protocols used by the network and the source computer |

The term "regardless of network configurations" is well understood and needs no construction.  As an initial matter, the defendants are not construing "regardless of" as they repeat those very words in their proposed construction.  Thus, in essence, the defendants are proposing that only "network configurations" be construed.  The need for such construction, however, is belied by the various constructions that the defendants are now proposing to use to instruct the jury in connection with other claim terms.  In particular, the defendants are already proposing that the jury be instructed with phrases such as (1) "**network** to which the user device is **configured** to be connected," *HP* Docket No. 248 ("Amended JCCS") at 2 ("home network"); and (2) "the user host device **configured** with a permanent IP address of the home **network**," *id.* at 4 ("network location . . ..").  The defendants cannot explain why "network configurations" would somehow be confusing when they must believe that lay jurors would understand the words "configured" and "network."  The term "regardless of network configurations" needs no construction.

If the Court is nonetheless inclined to consider construing this term, it should not adopt the construction proposed by the defendants for at least the simple reason that, as used in claims 10 and 17 of the '554 patent, "network configurations" does not mean "hardware, MAC addresses, IP addresses, and networking protocols used by the network and the source computer" as the defendants propose.  Instead, as discussed below, the claim language and

-35-

specification make clear that "network configurations" is correctly construed to mean "network address settings."

Proper analysis requires beginning with the claim language, and the words of claims 10 and 17 that surround "regardless of network configurations" set forth an important context that bears on the meaning of that claim term. Both claims 10 and 17 explicitly recite that the access to the network that can occur regardless of network configurations is "via a packet translation." Claim 10 recites, in pertinent part:

> a gateway device, wherein the gateway device receives a request from the source for access to the network and provides the source computer with access to the network **regardless of network configurations via a packet translation** learned during a self configuration . . . .

Claim 17 similarly recites:

> receiving at the gateway device a request from the source to access the network **regardless of network configurations via a packet translation** learned during a self configuration . . . .

The claims make clear that network access is provided by packet translation and that, via packet translation, network configuration concerns can be dealt with and resolved. Because packet translations operate on network addresses, the network configuration concerns that can be resolved by packet translation are network address settings. *E.g.*, Ex. 10 ('497 application) at NMDX0009192–94.[5] Accordingly, given that access is provided "via a packet translation," the proper construction of "network configurations" is "network address settings."

The defendants' proposed construction of "network configurations" fails to properly consider the relationship between "network configurations" and

---

[5] The '554 patent incorporates by reference U.S. Patent Application No. 60/111,497 (Exhibit 10), so the '497 application is intrinsic evidence. *See* Ex. 6 ('554 patent) at col.1, ll.14–15, ll.42–43.

"packet translation" as recited in the claim language.   At a minimum, the intrinsic evidence does not support limiting the claims to packet translations that must provide access "regardless of the hardware, MAC addresses, IP addresses, **and** networking protocols used by the network and the source computer."

For these reasons, if the Court is inclined to construe "regardless of network configurations" it should adopt Nomadix's proposed construction of "regardless of network address settings."

**F.    The '399 patent**

**1.    "management system" ('399 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| management system<br><br>'399: claims 1, 4, 6, 8, 13, 16, 18, 21 | No construction is necessary | a management system that is separate from the network gateway device for managing a property's operations and connected to the network gateway device via a physical link |

The term "management system" does not require clarification because it can be readily understood according to its ordinary meaning.   Indeed, "management system" itself appears verbatim in the defendants' construction, so the defendants implicitly acknowledge that no construction is necessary.

Rather than seeking clarification of what a "management system" is, the defendants seek only to improperly narrow the claims to certain kinds of management systems.   In particular, the defendants' construction would add at least three limitations to the claims, requiring the management system to be 1) "separate," in some sense, from the gateway device; 2) used "for managing a property's operations"; and 3) connected to the gateway device by a "physical link."   Putting aside the ambiguities that importing these limitations would create, nothing in the intrinsic evidence constitutes the type of disclaimer that

-37-

would be necessary to limit the scope of the claims in this way. *See, e.g.*, *Spine Solutions*, 620 F.3d at 1315 (noting that "an express disclaimer sufficient to limit the scope of the claims . . . requires expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope") (citations omitted). For these reasons, the defendants' proposed construction is improper.

**2.     "absent additional agents" terms ('399 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| absent additional agents implemented by the computer<br><br>'399: claims 1, 13 | Nomadix agrees with the Court's prior construction (for the corresponding term from claim 6):<br><br>absent additional special client software implemented by the computer for managing the communication between the computer and the gateway device | without the need to implement additional "agents" or to reconfigure the computer in any manner |
| absent additional agents implemented by a user's computer<br><br>'399: claims 6, 18 | Nomadix agrees with the Court's prior construction:<br><br>absent additional special client software implemented by the computer for managing the communication between the computer and the gateway device | without the need to implement additional "agents" or to reconfigure the user's computer in any manner |

This Court construed the term "absent additional agents implemented by a user's computer" in the *Second Rule* case. Nomadix agrees with this Court's construction and sees no basis for construing the parallel terms recited by claims 1, 13, and 18 any differently. The defendants do not appear to substantively dispute the Court's earlier construction. To the contrary, the defendants agree that the Court's construction of "agent" (as "special client software for managing the communication between the client and the gateway device")

-38-

should control.  *See* Amended JCCS at ex. 6, p. 55.  However, the defendants'
construction also requires that the gateway and computer communicate "without
the need . . . to reconfigure the user's computer in any manner."   This
construction is merely another attempt to improperly import a limitation and
narrow the claims.

The defendants' construction is contrary to the prosecution history.
Nomadix added the "absent additional agents" terms during prosecution,
amending the independent claims to recite that the network gateway device
communicates with the computer "absent additional agents implemented by the
computer."  *See* Ex. 11 ('399 patent prosecution history) at NMDX0010766–70.
Nomadix added this limitation to specifically distinguish over U.S. Patent No.
5,987,430 ("Van Horne"), which, it argued, discloses a system that requires
special client software for managing the communication between a client
computer and gateway device.  *Id.* at NMDX0010773.  Nomadix argued to the
Patent Office that the claimed invention was distinguishable because no
additional client software was needed for the claimed computer to communicate
with the gateway:

> The '430 Van Horne [patent] provides no teaching of a gateway device
> that can manage communication with a client absent special client
> software.  In fact, the '430 Van Horne patent explicitly teaches (and
> requires in all of the independent claims) **a client system running client
> software for the purpose of managing the communication between
> the client and the gateway**.

*Id.* (emphasis added).  Nomadix's arguments centered on the lack of client
software, not on any reconfiguring of a user computer, and therefore nothing in
the prosecution history indicates a "clear disavowal of claim scope" sufficient to
restrict the claims in the manner the defendants propose.  *Spine Solutions,* 620
F.3d at 1315.

For these reasons, the Court should not modify its prior construction as the defendants propose.

### 3.   "call accounting record" terms ('399 patent)

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| call accounting record format<br><br>'399: claims 1, 6 | Nomadix agrees with the Court's prior construction:<br><br>a format that can be used to organize data related to telephone calls | a format that can be used to organize data related to telephone calls that includes fields corresponding to charged amount and phone number called |
| a call accounting record<br><br>'399: claims 15, 20 | Nomadix agrees with the Court's prior construction:<br><br>a protocol that can be used to organize data related to telephone calls | a protocol that can be used to organize data related to telephone calls that includes fields corresponding to charged amount and phone number called |

This Court construed the term "call accounting record" in the *Second Rule* case. The Court's previous construction was correct and should control here. Although the defendants have incorporated the Court's previous construction into their own, they again seek to improperly import a limitation into the claims: they assert that the call accounting record format must include specific fields corresponding to a charged amount and a called telephone number. These limitations appear nowhere in the claim language. Additionally, including these limitations would be contrary to the plain disclosure of the specification as well as the Court's analysis in *Second Rule*.

The '399 patent discloses that the gateway generates billing information in whichever format a particular management system is designed to receive, such as a call accounting record. *E.g.*, Ex. 8 ('399 patent) col.7, ll.35–39. Figure 3 depicts one example of a call accounting record. *Id*. at col.7, ll.53–55. The '399 patent emphasizes that the call accounting record of Figure 3 is merely one embodiment "that the gateway device 12 **can modify as needed** to conform

1  to the format requested by the management system 56."  *Id.* at col.7, ll.56–58

2  (emphasis added).  Thus, the specification expressly provides that the claimed

3  "call accounting record" and "call accounting record format" are not limited to

4  specific fields, including the fields identified by the defendants.  *Id.* at col.8,

5  ll.52–54 (a call accounting record format may include, but does not require, a

6  field corresponding to telephone number called).

7         Additionally, the Court has already rejected the argument that a call

8  accounting record must include particular fields.  The defendant in *Second Rule*

9  argued that "call accounting record" necessarily included a specific field for

10  durational measurements, as depicted in Figure 3 of the '399 patent.  *See* Ex. 9

11  (*Second Rule* Am. Claim Constr. Order) at 16.   The Court rejected this

12  argument, recognizing that "the specification makes clear that these data

13  measurements [disclosed in the specification] **are exemplary only**.'"  *Id.* at 17

14  (citing '399 patent col.7, ll.57–58) (emphasis added).  Further, the Court noted,

15  "the specification recognizes that there may be deletions or replacements of

16  particular types of data, depending on the particulars of the management

17  system."  *Id.* at 18 (citing '399 patent col.8, ll.49–65).  Applying this Court's

18  prior analysis to the nearly identical claim construction issue presented here

19  shows that the defendants' position must fail.

20         **4.     "predetermined" terms ('399 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| predetermined protocol<br><br>'399: claims 1, 13, 15 | No construction is necessary | a protocol that can be used to organize data related to telephone calls that includes fields corresponding to charged amount and phone number called |

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| predetermined data formats<br><br>'399: claims 15, 20 | No construction is necessary | a format that can be used to organize data related to telephone calls that includes fields corresponding to charged amount and phone number called |

The claim terms "predetermined protocol" and "predetermined data formats" have an ordinary and customary meaning that would be readily understood by a jury. Therefore, these terms need no construction. *U.S. Surgical Corp.*, 103 F.3d at 1568. In fact, the defendants have not proposed any unique construction for these terms. Rather, the defendants propose that these terms should be construed identically to the "call accounting record" terms. This is yet another attempt to improperly narrow the scope of the claims as well as to blur distinctions in scope between differently worded patent claims.

The defendants' construction drastically departs from the ordinary meaning. The claims make clear that neither "predetermined protocol" nor "predetermined data format" is equivalent to a "call accounting record." Claim 1, in fact, lists "predetermined protocol" and "call accounting record format" as distinct elements: "a management system . . . configured to communicate with **at least one predetermined protocol**, wherein the network gateway device formats the data into **call accounting record format**." Where, as here, "a claim lists elements separately, the clear implication of the claim language is that those elements are distinct component[s] of the patented invention." *Becton*, 616 F.3d at 1254 (internal quotation marks omitted); *see also CAE Screenplates*, 224 F.3d at 1317 ("In the absence of any evidence to the contrary, we must presume that the use of . . . different terms in the claims connotes different meanings."). Additionally, claim 15 expressly differentiates a predetermined protocol from a call accounting record, reciting that the "predetermined protocol

-42-

is selected from the group consisting of a low level protocol, a call accounting record, and a private branch telephone system protocol." Thus, the claim language establishes that "predetermined protocol" and "predetermined data formats" cannot be limited to call accounting records; rather, these are broader terms that, pursuant to their ordinary meaning, can encompass any number of protocols and formats for which a management system is configured.

The defendants' construction also conflicts with the specification. The '399 patent provides that the gateway device supplies billing data to a management system using the management system's standard data format. *See, e.g.*, Ex. 8 ('399 patent) col.2, l.63 – col.3, l.1; col.7, ll.1–6, ll.35–43. The '399 patent provides multiple examples of such standard formats, including a call accounting record, a low level protocol, and a private branch telephone system protocol. *Id.* at col.3, ll.38–42, col.7, ll.53–55. The '399 patent specifies that these examples are not exhaustive. The gateway can operate according to any predetermined protocol that the management system supports. "[T]here are many different management system standards, none of which are universal and implemented in all property management systems. As a result . . . the gateway device 12 is set up to communicate with the management system in which it is integrated." *Id.* at col.8, ll.13–19. Thus, like the claims, the specification shows that "predetermined protocol" and "predetermined data formats" are not limited to call accounting records.

The defendants' attempt to narrow these terms should be rejected.

/ / /

/ / /

-43-

5.      "physical location" ('399 patent)

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| physical location<br><br>'399: claims 13, 18 | No construction is necessary | communication port through which the user's computer accessed the network |

Claim 13 recites "a network gateway device . . . [that] maintains data representative of the user's physical location."  *See also* claim 18 ("collecting data . . . including a physical location of a user").  As it appears in claims 13 and 18, the term "physical location" can be readily understood according to its ordinary and customary meaning: a user's "physical location" is, quite simply, the place at which a user is located.  The defendants seek to limit "physical location" to a "communication port," which is just one embodiment.  Again, this is nothing more than an attempt to improperly import limitations into the claims.

The defendants' construction is contrary to both the specification and the prosecution history, which describe a user's physical location as being any place a user is located.  The specification discloses that "the gateway device 12 includes the ability to recognize . . . the location of computers attempting to access a network" and proceeds to identify various examples of such locations. Ex. 8 ('399 patent) col.4, ll.36–39.  In some embodiments, a user's location is a particular room or an apartment address.  *Id.* at col.7, ll.42–45 ("The gateway device 12 creates a data record corresponding to an individual user/subscriber's use of the computer system, including the **user/subscriber's location (room number)**."); *id.* at col.6, ll.35–37 ("The gateway device 12 can thus monitor and record information such as . . . the **room from which the user obtained [network] access**"); *see also* Ex. 12 ('093 application)[6] at NMDX0011436

---

[6]      The '399 patent incorporates by reference each of U.S. Patent Application Nos. 60/161,093. 60/161,139 and 09/693,060 (the application leading to the '554 patent).  Ex. 8 ('399 patent) col.1, ll.7–27, col.6, ll.26–31.

("Location based identification and authorization allows the gateway device to grant network access to a **specific location (e.g. a hotel room, a specific apartment address, etc.**)"; *id.* at NMDX0011430 (explaining that where a gateway administrator "desires to manage and bill subscribers based on where they are **physically located**," the administrator will focus on network subscriptions associated with room numbers); Ex. 13 ('060 application) at NMDX0014708 ("access rights can be available contingent upon the **source's location (e.g. room)** . . . no further identification is required, as the location from which the source is requesting access is known to the gateway device") (emphases added).  A user's location can also be, for example, an entire hotel or an airport terminal.  *E.g.*, Ex. 14 ('139 application) at NMDX0011842. (disclosing that a control panel can include "information that is customized to . . . the location/site from which the user is remotely located," such as information relating to a hotel or an airport terminal).  Additionally, as Nomadix discussed during prosecution, a user's location can be a communication port located in a hotel.  Ex. 11 ('399 patent prosecution history) at NMDX0010449.

The defendants' construction would limit the scope of the claims to one of these many disclosed embodiments: that of the communication port.  This attempt to limit the claims to a single embodiment is improper.  *See, e.g.*, *Kara Tech.*, 582 F.3d at 1348.  The claim language and intrinsic evidence establish that the recited "physical location" is not limited to a "communication port."  Rather, the location can also be a hotel room, an airport terminal, an apartment, or any other physical location of the user.

In addition to being improperly limiting, the defendants' construction introduces ambiguity into the scope of the claims.  For example, the proposed construction does not specify whether the term "communication port" is being used in its generic sense, as a virtual connection between multiple programs or networks, or whether specific hardware is contemplated.  This vague

-45-

construction would confuse, not assist, the jury, and it is improper for this additional reason.

**6.    "collecting data corresponding to the user's access . . ." ('399 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| collecting data corresponding to the user's access to said computer network, including a physical location of the user and the user's network usage, in said network gateway device<br><br>'399: claim 18 | No construction is necessary | monitoring and recording "data representative of the user's access to the computer network," including a "physical location" of the user and the "user's network usage", in said network gateway device |

In the *Second Rule* case, the Court considered a phrase very similar to the phrase at issue here: "collecting data corresponding to the user's access to said computer network," as recited by claim 6 of the '399 patent.  The Court determined that it was unnecessary to construe the term.  It is similarly unnecessary to construe the "collecting data" term in this case.

Upon parsing the defendants' construction, it becomes evident that they have focused on two terms: "collecting" and "corresponding to."  Both of these terms can be understood according to their ordinary meaning; neither requires construction.  The defendants seek to assign definitions that are inconsistent with the terms' ordinary meanings, redefining "collecting" to mean "monitoring and recording," and "corresponding to" to mean "representative of."  Nothing in claim 18 supports this wholesale rewriting of the claims.  Quite simply, "collecting" does not mean "monitoring," much less "monitoring **and** recording."  Likewise, "corresponding to" does not mean "representative of."

-46-

The defendants have improperly disregarded the ordinary meaning of these claim terms.  None of the four exceptions to the ordinary meaning rule applies here.  Because the terms "collecting" and "corresponding to" are commonly understood according to their ordinary meanings, these terms—and this phrase—need not be construed.  *U.S. Surgical Corp.*, 103 F.3d at 1568.

## G.    The '009 patent

### 1.    "single connection . . ." ('009 patent)

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| single connection between the device and the computer<br><br>'009: claims 1, 23 | No construction is necessary | connection between the device and the computer that does not copy data between two sessions or use application buffering |

The key portion of this disputed term, "single connection," is easily understood and no construction is necessary.  The defendants' proposed construction is once again nothing more than an attempt to improperly import limitations into the claims.

The defendants would add at least two limitations, requiring that the connection 1) not copy data between two sessions, and 2) not use application buffering.  These technical requirements are wholly absent from the claims.  Once again, the defendants' construction departs from the ordinary meaning of the claim language by importing narrowing limitations and complicates an already straightforward term.  If the Court adopts the defendants' construction, the jury will need to be instructed on the technical significance of copying data between sessions and "application buffering"—concepts that the defendants' definition does not explain and that are entirely absent from the claims.  *See Every Penny*, 563 F.3d at 1383.  Since "single connection" has an ordinary and readily understood meaning, no construction is necessary.

-47-

# V.  CONCLUSION

For the reasons detailed above, the Court should adopt the claim constructions offered by Nomadix because they maintain the proper scope of claim terms and genuinely help lay jurors to understand that scope.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: March 4, 2011              By: /s/ *Douglas G. Muehlhauser*
                                  John B. Sganga, Jr.
                                  Douglas G. Muehlhauser
                                  Perry D. Oldham
                                  Mark Lezama
                                  Alan G. Laquer

                                  Attorneys for Plaintiff
                                  NOMADIX, INC.

10787593