1   I. Neel Chatterjee (SBN 173985)
    nchatterjee@orrick.com
2   Fabio E. Marino (SBN 183825)
    fmarino@orrick.com
3   Monte M.F. Cooper (SBN 196746)
    mcooper@orrick.com
4   Qudus B. Olaniran (SBN 267838)
    qolaniran@orrick.com
5   ORRICK, HERRINGTON & SUTCLIFFE LLP
6   1000 Marsh Road
    Menlo Park, CA  94025
7   Telephone:   650-614-7400
    Facsimile:   650-614-7401
8

9   Benjamin J. Hofileña (SBN 227117)
    bhofilena@orrick.com
10  Alyssa M. Caridis (SBN 260103)
    acaridis@orrick.com
11  ORRICK, HERRINGTON & SUTCLIFFE LLP
12  777 South Figueroa Street, Suite 3200
    Los Angeles, CA  90017
13  Telephone:   213-629-2020
    Facsimile:   213-612-2499
14  Attorneys for Defendant and Counterclaimant
15  iBAHN CORPORATION

16  [SEE SIGNATURE PAGE FOR A COMPLETE
    LISTING OF COUNSEL FOR DEFENDANTS]
17

18              IN THE UNITED STATES DISTRICT COURT

19          FOR THE CENTRAL DISTRICT OF CALIFORNIA

20                      WESTERN DIVISION

| | |
|---|---|
| 21  NOMADIX, INC., | Case No.  CV-09-08441 DDP (VBKx) |
| 22                 Plaintiff, | **DEFENDANTS' ANSWERING CLAIM CONSTRUCTION BRIEF** |
| 23         v. | |
| 24  HEWLETT-PACKARD COMPANY, et al., | Hearing Date:        May 19, 2011 |
| 25                 Defendants. | Time:        9:00 a.m. |
| 26 | Honorable Dean D. Pregerson |
| 27  AND RELATED COUNTERCLAIMS | |
| 28 | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................1

II.     THE TECHNOLOGY OF THE NOMADIX PATENTS-IN-SUIT ..............2

    A.   Introduction to Computer Networking ................................................2

    B.   The Computing Industry's Solution to Manual Configuration ...........4

    C.   The Nomadix Workaround ..................................................................5

III.    ARGUMENT ....................................................................................6

    A.   Transparent Router Patents ('892, '727, '995, and '009 patents).........6

        1.   "home" terms ('892, '727, '995, and '009 patents) ...................7

        2.   "foreign" terms ('892, '727, '995, and '009 patents)................9

        3.   "user device having an incompatible IP address" ('727
            patent)................................................................................14

        4.   "incorrectly configured messages" ('727 patent)....................16

        5.   "user host device is configured to communicate . . . by
            using an IP address of the home gateway" ('995 patent) .....19

        6.   "single connection . . ." ('009 patent)....................................22

    B.   The Transparent Redirection Patents ('894, '554, and '716
        patents) ..............................................................................24

        1.   "the order of steps of all claims" ('894 patent).......................25

        2.   "administrator" ('894 patent) ................................................28

        3.   "access rights" terms ('554 patent).........................................29

        4.   "regardless of network configurations" ('554 patent)..............32

        5.   "network location of the user host device" ('716 patent).........35

        6.   "external network location" ('716 patent) ..............................37

    C.   The Transparent Billing Patent ('399 patent) ...................................38

        1.   "billing records" terms ('399 patent)......................................39

        2.   "physical location" ('399 patent) ...........................................43

        3.   "collecting data corresponding to . . ." ('399 patent)..............44

        4.   "management system" ('399 patent) .......................................46

        5.   "absent additional agents" terms ('399 patent)........................47

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**
(continued)

**Page**

IV.    CONCLUSION ........................................................................................50

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3    CASES

4    *Agilent Technologies, Inc. v. Affymetrix, Inc.*,

5         567 F.3d 1366 (Fed. Cir. 2009)...............................................................18, 22

6    *Altiris, Inc. v. Symantec Corp.*,

7         318 F.3d 1363 (Fed. Cir. 2003).....................................................................25, 26

8    *Bio Tech. Gen. Corp. v. Duramed Pharm., Inc.*,

9         325 F.3d 1356 (Fed. Cir. 2003).......................................................................27

10   *C.R. Bard, Inc. v. U.S. Surgical Corp.*,

          388 F.3d 858 (Fed. Cir. 2004).....................................................................21, 23

11
12   *CCS Fitness, Inc. v. Brunswick Corp.*,

          288 F.3d 1359 (Fed. Cir. 2002).......................................................................39

13
14   *Computer Docking Station Corp. v. Dell, Inc., et al.*,

          519 F.3d 1366 (Fed. Cir. 2008).......................................................................40

15
16   *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,

          438 F.3d 1374 (Fed. Cir. 2006).....................................................................31, 42

17
18   *CVI/Beta Ventures, Inc., v. Tura LP*,

          112 F.3d 1146 (Fed. Cir. 1997).......................................................................49

19
20   *E-Pass Techs., Inc. v. 3Com Corp.*,

          473 F.3d 1213 (Fed. Cir. 2007).......................................................................25

21   *Elan Microelecs. v. Apple, Inc.*,

22        No. C 09-01531 RS, 2010 WL 4510909 (N.D. Cal. Nov. 1, 2010)..................25

23   *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*,

          287 F.3d 1108 (Fed. Cir. 2002).....................................................................42, 45

24
25   *Gillespie v. Dywidag Sys. Int'l*,

          501 F.3d 1285 (Fed. Cir. 2007).......................................................................34

26   *IP3 Networks, Inc. v. Nomadix, Inc.*,

27        No. 3:04-cv-1485-BTM-POR (S.D. Cal.) (filed July 23, 2004)......................13

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Kraft Foods, Inc. v. Int'l Trading Co.,*
     203 F.3d 1362 (Fed. Cir. 2000)........................................................................31

*Martek Biosciences Corp. v. Nutrinova, Inc.,*
     579 F.3d 1363 (Fed. Cir. 2009)..........................................................................7

*Microsoft Corp. v. Multi-Tech Systems, Inc.,*
     357 F.3d 1340 (Fed. Cir. 2004)..........................................................................8

*MyMail, Ltd. v. Am. Online, Inc.,*
     476 F.3d 1372 (Fed. Cir. 2007)........................................................................39

*Netcraft Corp. v. eBay, Inc.,*
     549 F.3d 1394 (Fed. Cir. 2008)........................................................................42

*NTP, Inc. v. Research In Motion, Ltd.,*
     418 F.3d 1282 (Fed. Cir. 2005)..................................................................20, 42

*O2 Micro International Ltd. v. Beyond Innovation Technology Co., Ltd.,*
     521 F.3d 1351 (Fed. Cir. 2008)........................................................................16

*Oak Tech., Inc. v. Int'l Trade Comm'n,*
     248 F.3d 1316 (Fed. Cir. 2001)........................................................................27

*Ormco Corp. v. Align Tech., Inc.,*
     498 F.3d 1307 (Fed. Cir. 2007)..........................................................................8

*Phillips v. AWH Corporation,*
     415 F.3d 1303 (Fed. Cir. 2005)............................................................22, 30, 31

*Purdue Pharma L.P. v. Endo Pharms. Inc.,*
     438 F.3d 1123 (Fed. Cir. 2006)....................................................................8, 44

*Ring Plus, Inc. v. Cingular Wireless Corp.,*
     614 F.3d 1354 (Fed. Cir. 2010)........................................................................31

*Ring Plus, Inc. v. Cingular Wireless, LLC,*
     No. 2:06-CV-159-DF, 2007 WL 5688765 (E.D. Tex. July 9, 2007)................26

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,*
     242 F.3d 1337 (Fed. Cir. 2001)........................................................................23

*Seachange Int'l v. C-Cor, Inc.,*
     413 F.3d 1361 (Fed. Cir. 2005)........................................................................44

DEFENDANTS' CLAIM CONSTRUCTION BRIEF
CV-09-08441 DDP (VBKx)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995)...........................................................................32

*The Gentry Gallery Inc. v The Berkline Corporation*,
    134 F. 3d 1473 (Fed. Cir. 1998)......................................................................11

*U.S. Surgical v. Ethicon, Inc.,*
    103 F.3d 1554 (Fed. Cir. 1997).......................................................................16

*V-Formation, Inc. v. Benetton Group SPA*,
    401 F.3d 1307 (Fed. Cir. 2005)......................................................................23

*Verizon Services Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007)......................................................................23

STATUTES

35 U.S.C. § 112 .............................................................................................13, 17

# LIST OF EXHIBITS

| Ex. No. | Description | Abbreviation |
|---|---|---|
| 1 | U.S. Patent No. 6,130,892 issued Oct. 10, 2000 (Short et al.) | '892 Patent |
| 2 | U.S. Patent No. 7,088,727 issued Aug. 8, 2006 (Short et al.) | '727 Patent |
| 3 | U.S. Patent No. 7,554,995 issued Jun. 30, 2009 (Short et al.) | '995 Patent |
| 4 | U.S. Patent No. 6,857,009 issued Feb. 15, 2005 (Ferreria et al.) | '009 Patent |
| 5 | U.S. Patent No. 6,636,894 issued Oct. 21, 2003 (Short et al.) | '894 Patent |
| 6 | U.S. Patent No. 7,194,554 issued Mar. 20, 2007 (Short et al.) | '554 Patent |
| 7 | U.S. Patent No. 7,689,716 issued Mar. 30, 2010 (Short et al.) | '716 Patent |
| 8 | U.S. Patent No. 6,868,399 issued Mar. 15, 2005 (Short et al.) | '399 Patent |
| 9 | May 16, 2007 Reply to Final Office Action re reexamination of U.S. Patent No. 6,130,892, Serial No. 90/007,423 | 05/16/07 '892 RE ROA |
| 10 | Apr. 1, 2009 Record of Oral Hearing re reexamination of U.S. Patent No. 6,130,892, Serial No. 90/007,423 | 04/01/09 '892 RE ROH |
| 11 | Apr. 22, 2004 Office Action re U.S. Patent No. 7,088,727 | 04/22/04 '727 OA |
| 12 | Mar. 9, 2006 Amendment and Response to Office Action re U.S. Patent No. 7,088,727 | 03/09/06 '727 ROA |
| 13 | Apr. 4, 2005 Request for Continued Examination and Amendment re U.S. Patent No. 7,088,727 | 04/04/05 '727 RCE and Amdt. |
| 14 | Oct. 5, 2005 Office Action re U.S. Patent No. 7,088,727 | 10/05/05 '727 OA |
| 15 | May 6, 2003 Amendment and Response to Office Action re U.S. Patent No. 6,636,894 | 05/06/03 '894 ROA |
| 16 | Dec. 13, 2004 Response to Office Action re U.S. Patent No. 7,194,554 | 12/13/04 '554 ROA |
| 17 | Feb. 11, 2005 Amendment and reply to Office Action re U.S. Patent No. 7,194,554 | 02/11/05 '554 ROA |
| 18 | Apr. 15, 2005 Office Action re U.S. Patent No. 7,194,554 | 04/15/05 '554 OA |

| 19 | Dec. 21, 2005 Office Action re U.S. Patent No. 7,194,554 | 12/21/05 '554 OA |
| 20 | May 26, 2006 Office Action re U.S. Patent No. 7,194,554 | 05/26/06 '554 OA |
| 21 | Oct. 17, 2005 Amendment and Response to Office Action re U.S. Patent No. 7,194,554 | 10/17/05 '554 ROA |
| 22 | Mar. 21, 2006 Preliminary Amendment and Response to Office Action Response re U.S. Patent No. 7,194,554 | 03/21/06 '554 ROA |
| 23 | Nov. 28, 2006 Notice of Allowability re U.S. Patent No. 7,194,554 | 11/28/06 '554 Notice of Allowability |
| 24 | Nov. 7, 2003 Amendment and Response to Office Action re U.S. Patent No. 6,868,399 | 11/07/03 '399 ROA |
| 25 | Dec. 9, 2002 Amendment and Response to Office Action re U.S. Patent No. 6,868,399 | 12/09/02 '399 ROA |
| 26 | Aug. 27, 2002 Office Action re U.S. Patent No. 6,868,399 | 08/27/02 '399 OA |
| 27 | David A. Maltz and Pravin Bhagwat, TCP Splicing for Application Layer Proxy Performance | IBM Research Paper |
| 28 | Plaintiff's Opening Claim Construction Brief, *Nomadix, Inc. v. Second Rule LLC*, No. 2:07-cv-01946-DDP-VBK (C.D. Cal.) (filed Aug. 4, 2008) | Nomadix's Op. Br. |
| 29 | Defendant's Opening Claim Construction Brief, *Nomadix, Inc. v. Second Rule LLC*, No. 2:07-cv-01946-DDP-VBK (C.D. Cal.) (filed Aug. 4, 2008) | Second Rule Op. Br. |
| 30 | Plaintiff Nomadix, Inc.'s Reply Claim Construction Brief, *Nomadix, Inc. v. Second Rule LLC*, No. 2:07-cv-01946-DDP-VBK (C.D. Cal.) (filed Aug. 22, 2008) | Nomadix's Reply Br. |
| 31 | Defendant's Reply to Plaintiff's Opening Claim Construction Brief, *Nomadix, Inc. v. Second Rule LLC*, No. 2:07-cv-01946-DDP-VBK (C.D. Cal.) (filed Aug. 22, 2008) | Second Rule Reply Br. |
| 32 | Amended Claim Construction Order, *Nomadix, Inc. v. Second Rule LLC*, No. 2:07-cv-01946-DDP-VBK (C.D. Cal.) (filed Oct. 15, 2008) | Second Rule Amended Claim Constr. Order |
| 33 | Exemplary Claims of the Patents-In-Suit | Exemplary Claims |
| 34 | U.S. Provisional Patent Application No. 60/111,497, filed on December 8, 1998. | 12/08/98 '497 Appln. |
| 35 | Jun. 7, 2004 Amendment and Response to Office Action re U.S. Patent No. 7,088,727 | 06/07/04 '727 ROA |
| 36 | U.S. Patent No. 5,893,077 issued Apr. 6, 1999 (Griffin) | Griffin '077 Patent |

| 37 | U.S. Patent No. 6,385,653 issued May 7, 2002 (Sitaraman) | Sitaraman '653 Patent |
|----|-----------------------------------------------------------|------------------------|

1  **I.    INTRODUCTION**

2          In the mid- to late 1990's, computer users began traveling more frequently with

3  laptop computers and accessing the Internet at hotels, coffee shops and other places

4  offering Internet access.  However, a problem arose in that, in those days, a computer

5  was generally configured to communicate with a "home" network, *i.e.*, a network

6  found in the office or residence in which the computer was typically used.   The

7  computer had to be manually reconfigured each time that it encountered a new

8  network (*e.g.*, at each new hotel or coffee shop).  Manual configuration was not an

9  intuitive or easy task, particularly for people who were not trained in the computer

10 field.   The purported invention of the Nomadix patents was a workaround that

11 eliminated the need for such manual reconfiguration.

12         The workaround claimed in the eight asserted Nomadix patents was not the

13 only way to avoid the problem of manual reconfiguration.  The approach that the

14 mobile computing industry widely adopted was entirely different from the Nomadix

15 workaround and was actually based on alternative technology that existed at the time

16 of the purported invention.  Underlying many of the claim construction disputes in

17 this case is Nomadix's attempt to broaden the scope of its claims to cover not only the

18 workaround that it developed but also the radically different technology that for many

19 years has been used in the mobile computer field.  In so doing, Nomadix seeks to read

20 out the very solution to the manual reconfiguration problem that its patents originally

21 addressed.  Nomadix's constructions, as a result, ignore clear teachings of the patents,

22 express definitions of the patentees, and disavowals made during prosecution.

23         This Court should reject Nomadix's invitation to ignore the words of the claims

24 that it wrote and the invention as characterized in the intrinsic evidence.  Accordingly,

25 Defendants respectfully ask this Court to adopt Defendants' proposed constructions.[1]

26 _____

27 [1] Per the instruction of this Court, the Defendants have cooperatively identified only
   a limited number of terms to construe at this time, with the understanding that other
   issues of claim construction or indefiniteness could be raised at a later time.

28 Defendants reserve the right to present further claim construction and/or

## II.     THE TECHNOLOGY OF THE NOMADIX PATENTS-IN-SUIT

### A.     Introduction to Computer Networking

Computers are typically connected to a local area network ("LAN"). Generally speaking, a LAN consists of two or more computers that communicate with each other in a limited geographical setting, such as a home or an office. Computers on a LAN can communicate with one another, but to communicate with other computers not on the LAN, *e.g.*, to communicate with computers on a different LAN or to reach a website on the Internet, they must first send a message through a "gateway."  A gateway is a special computer that connects networks together and allows computers connected to different networks to talk to each other. A gateway is located at the site of the LAN and relays messages through devices on the Internet called "routers" so that each message can reach its intended destination.

For a computer to communicate with a gateway and with other computers not on a LAN, two different types of addresses are typically used:  a Media Access Control ("MAC") address and an Internet Protocol ("IP") address.  A MAC address (*e.g.*, 00:A0:C9:14:C8:29) is a unique and permanent identifier that is provided to each computer and gateway, typically at the time of manufacture.  On the other hand, an IP address (*e.g.*, 132.74.18.2) is used for communicating across networks by indicating where the computer with a particular IP address is located and, thus, allowing computers on other networks to send messages to that computer.  At the time that Nomadix began filing its patent applications, IP addresses were typically "*static*" or effectively permanent.[2]  If a new IP address was required, the computer had to be manually reconfigured with that new IP address.  *See, e.g.*, U.S. Patent

---

indefiniteness issues regarding these or other claim terms later in the case.  Indeed, the asserted claims are indefinite in numerous respects and the meaning of several claims is impossible to divine.  Defendants have here focused on only those terms that are susceptible to construction.

[2] The application for the earliest Nomadix patent, U.S. Patent No. 6,130,892, was filed on March 12, 1998.

1  No. 6,130,892 ("'892 Patent"), Abstract.[3]

2      Computers communicate by sending messages to one another in discrete
3  bundles called "packets."  Conceptually, a packet is like a piece of mail.  The
4  portion of the packet that may be thought of as the envelope contains, among other
5  things, the sending computer's own MAC address and IP address, the IP address of
6  its intended recipient, and the MAC address of the sending computer's gateway.
7  The packet also contains the actual data being transmitted, called a "payload."  The
8  payload's analog is the letter inside an envelope.

9      To communicate with devices on another network, a computer sends a packet
10  to its gateway computer.  The gateway then forwards the packet along, typically
11  through many intermediate routers, until the packet reaches its final destination.  At
12  every step in the process, each intermediate router modifies the packet to include its
13  own MAC address and the MAC address of the next router in the path (to ensure
14  that the packet takes the correct next step).  Once a packet reaches its intended
15  recipient, that recipient can respond and send packets back to the computer that
16  initiated the communication.  Those packets will have, as a destination IP address,
17  the IP address of the original computer's gateway.  Such return packets will
18  likewise travel from router to router until they arrive back at the gateway for the
19  original computer.  That gateway will then forward the packet to the computer
20  itself.  The various routers through which inbound and outbound packets travel
21  contain tables that map IP addresses to MAC addresses.  Using the IP addresses
22  contained in the packet, each router identifies the MAC address of the next router to
23  which to send the packet, ensuring that it ultimately arrives at its intended
24  destination.

25  _____
[3] All exhibits cited in this brief are attached to the Declaration of Monte M.F.
26  Cooper ("Decl. of Cooper") filed concurrently herewith.  Additionally, for the
convenience of the Court, a list of exhibits with the abbreviations used throughout
27  this brief can be found after the Table of Authorities.  The '892, '727, '995, '009,
'894, '554, '716, and '399 patents are attached to the Decl. of Cooper as Exhibits 1-
28  8.  All references to lines and column numbers in the patents are in the form "'892
patent at col(s).__:line(s) __."

1    Thus, before a computer can send packets out on the Internet through a LAN,
2    it must have two things:  (1) a proper IP address from which to send the packet (*i.e.*,
3    a proper return address) and (2) the MAC address of the LAN's gateway (*i.e.*, a
4    proper address for the first recipient, which will then forward the packet on to the
5    next router in the chain).  One way for a computer to obtain these two addresses is
6    for a person to manually configure the computer with IP address information.  But,
7    as noted above, such manual configuration would have to take place every time the
8    computer moved from one network to another, and the average person would find
9    repeated manual configuration an onerous, if not impossible, task.

10          **B.      The Computing Industry's Solution to Manual Configuration**

11    In 1993, before the Nomadix patents were filed, the mobile computing
12    industry solved the manual reconfiguration problem in an elegant manner by
13    developing a standard called Dynamic Host Configuration Protocol, or DHCP.
14    DHCP is a technology that <u>dynamically</u> assigns a temporary IP address to each
15    computer for communication over a network.  *See* U.S. Patent No. 7,088,727 ("'727
16    Patent") at 2 (citing Network Working Group Request for Comments: 1541
17    Dynamic Host Configuration Protocol (Oct. 1993)).  Each time that a computer
18    using DHCP attempts to connect to a new network, the computer automatically
19    issues a DHCP request.  A DHCP server on the network responds by doing two
20    pertinent things:  (1) issuing the computer a temporary IP address to use on the
21    network and (2) providing the computer with the address of the network's gateway
22    – called the "default gateway."   Thus, upon encountering a new network, a
23    computer using DHCP immediately obtains a dynamically assigned IP address that
24    is a proper source IP address for sending packets on that network and
25    simultaneously learns to where it should direct the packets that it would like to send
26    out onto the Internet.  No manual configuration is ever required.  At the time that
27    Nomadix filed its original patent applications, DHCP had been available but was
28    not commonly used.  By the time that Windows 98 was released, DHCP had

1    become a routine component built into most computers.

2         **C.    The Nomadix Workaround**

3         Even as the computing industry began widespread adoption of DHCP,

4    Nomadix expressly rejected it as an impractical universal solution to the "manual

5    configuration" problem.  *See* Ex. 34 Attachment A at 7 [12/08/98 '497 Appln.],

6    ("The DHCP approach is too costly and complex to be deployed at the customer

7    premises.").  Instead, Nomadix developed and patented a different approach.  *See,*

8    *e.g.,* '892 Patent at 12:31-40; '727 Patent at 12:43-52; U.S. Patent No. 7,554,995

9    ("'995 Patent") at 12:57-67 (distinguishing DHCP from the purported Nomadix

10   invention).  Nomadix's approach allowed a mobile computer to keep the static IP

11   address assigned to it on the network to which it typically was connected (which the

12   Nomadix patents call the "home" network).  When the computer sent out packets

13   on the new network (*i.e.*, the "foreign network), the packets (1) would have a static

14   IP address that would not make sense on the "foreign" network; and (2) would be

15   directed to the MAC address of the gateway on the "home" network, not to the

16   default gateway of the "foreign" network.  Without Nomadix's proposed solution,

17   the new network would simply ignore these packets and efforts to communicate

18   would fail.  To prevent a statically configured device from being ignored, Nomadix

19   introduced a special device (generally referred to in the early Nomadix patents as a

20   "nomadic router" or in the later patents as simply the "gateway device") that resides

21   between the computer and the first new network to which the computer is

22   connected.

23        The nomadic router "intercepts" the packets sent out by a statically

24   configured computer and tricks the computer into thinking that – even though it has

25   moved – it is still on its "home" network.  *See, e.g.*, '892 Patent, Abstract ("The

26   router automatically and transparently re-configures the terminal to its new location

27   and processes outgoing and incoming data.  The router includes a processor which

28   appears as the home network to the terminal, and appears as the terminal to the

1    communication system . . . .").[4]  The nomadic router modifies the outbound packets

2    transmitted by the computer so that the gateway on the "foreign" network will not

3    ignore them, and when other computers (*e.g.*, out on the Internet) send back

4    responses, the gateway will deliver any response to the nomadic router, which will

5    then ensure that the original computer receives them.

6         Nomadix later modified the nomadic router to add a number of other features

7    for managing these network connections, such as redirection services to control

8    network access and a billing module to track a device's access and use of the

9    network.  *See, e.g.*, '892 Patent at Figs. 1-3; U.S. Patent No. 6,636,894 ("'894

10   Patent") at Fig. 1; U.S. Patent No. 6,868,399 ("'399 Patent") at Fig. 2.

11   **III.   ARGUMENT**

12        The eight patents in suit roughly break down into three different categories:

13   (1) the Transparent Router Patents, (2) the Transparent Redirection Patents, and (3)

14   the Transparent Billing Patent.  For each group of patents, Defendants first provide

15   an overview of the relevant technology and then discuss the dispute(s) that the

16   parties' proposed constructions present.[5]

17        **A.     Transparent Router Patents ('892, '727, '995, and '009 patents)**

18        The '892, '727, and '995 patents[6] all originate from a single patent

19   application and share largely the same specification.  Although not directly in the

20   continuation chain of these patents, U.S. Patent No. 6,857,009 ("'009 Patent")

21   incorporates the '892 patent application by reference.  '009 Patent at 6:52-52.  For

22   _____

23   [4] The Nomadix patents repeatedly use this word "transparent" to describe the process by which the nomadic router would help statically configured computers connect to and communicate over the networks that they would encounter as they moved around.  As noted in this particular quote, the router would facilitate connection "automatically and transparently" – *i.e.*, without requiring manual reconfiguration and without the computer being "aware" that it is no longer at home.

26   [5] For ease of reference, the disputed claim terms are highlighted within the representative claims of each patent-in-suit in Ex. 33 [Exemplary Claims].

27   [6] The '995 patent is a continuation of the '727 patent, which is continuation-in-part of the '892 patent, which is a continuation-in-part of U.S. Pat. Appln. No. 08/816,174, filed on March 12, 1997, now abandoned.  *See* '995 Patent.

1  convenience, the '892, '727, '995, and '009 patents are collectively referred to in
2  this brief as the "Transparent Router Patents."

3  The Transparent Router Patents all describe the "nomadic router" capable of
4  providing a statically configured computer with access to a foreign network,
5  without reconfiguring the computer's network settings.  *See, e.g.,* '892 Patent at
6  Abstract.

### 1.   "home" terms ('892, '727, '995, and '009 patents)

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| home network<br>'892: claim 1<br>'727: claim 20<br>'009: claims 1, 23 | [network/gateway] to which the user device is configured to be connected and which corresponds to the home internet [or IP] address | network to which the user device is configured to be connected |
| home gateway<br>'995: claims 1, 17, 24, 40 | | No construction is necessary |

13  The disputes with respect to "home network" and "home gateway"
14  (collectively, "home terms") are:  (1) whether these terms should be construed as
15  explicitly defined in the patent specification or, as Nomadix argues, more broadly
16  to cover disclaimed subject matter and (2) whether the "home" in both terms should
17  be construed to mean the same thing.

18  Nomadix expressly defined the meaning of the "home" terms in its patents.
19  The patents, using definitional language, state:

20      It will be understood that the term "home" . . . **is** the network, gateway
21      or other communication devices or system to which the terminal is
22      normally connected **and** which corresponds to the home internet or IP
23      address.

24  '892 Patent at 6:15-19 (emphasis added); *see also* '727 and '995 Patents at 6:16-20.
25  Nomadix's unambiguous definition of "home" in the specification is controlling
26  and should be adopted.  *See Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d
27  1363, 1380 (Fed. Cir. 2009) ("When a patentee explicitly defines a claim term in
28  the patent specification, the patentee's definition controls.").

Nomadix argues that Defendants' construction reads limitations into the claims. To the contrary, Nomadix expressly defined "home" in the specification and must be held to that definition. Nomadix also argues that Defendants' construction introduces ambiguity. But, Defendants took the proposed construction straight from the specification. To the extent any ambiguity exists, it is a problem of Nomadix's own making. Nomadix told the world what it meant by "home" and now must live with its definition.

Nomadix seeks to ignore the clear language found in the specification so that it may argue that the claims read on systems and methods that utilize DHCP. But, Nomadix conceded during prosecution of these patents that user devices assigned temporary IP addresses through DHCP (*i.e.*, those that have no concept of "home" because their IP address changes frequently) do not fall within the scope of the Transparent Router Patents' claims.[7]  During re-examination of the '892 patent, Nomadix attempted to distinguish a prior art reference that assigned users a temporary IP address through DHCP, arguing that "[t]he DHCP packet is *not* intercepted" and "[t]he DHCP packet from the MH [mobile host] is *not* dropped" as required by the claims. *See* Ex. 9 at 4 [05/16/07 '892 RE ROA]; *see also Microsoft Corp. v. Multi-Tech Systems, Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) ("Any statement of the patentee in the prosecution of a related application as to the scope of the invention would be relevant to claim construction. . . ."); *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006) ("Under the doctrine of prosecution disclaimer, a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution."). Thus, both the specification and the prosecution history support Defendants' proposed construction.

---

[7] "[S]tatements from prosecution of a familial patent relating to the same subject matter as the claim language at issue in the patent being construed… are relevant in construing the claims at issue." *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007).

Finally, Nomadix challenges Defendants' construction by arguing that the term "network" and "gateway" should be defined differently.  But, Defendants do not contend that "network" and "gateway" have the same meaning.  Rather, Defendants contend only that the modifier "home" has the same meaning, regardless of whether it modifies "network" or "gateway."

## 2.    "foreign" terms ('892, '727, '995, and '009 patents)

Because the terms "foreign network," "foreign gateway," and "first network" (collectively, "foreign terms") describe the same concept based upon the same disclosure, these terms should be afforded the same construction.

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| foreign network<br>'892: claims 1, 8<br>'009: claims 1, 23 | [network/gateway] to which the user device is not normally connected and which corresponds to a local internet [or IP] address that is not the home internet [or IP] address | a network other than the home network |
| foreign gateway<br>'995: independent claims 1, 17, 24, 40 | | a gateway not on a network of the home gateway |
| first network<br>'727: claims 19, 20 | | No construction is necessary |

The parties' disputes with respect to the "foreign terms" are essentially the same as the disputes for the "home" terms, namely:  (1) whether the construction of these terms should include a requirement that the IP address be different from the home IP address and (2) whether "first network" requires construction.

### a)    "foreign" network/gateway

Just as the "home" network or gateway must correspond to the "home" Internet address, the "foreign" network or gateway must correspond to an IP address that is not the home IP address.[8]  The claims indicate that "foreign" network is distinguished from "home" network by the different IP addresses.  Claim 1 of the '995 patent, for example, claims a method of communicating through a foreign gateway and requires that the "<u>foreign gateway has an IP address</u>

---

[8]  In fact, Nomadix' proposed construction is consistent with the Defendants' construction.  *See* Op. Br. at 11.

1  different from the home gateway." Similarly, claim 1 of the '892 patent claims a

2  method for communicating over a "foreign" network and notes that packets that are

3  targeted to the "home" network are "intercepted." As such, a proper definition of

4  the "foreign" network or gateway should include the IP address that logically

5  defines a device as a member of a particular network.

6        Indeed, that point is made even clearer by the '892 patent re-examination file

7  history. During re-examination, Nomadix emphasized the importance of network

8  settings, such as IP addresses, in distinguishing a "home" network from a "foreign"

9  network. Nomadix stated, in pertinent part, "[t]he foreign network will have an IP

10  address that is unique to it. . . . The foreign network has a different IP address . . . ."

11  Ex. 10 at 3 [04/01/09 '892 RE ROH].

12        Nomadix claims that Defendants' constructions are vague and narrow. Op.

13  Br. at 17. To the contrary, Defendants' construction adopts the express definition in

14  the patent specifications. *See, e.g.*, '892 Patent at 6:15-19; '995 Patent at 6:16-20.

15  On the other hand, Nomadix's proposed constructions vaguely define the "foreign"

16  network or gateway as anything other than the "home" network or gateway. *See*

17  Op. Br. at 11 ("A device's 'home' network is the network that it is configured for.

18  Any other network is a 'foreign' network."); *id.* at 16 ("Accordingly, in the context

19  of the claims, 'a foreign gateway' is 'a gateway not on a network of the home

20  gateway.'"). These statements do not explain to the jury the differences in the

21  disputed terms. From the viewpoint of a user device, the "foreign" terms are

22  different from the "home" network or gateway to which the user device normally

23  connects because their IP addresses are different from the IP addresses of the

24  "home" network or gateway. *See, e.g.*, '892 Patent at 2:63-65, 6:15-19, 7:30-57,

25  8:11-17; '995 Patent at 3:4-6, 6:16-20, 7:30-57, 8:12-25.

26            **b)   "first network"**

27        The parties dispute whether "first network" is broad enough to encompass

28  any network, including the "home" network. Nomadix, by offering no construction

1    for this term, hopes to be able to read this term broadly enough to cover a "home"
2    network.  Op. Br. 20 ("Simply put, 'first network' by itself refers to any network,
3    not necessarily a foreign network.").   As discussed below, this construction is
4    contradicted by the claim language and is an improper attempt to recapture claim
5    scope given up during prosecution of the '727 patent.   Defendants' proposed
6    construction, which properly excludes the "home" network, is, on the other hand,
7    supported by the intrinsic evidence.

8         The claim language itself demonstrates that the "first network" cannot be the
9    "home" network.  For example, the preamble of claim 20 states "[t]he method of
10   claim 19 wherein the user device is configured to communicate over a <u>home</u>
11   <u>network</u> having network settings incompatible with the first network . . ."
12   (emphasis added).   Under Nomadix's construction, which allows the "first
13   network" to be a "home" network, claim 20 would make no sense.   Adopting
14   Nomadix's construction would render the prerequisite for performing the method of
15   claim 20 impossible as a "home" network <u>cannot</u> have network settings that are
16   incompatible with the "home" network.   On the other hand, Defendants'
17   construction makes clear that the "first network" cannot be the "home" network and
18   as such satisfies the preamble requirement of claim 20.   Furthermore, if "first"
19   meant "home," there would be no need for "intercepting user device messages …"
20   or "modifying incorrectly configured messages transmitted by the user device …"
21   as claim 19 of the '727 patent requires.  *See The Gentry Gallery Inc. v The Berkline*
22   *Corporation*, 134 F. 3d 1473, 1479-80 (Fed. Cir. 1998).

23        The claims would make no sense if the "first network" could be the "home"
24   network for yet another reason.  As even Nomadix has conceded, the claims require
25   a user device with a "static IP address."  *See* AJCCS (Dkt. No. 248), Ex. 2 at 6
26   ("user device having a permanent address").   The specification also consistently
27   teaches that the user device has a *permanent address* from the network to which it
28   is normally connected, *i.e.*, the "home" network.  *See* '727 Patent at 2:5-26.  Stated

1    another way, the "first network" cannot be the network that corresponds to the user

2    device's permanent address.  The patent claims a method for providing connectivity

3    to a "first network" and the specification explains that "a 'Nomadic' router or

4    translator enables a laptop computer … configured to be connected to a local home

5    network to be connected to any location on the internet … the processor intercepts

6    the message and translates the outgoing data by replacing the <u>permanent address</u>

7    <u>with the router address as the source address</u>."  *See id.* at 2:5-26 (emphasis added).

8    If the "first network" could be the "home" network there would be no need to

9    provide connectivity, as the computer would already be configured to communicate

10   with its "home" network.

11        Further, the specification makes clear that the dynamically configured

12   devices are not within the scope of this claim.  *Id.* at 12:43-50 ("Nomadic router **10**

13   may also provide other network services to host computer **12**.  For example, host

14   computer **12** may be able to utilize the DHCP service to obtain configuration

15   information rather than being <u>manually configured</u>.  However, a host computer

16   utilizing the DHCP service requires that a DHCP server be installed on the network

17   segment to which it is currently attached.  If the host computer **12** is configured to

18   use this service but a DHCP server is not available on the remote/foreign network,

19   nomadic router **10** will intercept the DHCP requests and respond with configuration

20   information for host computer **12** to use.") (underline added).

21        The prosecution history also supports Defendants' construction.   For

22   example, in response to a prior art rejection, Nomadix narrowed the scope of claim

23   19 to overcome that rejection[9] and stated that "[a]mended independent claim 19

24   provides a method for providing connectivity to a <u>foreign network</u> for a user

25   device."  Ex. 35 at 11 [06/07/04 '727 ROA] (emphasis added).  The amendment

26   clearly show that the claims of the '727 patent are not directed at just "any

27   ─────────────
28   [9] *See* Ex. 11 at 2 [04/22/04 '727 OA] ("Referring to claims 1 and 19, Bronstein discloses a method for providing connectivity to a second local area network for a user device configured for a first local area network . . . .").

network."

Nomadix's effort to make "first network" mean "any network" also ignores claim amendments that it made as a result of litigation[10] involving the '892 patent (parent of the '727 patent).  While prosecuting the '727 patent and after the PTO issued a notice of allowance, Nomadix informed the PTO that the term "foreign network" had been identified in litigation as indefinite and lacking written support in the '892 patent specification.[11]  The Examiner agreed with Nomadix's submission and rejected the '727 patent claims as invalid under 35 U.S.C. § 112.[12]

To overcome the rejections, Nomadix amended the '727 claims to use "first" in place of "foreign."  Nomadix argued that the discussion of a "remote or foreign network" in the specification provided written disclosure for "first network." Although the specification also discussed "home" network, Nomadix never indicated that the discussion of "home" network provided support for the claimed "first network."  Ex. 12 at 19 [03/09/06 '727 ROA] ("Examiner posited that … the term[] "foreign network" … lack[s] support in the written description.  Amended independent claim 19 recites … a "first network" … The specification describes … the configuration of a first network such as a remote or foreign network ….  As such, the written description supports the term 'first network'.").  This amendment, coupled with the Nomadix's other amendments narrowing claim 19 to require a user device with a permanent address, are further evidence that the "first network" is not the user device's network at its "home" or base location.  *See* '727 Patent at 6:8-10.

_____

[10] *See IP3 Networks, Inc. v. Nomadix, Inc.*, No. 3:04-cv-1485-BTM-POR (S.D. Cal.) (filed July 23, 2004); *see also* Ex. 12 at 19 [03/09/06 '727 ROA].
[11] *See* Ex. 13 at 1-3 [04/04/05 '727 RCE and Amdt.].
[12] *See* Ex. 14 at 2-3 [10/05/05 '727 OA].

### 3.    "user device having an incompatible IP address" ('727 patent)

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| user device having an incompatible private IP address[13]<br>'727: claim 11 | user device configured with a permanent IP address from the home network | user device configured with a private IP address not compatible with the network |
| incompatible private IP address | a unique IP addresses that can never match the unique private IP address of the user device[14] | private IP address not compatible with the network |

The parties agree that a "user device having" means a "user device configured with."  The parties, however, disagree as to whether an "incompatible private IP address" is a "permanent IP address from the home network."

At its core, this dispute is once again about whether the "incompatible" address results from a static IP based computer system.  Nomadix has put forth no evidence that "incompatible private IP address" has any ordinary or customary meaning.  To the contrary, like "home" network and "foreign" network, the use of the phrase "incompatible private IP address" is referring to the "permanent IP address from the home network."  Defendants' proposed construction makes clear that a user device's IP address from its "home" network is "incompatible" with a "foreign" network because the "foreign" network must be using private IP addresses that are different from the user device's "home" network.  On the other hand, Nomadix's definition amounts to no definition at all by merely defining "incompatible" as "not compatible" and little else.

---

[13] A private IP address is any IP address that falls within one of three IP address ranges reserved for private network use.

[14] "[I]ncompatible private IP address" is common to two terms in the parties' initial JCCS (Dkt. Nos. 202 and 214) ("utilizing private IP addresses for a user device having an *incompatible private IP address*" and "user device having an *incompatible private IP address*").  In the preparation of the reduced set of claim terms, the network perspective of an incompatible private IP address was inadvertently left in the Defendants' proposed construction for "incompatible private IP address," which was derived from an earlier proposal for "utilizing private IP addresses for a user device having an incompatible private IP address."

1      The specification does not use the phrase "incompatible private IP address."

2   Other than in the claims, the term "private IP address" is not used anywhere else in

3   the specification.   The file history however supports Defendants' position.

4   Nomadix described "private" and "permanent" synonymously in the file history.

5   Specifically, in response to a written description rejection that cited the disputed

6   term "incompatible private IP address," Nomadix repeatedly referred to "permanent

7   address," "permanent internet address," and "permanent IP address" as providing

8   support for the disputed term:

9      The Examiner posited that … 'incompatible private IP' [address]

10      lack[s] support in the written description … the IP address of the user

11      device has to be reconfigured each time the user device moves to a

12      new network (page 3, lines 27-29); the Nomadic Router provides 'a

13      permanent IP address' to the user device (page 4, lines 1-2); . . . the

14      user device has a 'permanent internet address which conveniently

15      need not be changed in accordance with the present invention' (page

16      9, lines 16-17); the **user device has a 'home internet or IP address'**

17      (page 9, lines 25-26); the Nomadic Router 'provides the mapping

18      between the location based IP address used in the internet today and

19      the permanent user based address housed in the CPU in the [user]

20      device *12*' (page 12, lines 10-14; and FIG. 2 - the 'IP Mapping'

21      element); the Nomadic Router has a protocol for specifying the

22      'mapping between permanent and temporary IP addresses' (page 12,

23      lines 15-21); … As such, the written disclosure supports the term[] . . .

24      'incompatible private IP address'. [sic]

25   Ex. 12 at 14-16 [03/09/06 '727 ROA] (emphasis added).   As such, Defendants

26   proposed a construction that is consistent with the patentees' statements and the

27   support identified during prosecution of the '727 patent.

28      By contrast, Nomadix does not even attempt to construe the disputed terms.

1  Nomadix simply proposes to construe "incompatible" as "not compatible," which
2  would not help a jury understand what it means for a private IP address to be
3  incompatible with a network.  *O2 Micro International Ltd. v. Beyond Innovation*
4  *Technology Co., Ltd.*, 521 F. 3d 1351, 1362 (Fed. Cir. 2008); *see also U.S. Surgical*
5  *v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997) (the purpose of claim
6  construction is to resolve disputed meanings of claim terms, not to repeat or restate
7  claims terms).

8       Nomadix's claim construction arguments ignore the fact that the
9  specification only provides support for a user device configured with a unique or
10 permanent IP address from its "home" network.  Op. Br. at 24-25.  Specifically, the
11 specification states that "[t]he nomadic router automatically converts the actual
12 location address to a unique communication address for the user such as an internet
13 address, such that the terminal [*i.e.*, the user device] performs communications
14 originating from the communication address regardless of the physical location of
15 the terminal."  '727 Patent at 2:44-49 (emphasis added).  Further, the specification
16 states "the present nomadic router provides a separation of location and identity by
17 providing a permanent IP address to the network device (host)."  *Id.* at 3:1-3
18 (emphasis added); *id.* at 6:7-9 ("Host device 12 may be provided with a permanent
19 internet address which conveniently need not be changed in accordance with the
20 present invention.") (emphasis added).

21                    **4.    "incorrectly configured messages" ('727 patent)**

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| incorrectly configured messages<br>'727: claim 19 | messages addressed to an incorrect address | No construction is necessary |

24 Despite the fact that the '727 patent specification never uses the phrase
25 "incorrectly configured messages" anywhere but in the claims, Nomadix argues that
26 a jury will understand this term and that it need not be construed.  Nomadix is
27 wrong.  A jury cannot be asked to understand this technically complex phrase when
28

Defendants' Claim Construction Brief
                                                                      CV-09-08441 DDP (VBKx)

1   it is nowhere in the patent, and Nomadix has introduced no evidence that this term
2   has an ordinary and customary meaning to a person of ordinary skill in the art, let
3   alone to the average juror.

4        While the written description is replete with references to how <u>user devices</u>
5   are "configured" it does not explain how a message – *i.e.*, a packet of information
6   sent out by a computer – can be "configured," much less "incorrectly configured."
7   Indeed, the PTO issued a rejection under 35 U.S.C. § 112 on the grounds that this
8   term lacked support in the specification.  In response, Nomadix explained that "a
9   user device is configured to be connected to a local home network such that the user
10  device transmits messages based on its configuration."  Ex. 12 at 21 [03/09/06 '727
11  ROA].    As Nomadix further explained, "the user device may not be able to
12  communicate with a new network to which the user device is connected when the
13  user device is 'configured incorrectly' for the network."  *Id.*  In other words,
14  Nomadix informed the PTO that there was support in the written description for
15  "incorrectly configured messages" because the written description described
16  <u>incorrectly configured devices</u>.

17       The '727 specification explains that a host or user device is incorrectly
18  configured when it attempts to send packets to an address that cannot receive them:
19  "a router will receive the packets only if the host computers specifically send
20  (address) the packets to that router … If a host is <u>configured incorrectly</u> (bad
21  address or address of a router not on the local network), then the host computer and
22  router will be unable to communicate, *i.e.*, the router will not listen to the host or
23  will 'drop' packets." '727 Patent at 1:48-54 (emphasis added).  The only logical
24  conclusion one can reach then is that "incorrectly configured messages" are those
25  sent to an incorrect address, *i.e.*, to a gateway that is not on the network.

26       Nomadix apparently concedes that an incorrect address constitutes "one kind
27  of incorrectly configured message."  Op. Br. at 26.  But Nomadix provides no
28  evidence that the term should be construed more broadly.  Instead, Nomadix argues

1   that claim 19 of the '727 patent demonstrates that, in some instances, a message

2   will be "incorrectly configured" because the address of the user's device is

3   "incorrect." *Id*. at 27.  This argument is simply wrong.  A user device's address is

4   what it is and cannot be "incorrect."  Similarly, the fact that claim 19 describes

5   messages that are modified by replacing the source address with the router address

6   does not mean that the source address is what makes the message "incorrectly

7   configured."  To the contrary, the claim *separately* requires that the message have

8   "the permanent address of the user device as a source address."  That permanent

9   address cannot remain the source address of the message after the router fixes the

10  bad destination MAC address because the resulting, "corrected" message comes

11  from a new source – the router itself.  The "wherein" clause imposes precisely that

12  additional limitation:  the source address must be changed from the static IP address

13  of the user device to the router's address (to ensure that any responsive message

14  returns to the router, for delivery to the device).

15        The source address translation just described must occur any time user device

16  messages are "intercepted" and modified – without regard to the reason for the

17  modification.  Thus, the presence of the words "incorrectly configured" has to

18  import some other meaning to the claim.  *Agilent Technologies, Inc. v. Affymetrix,*

19  *Inc.*, 567 F.3d 1366, 1378 (Fed. Cir. 2009) ("A claim construction that gives

20  meaning to all the terms of the claim is preferred over one that does not do so.")

21  (citation omitted).

22        Finally, Nomadix argues that Defendants' construction of this phrase

23  "applies only in absurd circumstances."  Op. Br. at 26.  To the contrary,

24  Defendants' construction applies directly to the problem purportedly solved by

25  these patents:  what happens when a device moves from one network to another but

26  continues to direct messages to the MAC address of the gateway on the "home"

27  network.  Nomadix's solution was to have its nomadic router "correct" those

28  messages.

Defendants' Claim Construction Brief
CV-09-08441 DDP (VBKx)

1    Nomadix's alternate scenario, that a user types in "www.google.com" but the
2    resulting packet is addressed to "www.yahoo.com," is absurd and not at all what
3    Defendants have argued or will argue.  The whole point of how the modern Internet
4    works is that two destination addresses are required:  an IP address for the ultimate
5    destination and a MAC address for the next device on the journey to that
6    destination.  From the perspective of any local network, the destination IP address
7    will typically be for some distant device (*e.g.*, a webserver for Google or Yahoo).
8    As far as the local network is concerned, almost any IP address is "correct," but that
9    is not true of the destination MAC address.  That address can certainly and easily be
10   "incorrect."   As just explained, if that MAC address is not associated with any
11   device on the LAN, the message addressed with it will be dropped.  Thus, if a
12   computer has a permanent IP address (as is the case for these claims) and moves to
13   a different network, any message that it would send (including a request for
14   www.google.com) will contain the destination MAC address of the wrong gateway.
15   Because that gateway is not on the current network, that address is "incorrect" and
16   the message containing it would be dropped.  Defendants' construction is designed
17   to capture this circumstance – and the specification describes no other.[15]

18              **5.    "user host device is configured to communicate . . . by using**
19                    **an IP address of the home gateway" ('995 patent)**

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| the user host device is configured to communicate through a home gateway by using an IP address of the home gateway<br>'995: claims 1, 17, 24, 40 | the user device is configured with a permanent IP address to communicate through a home gateway | No construction is necessary |

25           Despite the fact that Nomadix has stipulated that user devices "configured to

26   _____
     [15] Nomadix' exercise in absurdity underscores the need for a precise construction of
27   this term.  The obfuscating example that Nomadix raises would be further removed
     by simply changing the Defendants' proposal to read, "messages addressed to an
28   incorrect MAC address."  Defendants have no objection to this further
     modification, if the Court is so inclined.

                                        Defendants' Claim Construction Brief
                                        CV-09-08441 DDP (VBKx)

1   communicate with a home network" in the '892 patent require a static or permanent
2   IP address for the user device (*see* AJCCS, Dkt. No. 248, Ex. 1), Nomadix argues
3   that the '995 patent should not be similarly limited – even though the '995 patent is
4   a continuation of the '892 patent, shares much of the same specification, and
5   contains essentially the same claim limitation.  The plain language of the claims
6   should be construed consistently across all patents in the family.  *NTP, Inc. v.*
7   *Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005).  In both the '995
8   patent and the '892 patent, the claims and specification make clear that a permanent
9   IP address is what "configure[s]" the user host device "to communicate through a
10  home" network and the gateway on that network.[16]  Nomadix's attempt to avoid
11  construction does not resolve the scope of the '995 patent for the jury and
12  contradicts its own agreed construction of the '892 patent.

13      The '995 patent claims are directed at receiving and processing Address
14  Resolution Protocol (ARP) packets that are targeted for a user device's home
15  gateway.  For background, an ARP request packet is a request that asks other
16  devices on a particular network to tell the sender what the MAC address is for a
17  given IP address.  As reflected by the prior art that Nomadix cited to the Examiner,
18  ARP, including proxy ARP[17], is an old and well-known way for a device to obtain
19  the MAC address of, *e.g.*, a default gateway on a network.  *See* '995 Patent at 3
20  (citing Network Working Group Requests for Comments: 1919–Classical Versus
21  Transparent IP Proxies (Mar. 1996)).  Proxy ARP is not used in connection with
22  computers using DHCP, as the DHCP process automatically informs the computer
23  of the default gateway's address.

24  _____
[16] The parties separately dispute the meaning of "home" gateway.  Because
25  Defendants believe "home" gateway should be construed consistently with "home"
    network, both terms are addressed in Section III.A.1.
26  [17] A gateway device can be configured to provide its own MAC address in response
    to an ARP request even though that request seeks the MAC address of an IP
27  address other than the gateway's.  When a gateway device does this, it is engaging
    in what is called "proxy ARP."  *See* '995 Patent at 3 (citing Network Working
28  Group Requests for Comments: 1027–Using ARP to Implement Transparent
    Subnet Gateways (Oct. 1987)).

1       Defendants' construction is supported by the claim language, which requires

2   that "the user host device is configured to communicate through a home gateway by

3   using an IP address of the home gateway."   Only a user host device with a

4   permanent IP address would be trying to communicate over a foreign network using

5   an IP address of a "home" gateway.   If a user host device were assigned a

6   temporary IP address, as Nomadix implies, there would be no need to transmit an

7   ARP request packet containing the IP address of its "home" gateway, as the claims

8   expressly require.

9       The specification further supports Defendants' construction that a permanent

10  IP address is required.   The "Summary of the Invention" section states that the

11  nomadic router "enables a laptop computer or other terminal which is configured to

12  be connected to a local home network to be connected to any location on the

13  internet . . . ."  *Id*. at 2:11-13.   After the user device transmits a message, "the

14  processor intercepts the message and translates the outgoing data by replacing the

15  permanent address with the router address as the source address."  *Id*. at 2:25-27

16  (emphasis added).  Further, the router "translates the incoming data by replacing the

17  translator address with the permanent address as the destination address."  *Id*. at

18  2:29-31 (emphasis added).   The patents make repeated references to permanent

19  addresses in the Summary of the Invention, indicating that the claims are limited to

20  user devices with a permanent IP address.  *C.R. Bard, Inc. v. U.S. Surgical Corp.*,

21  388 F.3d 858, 864 (Fed. Cir. 2004) ("Statements that describe the invention as a

22  whole, rather than statements that describe only preferred embodiments, are more

23  likely to support a limiting definition of a claim term.").

24      To counter Defendants' construction, Nomadix raises two inapposite points.

25  First, Nomadix contends that Defendants "change the meaning of the claim

26  language by omitting that the IP address is the IP address 'of the home gateway.'"

27  Op. Br. at 15.  A permanent IP address to communicate through a "home" gateway

28  necessarily requires the use of an IP address of the "home" gateway.  As identified

Defendants' Claim Construction Brief
CV-09-08441 DDP (VBKx)

1   in the problem the Nomadix patents sought to solve, if the permanent IP address
2   were not for the "home" gateway, the user device could not communicate through
3   the "home" gateway.  '995 Patent at 3:43-50, 6:7-11.  Further, if the user device
4   were not configured to communicate using the permanent IP address of its "home"
5   gateway, the nomadic router would need to assign a temporary IP address.  '995
6   Patent at 12:61-67.

7       Second, Nomadix argues that "the claim language is clear on its face"
8   because the user host device is configured to communicate with the "home"
9   gateway.  Op. Br. at 14.  Nevertheless, the claim language is *not* clear on its face
10  what type of configuration meets this limitation.  To the extent that Nomadix argues
11  that any IP configuration – static IP or temporary assignment through DHCP – falls
12  within the scope of the claim, Nomadix would broaden the scope to encompass any
13  use of an IP address.  Had Nomadix intended the claim to cover all communications
14  using an IP address, it could simply have drafted the claim to read "user host
15  device."  Instead, Nomadix included additional limitations about how the user host
16  device is configured, which must affect the meaning of the term.  *Agilent
17  Technologies*, 567 F.3d at 1378 ("A claim construction that gives meaning to all the
18  terms of the claim is preferred over one that does not do so.") (citation omitted).

19          **6.    "single connection . . ." ('009 patent)**

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| single connection between the device and the computer<br>'009: claims 1, 23 | connection between the device and the computer that does not copy data between two sessions or use application buffering | No construction is necessary |

23      The parties dispute whether this term requires construction at all.
24  Construction is necessary because of the "intentional disclaimer, or disavowal of
25  claim scope by the inventor."  *Phillips v. AWH Corporation*, 415 F.3d 1303, 1316
26  (Fed. Cir. 2005).

27
28

-22-

Nomadix disclaimed copying data between two sessions and the use of application buffering in the '009 patent specification.  Specifically, Nomadix stated:

> Whether or not the client is configured to use a proxy service, a connection is established between the client and the configuration manager, and between the configuration manager and the origin server. <u>Rather than copying data</u> between these two sessions, <u>the present invention</u> transfers the session flow control functions to the endpoints to effectively splice the connections together while maintaining the end-to-end semantics.  To splice the connections, the configuration manager modifies the message header and retransmits the message so <u>there is no need for application buffering</u>.

'009 Patent at 3:37-47 (emphasis added).  This passage disclaims the copying of data and application buffering for "<u>the present invention</u>," not just an embodiment.  "When a patent … describes the features of the 'present invention' as a whole, this description limits the scope of the invention."  *Verizon Services Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007).  *See also SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343 (Fed. Cir. 2001) ("[T]he characterization of the coaxial configuration as part of the 'present invention' is <u>strong evidence</u> that the claims should not be read to encompass the opposite structure.") (emphasis added); *C.R. Bard*, 388 F.3d at 864 ("Statements that describe the invention as a whole are more likely to be found in certain sections of the specification, such as the Summary of the Invention.").

That a "single connection" excludes copying and buffering is further confirmed by other intrinsic evidence[18], including the cited IBM Research Paper. Ex. 27.  In that paper, the authors repeatedly state that the single connection created by their new splicing technique does not copy data and does not use buffering.  *See*

---

[18] "(P)rior art cited in a patent … constitutes intrinsic evidence."  *V-Formation, Inc. v. Benetton Group SPA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005).

Defendants' Claim Construction Brief
                                                                CV-09-08441 DDP (VBKx)

1    *id*. at 2 ("the proxy does not have to buffer any packets"); *id*. at 2-3 ("the data

2    copying part of the proxy—where the performance is normally lost—is replaced by

3    a single ioctl() call to set up the splice."); *id*. at 12 ("By moving received data from

4    the input buffer directly to the output buffer, the systems save the overhead of

5    copying the data through application space.  In TCP Splice, there *is no* input or

6    output buffer.") (emphasis in original).

7         In sum, there is a legitimate dispute over the proper scope of the "single

8    connection" phrase, and that phrase therefore requires construction.  Defendants'

9    construction is required by the patentees' disclaimer from the "present invention" of

10   copying and buffering.  Defendants' construction should be adopted.

11   **B.    The Transparent Redirection Patents ('894, '554, and '716**

12   **patents)**

13        The U.S. Patent No. 6,636,894 ("'894 Patent"), 7,194,554 ("'554 Patent"),

14   and 7,689,716 ("'716 Patents")[19] (collectively, the "Transparent Redirection

15   Patents") all originate from a single patent application and have similar

16   specifications.  They incorporate the same set of provisional applications.  They

17   also incorporate the parent application to the Transparent Router Patents.  Building

18   on the claimed nomadic router for statically configured computers, the Transparent

19   Redirection Patents added additional functionality to the nomadic router described

20   in the Transparent Router Patents.  The Transparent Redirection Patents purport to

21   redirect transparently a user's requests to a login page, control the user's level of

22   access via a login profile, and present location-specific information on the login

23   page.

24        Like the Transparent Router Patents, the Transparent Redirection Patents

25   disclose a gateway that transparently intercepts a computer's request for Internet

26   access to make a determination whether to allow the computer to access a "foreign"

27

28   ---
     [19] The '716 patent is a continuation of the '554 patent, which is continuation-in-part of the '894 patent.  *See* '716 Patent.

network without requiring a change in the user's "home" network setting.  *See, e.g.,* '894 Patent at 3:27-34; *see also* '554 Patent at Abstract; *see also* '716 Patent at 8:57-67.   The '894 patent describes directing a computer's access request to a redirection server if redirection is required.  *Id.*  The '554 patent also describes processing the users' login information to determine access rights on the "foreign" network.  The '716 patent describes presenting location-specific information to the user on the login page generated by the redirection server.

### 1.   "the order of steps of all claims" ('894 patent)

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| the order of steps of all claims | The steps of all the claims must be performed in the order listed | No construction is necessary |

The language of claims 1 requires that the method steps be performed in the order recited.  The nearly identical language in claim 6 requires that the claimed system perform the recited operations in that same order.

### a.   Claim 1

A method claim requires a specific order of steps when, "as a matter of logic or grammar, they must be performed in the order written."  *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003).  In particular, if a later step depends on the result of a previous step, the steps must be performed in that order.  *See, e.g., Elan Microelecs. v. Apple, Inc.*, No. C 09-01531 RS, 2010 WL 4510909, at *5 (N.D. Cal. Nov. 1, 2010) ("It is well established that where a claim step refers to the completed results of a prior step, the order is a claim limitation.") (*citing E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007).  Here, both logic and grammar support Defendants' construction.

As "a matter of logic," each of the seven steps of claim 1 must be performed in the recited order.  Claim 1 requires:  (1) "receiving" the request at the gateway device; (2) "determining" whether the request requires redirection; (3) "storing" the destination address if redirection is required; (4) "modifying" and "communicating"

1    the request to a redirection server if redirection is required; (5) "responding" to the
2    modified request; (6) "intercepting" and "modifying" the response; and (7)
3    "sending" the modified response to the computer. '894 Patent, Claim 1. Each step
4    expressly depends on the ones before it. By way of illustration, the redirection
5    server responds to the "modified browser request" at step 5. But, the "modified
6    browser request" does not even <u>exist</u> until the gateway device modifies the original
7    request, at step 4. Therefore, step 5 must occur after step 4. Similarly, the gateway
8    device cannot "intercept" the browser redirect message, at step 6, until after the
9    redirection server sends the message, at step 5. The gateway device cannot send the
10   "modified" message to the computer, at step 7, until after it "modifies" the
11   message, at step 6. Each of the other steps is similarly constrained to occur in a
12   specific sequence.

13        The grammar of the claim also imposes an order to the steps. The "storing"
14   and "modifying and communicating" steps are performed only "if redirection is
15   required." Until the gateway "determines" whether redirection is required, it does
16   not know whether the "storing" and "modifying and communicating" steps are to
17   be performed. Therefore, the "storing" and "modifying and communicating" steps
18   must be performed after the "determining" step.

19        Nomadix argues that there cannot be a required order when the claim
20   includes conditional elements. Op. Br. at 29 n.4. The Federal Circuit disagrees.
21   The use of "conditional language" "mandate[s]" an order of steps. *Altiris*, 318 F.3d
22   at 1367 (steps that are performed "if said testing automatically step indicates an
23   automation boot sequence" must be performed after the "testing automatically"
24   step); *see also Ring Plus, Inc. v. Cingular Wireless, LLC*, No. 2:06-CV-159-DF,
25   2007 WL 5688765, at *22 (E.D. Tex. July 9, 2007) (the step of "terminating the
26   telephone call . . . if the telephone line is busy" must be performed after the step of
27   "determining whether the telephone line . . . is busy"). Here, the use of the phrase
28   "if redirection is required" clearly and unambiguously imposes an order of steps.

### b.    Claim 6

Claim 6 recites a system, rather than a method, but it, too, requires a specific order of operations.  When the plain language of a claim – even a system claim – describes a sequential process, a specific order is imposed.  *See, e.g., Oak Tech., Inc. v. Int'l Trade Comm'n*, 248 F.3d 1316, 1325 (Fed. Cir. 2001); *see also Bio Tech. Gen. Corp. v. Duramed Pharm., Inc.*, 325 F.3d 1356, 1362 (Fed. Cir. 2003). Here, claim 6 recites a system for redirecting access requests that performs all the same steps as method claim 1.  For example, claim 6 includes a "gateway device" that receives, determines, stores, and modifies in the same order as, and with nearly the identical language of, claim 1.  In particular, claim 6, like claim 1, requires that the gateway device "store" and "modify" the original request only "if redirection is required."  '894 Patent, Claims 1 and 6.

To the extent that there is any difference between the steps of claim 1 and those of claim 6, claim 6 is even more explicit about the order of steps.  Claim 1 requires "intercepting" and "modifying" the browser redirect message and then "sending" the modified message to the user's computer.  Claim 6 replaces the "sending" step with a "forwarding" step.  But, it expressly states that the gateway device intercepts and modifies "<u>before</u> forwarding the browser redirect message." (emphasis added).

### c.    Nomadix ignores the plain language of the claims and the prosecution history.

Nomadix offers two arguments to try to justify broadening the scope of its claims.   Neither is adequate to the task.   First, Nomadix mischaracterizes Defendants' construction.  Defendants have never claimed the gateway must receive <u>all</u> requests before it can determine whether <u>any</u> of them require redirection. Claim 1 recites a list of steps that must be applied to each request that is to be redirected.   The preamble to claim 1 describes the invention as method for redirecting "an" (singular) original request.   Clearly, the gateway device cannot

1   determine whether a <u>particular</u> request requires redirection until the request has
2   been received.  The fact that this method will be repeated over and over again for
3   all of the incoming requests does not change how the method applies to each
4   individual request.

5       Second, Nomadix contends that the "storing" step need not be performed
6   before the "modifying and communicating" step.   But Nomadix ignores the
7   prosecution history, in which it clarified how the "modifying" step changes the
8   access request.   The original request is modified by overwriting the original
9   destination address with the address of the redirection server.  Ex. 15 at 5 [05/06/03
10  '894 ROA] ("If redirection of the destination address access request is required,
11  then . . . the original destination address access request is modified with the
12  destination address of a redirection server.").   Once the modifying step has been
13  performed, the original destination address is gone and, therefore, cannot be stored.
14  Nomadix does not point to any support for the nonsensical position that the original
15  destination address can be stored after it has been overwritten with the new
16  destination address.

17      Both claim 1 and claim 6 require a specific order of steps.  Defendants ask
18  the Court to instruct the jury that the steps of the '894 patent claims must occur in
19  the order recited.

20          **2.    "administrator" ('894 patent)**

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| administrator<br>'894: claims 1, 5, 6 | a person who administers the gateway device | No construction is necessary |

23  The parties dispute whether the term "administrator" requires construction.
24  Construction is required because the claim provides little guidance as to what an
25  "administrator" is. The term is used in independent claim 1 as follows:

26      responding, at the redirection server, to the modified request with a
27      browser redirect message that reassigns the modified request to an
28      <u>administrator-specified</u>, redirected destination address

1   '894 Patent, Claim 1 (emphasis added).

2        The specification explains that the administrator specifying the redirection

3   address is a person in charge of administering the gateway device.  *Id*. at 8:25-28.

4   For example, the specification explains that "the computer network can provide

5   access to users and direct the users to <u>portal pages established by the user, network</u>

6   <u>administrator</u> or another entity."  *Id*. at 3:9-33 (emphasis added).  The specification

7   also explains that "the <u>gateway administrator can readily alter the parameters or</u>

8   <u>other settings</u> in order to tailor the service according to their particular application."

9   *Id*. at 9:61-64 (emphasis added).  And, the specification explains that "the <u>gateway</u>

10  <u>administrator will have the capability to dynamically change the information</u>

11  <u>supplied</u> in the portal page based on many factors."  *Id*. at 10:31-36 (emphasis

12  added).  These teachings make clear that the "administrator" is a person who

13  administers the gateway device.

14       Defendants' proposed construction is consistent with Nomadix's previous

15  claim construction briefing.  Nomadix previously stated:

16       The '894 patent discloses technology that allows <u>network operators</u>

17       <u>like hotels</u> to force computers connected to the network to behave in a

18       certain way . . . a hotel could ensure that any user connected to the

19       network views the hotel's login page rather . . . than the user's home

20       page . . . when the user first opens his browser.

21  Ex. 28 at 35 [Nomadix's Op. Br.] (emphasis added).  The "administrator-specified"

22  limitation of the "administrator-specified redirection destination address" requires a

23  person – for example, a hotel network operator – administering the gateway device.

24          **3.**    **"access rights" terms ('554 patent)**

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| [determines the access rights of the source / determining the access rights of the source based upon the | once the source is authenticated to access the network, determine[s/ing] the rights of the source to | No construction is necessary |

| identification of the source], wherein [the] access rights define the rights of the source to access destination sites via the network '554: claims 10, 17 | access particular destination sites via the network based upon the identity of the source and the content and/or destination requested | |
|---|---|---|

The plain language of the '554 patent claims demonstrates that determining a user's "access rights" goes beyond the simple gatekeeper functionality of allowing or denying a user <u>any</u> access to the network. *Phillips,* 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms."). Indeed, claim 10 recites a system in which a server first determines if a user "is entitled to access the network based upon the access information" and only then "determines the access rights" of the user. Furthermore, claim 10 makes clear that the purpose of the system is "for selectably controlling <u>and customizing</u> access, to a network, by a source" (emphasis added).[20]  '554 Patent, claim 10. Without clear guidance from Defendants' construction, a jury may think that a system providing exactly the same network access to all sources falls within the claims – despite the fact that the claim requires the ability to customize a source's access through "access rights."

Unlike the "all or nothing approach" of conventional methods,  the specification discloses a "system that allows users dynamic and customizable access to a network such that the user's access and authorization to particular networks or sites is customizable." '554 Patent at 2:57-61.  The specification accomplishes this goal through a two-step process.  First, the AAA (Authentication, Authorization, and Accounting) server authenticates the user based upon information identifying the user, such as an ID or location. *Id*. at 3:12-18.  Then, "[o]nce authenticated," the server determines the user's access rights, "such that

---

[20] According to the specification, "source" can refer to "a particular user, computer or location" attempting to access the network. '554 Patent at 3:17-18.

1    sources have different access rights based upon their identity, and the content
2    and/or destination requested."[21]   *Id.* at 3:18-22.   "For example, it would be
3    advantageous for some users to be authorized access to all Internet sites, while
4    others may be denied access to particular sites."  *Id.* at 2:65-3:1.  "[E]ach time the
5    user attempts to access a different destination, the user is subject to the AAA, so
6    that the user may be prevented access from a particular site the AAA system and
7    method deem inaccessible to the user based upon the user's authorization while
8    permitting access to other sites that the AAA method and system deem acceptable."
9    *Id.* at 3:35-41.

10        By declining to construe "access rights," Nomadix tries to conflate the two-
11   step process in the claims of authenticating users and then "selectively permit[ting]
12   users a range of authorization" (from full access to access restricted to certain sites)
13   into the very "all or nothing approach" that Nomadix insisted its system was "not
14   based upon." *Id.* at 3:3-5.  Nomadix cannot escape the clear import from the claims
15   and specification that "access rights" do not simply allow a source onto the
16   network, but define which sites the source may visit once on the network.

17        Nomadix argues that Defendants' construction imposes an order of steps to
18   the '554 patent claims without justification.  Op. Br. at 33.  But common sense and
19   the plain language of the claims indicates that the step of "determin[ing] if the
20   source is entitled to access the network" must precede the step of "determin[ing] the
21   access rights," *i.e.,* "the rights of the source to access destination sites."  *Ring Plus,*
22   *Inc. v. Cingular Wireless Corp.*, 614 F.3d 1354, 1364 (Fed. Cir. 2010) ("Because a
23

---

24   [21]  Although claim 17 requires that "access rights" are "based upon the identification
25   of the source" and claim 10 does not, the specification's clear disclosure that
     "access rights" are based on the "identity" of the source "and the content and/or
26   destination requested" overrides the presumption of claim differentiation.  *Curtiss-*
     *Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006).
27   Moreover, there are numerous other differences between system claim 10 and
     method claim 17.  *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed.
28   Cir. 2000) (claim differentiation "does not mean that every limitation must be
     distinguished from its counterpart in another claim, but only that at least one
     limitation must differ").

1    sound presentation cannot be 'allowed to continue' before the presentation is first
2    played, the required order of the steps necessarily indicates that 'allowing' a sound
3    presentation means allowing the presentation to begin.") (emphasis in original).

4    **4.    "regardless of network configurations" ('554 patent)**

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| regardless of network configurations<br>'554: claims 10, 17 | regardless of the hardware, MAC addresses, IP addresses, and networking protocols used by the network and the source computer | No construction is necessary. However, if the Court is inclined to construe the term, Nomadix proposes:  regardless of network address settings. |

9        The parties dispute the meaning of "regardless of network configurations."
10   The patent claims and specification provide little guidance as to the meaning of the
11   phrase.   It is the prosecution history for the '554 patent that clarifies what the
12   phrase means, and Defendants' construction reflects that clarification.

**a.    Regardless of networking protocols**

14       Throughout prosecution of the '554 patent, Nomadix argued that an essential
15   feature of its invention was a "universal gateway device" capable of connecting any
16   computer to any network, regardless of networking protocols.[22]  It was this feature
17   – and this feature alone – that distinguished Nomadix's invention from the prior art.
18   Nomadix cannot now broaden the scope of its patent to recover what it has
19   expressly disclaimed.  *See, e.g.*, *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d
20   1570, 1576 (Fed. Cir. 1995) ("Claims may not be construed one way in order to
21   obtain their allowance and in a different way against accused infringers.").

22       The PTO repeatedly rejected every claim of the '554 patent as being
23   anticipated by, or obvious in light of, U.S. Patent No. 6,385,653 ("Sitaraman").  *See*
24   Ex. 18 [04/15/05 '554 OA]; Ex. 19 [12/21/05 '554 OA]; Ex. 20 at 5 [05/26/06 '554
25   OA].  Nomadix added the phrase "regardless of network configurations" after one

---

27   [22] The applicant had tried, and the Examiner had rejected, two earlier formulations
28   to capture this core concept:  "transparent access" and "pre-defined
     relationships"/"pre-assigned protocols."  *See* Ex. 16 at 8-12 [12/13/04 '554 ROA];
     Ex. 17 at 7-10 [02/11/05 '554 ROA]; Ex. 18 at 5 [04/15/05 '554 OA].

such rejection.  *See* Ex. 21 [10/17/05 '554 ROA].  Sitamaran included a "protocol layer" that could communicate with a source computer via multiple different protocols, using a variety of "protocol handlers."  *Id.* at 8; *see also* Ex. 37 at 4:39-49 [Sitaraman '653 Patent].  Nomadix admitted that the Sitaraman gateway was "robust."  Ex. 21 at 8 [10/17/05 '554 ROA].  But it was not robust enough.  According to Nomadix, Sitaraman did not operate "regardless of network configurations" because the source computer was limited to using one of only a finite number of protocols that the gateway supported:

> [T]he protocol layer (110) [of Sitaraman] does not enable a computer to communicate with the network <u>regardless of network configurations</u>.  To the contrary, the protocol layer only supports clients who utilize one of the specific application protocols for which a protocol handler has been installed, *and not other protocols*. . . .  If the protocol is not supported, however, the computer user will be unable to communicate with the network.

*Id.* at 8 (italics added).  By adding "regardless of network configurations," Nomadix clearly limited its claims to "gateway devices" that support all "other protocols."

The PTO once again rejected Nomadix's claims, noting that the Sitaraman gateway was "scalable to support additional network access methods" by adding protocol handlers to accommodate any new networking protocols encountered, thereby teaching "access to <u>any</u> network regardless of network configurations."  Ex. 19 at 11 [12/21/05 '554 OA] (emphasis in original).  Nomadix amended its claims again, this time clarifying <u>how</u> its universal gateway device would support all "other protocols":  it would do so "via a packet translation learned during a self configuration."  Ex. 22 at 8-9 [03/21/06 '554 ROA].

The PTO eventually allowed the claims.  In its Notice of Allowability, the patent examiner specifically cited the ability to "access any network regardless of network configurations via packet translation learned during self configuration" as

Defendants' Claim Construction Brief
CV-09-08441 DDP (VBKx)

the basis for its allowance.  Ex. 23 at 2 [11/28/06 '554 Notice of Allowability].  Where a patent applicant so clearly limits the scope of a claim by amendment, construction to capture the prosecution history disclaimer is appropriate.  *Gillespie v. Dywidag Sys. Int'l*, 501 F.3d 1285, 1291 (Fed. Cir. 2007) ("The patentee is held to what he declares during the prosecution of his patent.").  Defendants propose that "regardless of network configurations" be construed to include "regardless of . . . networking protocols" precisely to convey this disclaimer.

### b.   Regardless of IP addresses

The phrase "regardless of network configurations" also requires that the gateway device connect any computer to any network regardless of IP addresses.  Nomadix has conceded that the gateway device must operate "regardless of network address settings."  Op. Br. at 35-37.  IP addresses are "network address settings."  IP addresses are assigned by the network to identify the source and destination of network traffic.  At the time the '554 patent was filed, a computer had to be configured with its own IP address and that of the gateway device.  Provided it is understood that "network address settings" includes these IP addresses, Defendants do not object to the use of the more generic term.

Even if Nomadix disputes Defendants' understanding of what constitutes a "network address setting," the patent supports Defendants' construction that the gateway device operates regardless of IP addresses.  The '892 patent states[23] that the universal gateway device allows a computer to connect to the network without changing its IP address.  The universal gateway "removes any burden on the user for device reconfiguration (*e.g.*, IP address configuration, gateway or next hop router address, netmask, link level parameters, and security permission)."  '892 Patent at 8:14-17 (emphasis added).  The '892 patent further explains that the gateway device is able to reconfigure itself to use whatever IP addresses are

---

[23] The '554 patent incorporates the '892 patent by reference.  Ex. 22 at 8 [03/21/06 '554 ROA].

1   available and to reconfigure itself to avoid conflicts with other devices.  *Id.* at

2   12:66-13:3 ("[T]he nomadic router 10 is passively able to learn how the network is

3   configured and will elect to use an unused IP address.  If that IP address does

4   become used by another network device, it will switch over to another, unused IP

5   address.").  Therefore, the term "network configurations" includes IP addresses.

6               a.      <u>**Regardless of MAC addresses**</u>

7       The '554 patent also requires the gateway device to connect to any computer

8   regardless of MAC addresses.  A MAC address is a unique identifier that is pre-

9   programmed into every networking device.  The network uses MAC addresses to

10  route data, one hop at a time, from the source computer to the destination.  The '892

11  patent – which is incorporated by reference into the '554 patent – specifically states

12  that the gateway device will "receive all packets regardless of MAC address."  *Id.*

13  at Fig. 9A; *see also id.* at 13:50-57.  Therefore, at a bare minimum, the phrase

14  "regardless of network configurations" requires that the gateway provide

15  transparent network access regardless of MAC addresses.

16      Nomadix's proposal is unjustifiably narrow.  Defendants agree with

17  Nomadix that the term "network configurations" <u>includes</u> "network address

18  settings."  To communicate with the network, the source computer would need to

19  know, in the typical Internet context, several key network addresses, including its

20  own IP address, the MAC and IP addresses of the gateway, and perhaps the IP

21  address of the local DNS server.  But, the claim is not limited to the typical context,

22  nor is the term "network configurations" so limited.  Indeed, the statements made

23  during prosecution impose <u>universal</u> transparency on the claims, requiring that they

24  enable computers to access any network without regard to the protocols used.

25      For all these reasons, the Court should adopt Defendants' proposal.

26          **5.     "network location of the user host device" ('716 patent)**

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| network location of | connection port through which the user host device | No construction is necessary. However, if the Court is inclined |

| the user host device<br>'716: claim 1 | configured with a permanent IP address of the home network accesses the network | to construe the term, Nomadix proposes:<br>a location at which the user host device is connected to the network |
|---|---|---|

The parties dispute the meaning of "network location" and whether the user host device should be construed as a device from the "home" network. The parties also dispute the meaning of "network location" and whether the user host device should be construed as a device configured with the permanent IP address from the device's "home" network.

The construction of "network location" to mean the connection port through which the user host device accesses the network is consistent with both the letter and the spirit of the intrinsic record. The patent's specification defines the location of the user host device as the specific communication port through which the device connects to the network. For example, in connection with Figure 1, which shows the overall configuration of the claimed system, the patent teaches that the devices "can be plugged into ports that are located in different rooms of a hotel, business, or a multi-dwelling unit," or alternatively, they "can be plugged into ports in an airport, an arena, or the like." '716 Patent at 20:3-7, 30:41-45.

Nomadix's reliance on the "network location(s)" recited in specific dependent claims does nothing to change this conclusion. Each of the recited locations is again defined in terms of where the specific port is located. The recited "building" is the building containing the specific port, the recited "floor within a building" is the floor containing the port in question, and so on. Indeed, although not mentioned by Nomadix, claim 33 makes clear that the recited "location" is the specific port, even when there are other ports located in the same room.

As for the remainder of Defendants' construction, claim 1 itself mandates that the user host device must be configured with the permanent IP address of the device's "home" network. A key limitation of the claim is a "network-packet-

1    translation module," which modifies packets coming from the user host device to

2    replace the IP address of that device with the IP address of the gateway, and to

3    modify packets bound from the external network to the user host device to replace

4    the IP address of the external network location with the IP address of the gateway.

5    The same configuration is illustrated in Figures 11a and 11b of the patent.  This is

6    the technique described above in connection with Nomadix's Transparent Router

7    technology, and it would be completely unnecessary if the user host device were

8    not configured with a permanent IP address.  Accordingly, in light of this intrinsic

9    evidence, a person of ordinary skill in the art would have understood the "user host

10   device" to be configured with a permanent IP address.

### 6.    "external network location" ('716 patent)

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| external network location <br> '716: claim 1 | location for a network to which the user device is not normally connected and which corresponds to a local internet or IP address that is not the home internet [or IP] address | No construction is necessary. However, if the Court is inclined to construe the term, Nomadix proposes: a network location external to the network location of the user host device |

17      The parties' dispute whether the construction of "external network location"

18   should refer to the IP address of the user device.  Defendants' proposal is consistent

19   with the claim language and the stated purpose of the claimed invention.

20   Conversely, both of Nomadix's alternate proposals amount to offering no

21   construction at all because, rather than explain the meaning of the disputed terms,

22   they at most rearrange words within the disputed terms.

23      Defendants' proposed construction is consistent with the meaning of the

24   disputed term read in light of the intrinsic evidence.  The claim language plainly

25   states that an "external network location" cannot be one on the user device's base or

26   "home" network.  As discussed above concerning the "foreign" terms, the network

27   translation limitation in the claim would be superfluous if the external network

28   location were not "foreign" to the user device's current network location.  Further,

1   the plain language of the claim shows that IP addresses are critical to defining the

2   external network location.  Lastly, contrary to Nomadix's assertions (Op. Br. at 23),

3   the '716 patent claims the same gateway device disclosed in the Transparent Router

4   Patents.  '716 Patent at 12:49-57.  As such, Defendants' proposed construction is

5   more precise and useful than the one Nomadix proposes ("network location external

6   to the network location of the user device.")  *See* Op. Br. at 22-23.

7              **C.**     **The Transparent Billing Patent ('399 patent)**

8          The '399 patent ("Transparent Billing Patent") incorporates by reference all

9   but one of the provisional applications incorporated by reference in the Transparent

10  Redirection Patents and the parent application to the Transparent Router Patents.

11  *See* '399 Patent at 1:7-27, 4:27-32.

12         The Transparent Billing Patent describes a gateway device in connection

13  with a property management system that monitors a user's access and usage of the

14  property's network, *i.e.*, "foreign" network.  The patent further describes formatting

15  the access and usage information recorded on the gateway device into call

16  accounting records, the same format used by hotel billing systems to charge guests

17  for telephone calls, thereby eliminating the need for a separate billing format for

18  Internet access.  Once properly formatted, the gateway device communicates the

19  formatted record to the attached management system, which determines whether to

20  bill the user based on physical location, network usage, or access to the "foreign"

21  network.

22         The Transparent Billing Patent also describes avoiding the reconfiguration of

23  statically configured computers with IP addresses from a "home" network for

24  access on a "foreign" network.  For example, all of the claims require a gateway

25  device to provide access to a "foreign" network without installing "special client

26  software" on the user's computer for managing communication over the foreign

27  network.  *See, e.g.*, '399 Patent, Claim 1.

28

-38-                    Defendants' Claim Construction Brief
                        CV-09-08441 DDP (VBKx)

1    **1.    "billing records" terms ('399 patent)**

2         The terms "call accounting records," "call accounting record format,"

3    "predetermined protocol" and "predetermined data format," as used in the claims of

4    the '399 patent, all refer to particular types of telephone billing records that contain

5    fields corresponding to the amount charged and the phone number called.   As

6    Nomadix does not contend that these terms have a commonly understood definition

7    in the art, the specification is the best resource to inform the meaning of the claim

8    terms.  *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1376 (Fed. Cir. 2007)

9    ("without a meaning apart from the patent," one should "look to the specification"

10   to construe a claim element).

11                    **a.    call accounting record / call accounting format**

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| call accounting record / call accounting record format<br>'399: claims 6, 20 | a [protocol / format] that can be used to organize data related to telephone calls that includes fields corresponding to charged amount and phone number called | a [protocol / format] that can be used to organize data related to telephone calls |

16        The parties agree that a call accounting record is a format used to organize

17   data related to telephone calls.  The only dispute is whether the call accounting

18   record must include fields corresponding to the charged amount and phone number

19   called, which the specification and prosecution history make clear are required

20   fields for call accounting records.  *See CCS Fitness, Inc. v. Brunswick Corp.*, 288

21   F.3d 1359, 1366 (Fed. Cir. 2002).  The '399 patent claims are directed toward

22   integrating a gateway device with a management system at a location, such as a

23   hotel, for automatically billing users for network access.   According to the

24   specification, such data is "configured in most respects, identical to information

25   received… from a private branch telephone system (PBX), which are commonly

26   utilized in hotels."  '399 Patent 7:8-11.  Call accounting records (CARs) are one

27   such type of format.  *Id.* at 7:53-55.  In this way, the same management system that

28   bills guests for telephone calls can also bill for network access using the same call

1    accounting data format.

2          Although the precise format of call accounting records varies to some extent

3    depending on the management system, the specification explains that some of the

4    fields in the CAR are optional and can be removed, whereas others are required.  *Id.*

5    at 8:49-65.  "[W]here the CAR records cannot be replaced, a mock field, such as a

6    mock telephone number, may be included so that the property management system

7    receives the entire record it is programmed to received."  *Id.* at 61-65.

8          During prosecution, Nomadix clearly stated that "charged amount and phone

9    number called" are "<u>required</u> fields of call account records."  Ex. 24 at 10 [11/07/03

10   '399 ROA] (emphasis added).  To overcome an obviousness rejection, Nomadix

11   argued that it would not have been obvious to bill in a situation in which "no phone

12   number exists and/or no 'call' is being placed," such as accessing the Internet.  *Id.*

13   According to Nomadix, the "invention… teaches the gateway's ability to insert and

14   determine a charged amount and phone number called (required fields of call

15   account records), even though a real phone call was not placed nor a phone number

16   available."  *Id.*  Nomadix cannot avoid its clear and unambiguous statements in the

17   specification and prosecution history in defining the scope of call accounting

18   records.  *Computer Docking Station Corp. v. Dell, Inc., et al.*, 519 F.3d 1366, 1374

19   (Fed. Cir. 2008).

20         Nomadix argues that the Court should simply adopt its construction from the

21   *Second Rule* litigation.  But in the *Second Rule* case, neither party cited the

22   prosecution history to support its construction of the "call accounting record" terms.

23   *See* Exs. 28 at 25-27, 29 at 42-44, 30 at 11-13, 31 at 16-17 (claim construction

24   briefs).  The Court did not cite or rely on the prosecution history in reaching its

25   conclusions.  *See* Ex. 32 at 17-19 (*Second Rule* Amended Claim Constr. Order).

26   Therefore, the Court should reexamine its previous construction in light of the

27   prosecution history.  Unlike Nomadix's proposed construction, Defendants'

28   proposed construction is supported by the file history and should be adopted.

Defendants' Claim Construction Brief
                                                    CV-09-08441 DDP (VBKx)

b.   **Predetermined protocol / predetermined data format**

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| predetermined protocol / predetermined data format<br>'399: claims 6, 13, 18 | a [protocol / format] that can be used to organize data related to telephone calls that includes fields corresponding to charged amount and phone number called | No construction is necessary |

During prosecution, Nomadix repeatedly characterized the purported invention as not merely utilizing a generic "predetermined" protocol or data format, but call accounting records specifically. Indeed, Nomadix amended certain claims in this regard to overcome prior art. Nomadix should not be allowed assert a broader scope of "predetermined" protocol and data format now that the patents are in litigation.

As originally drafted, claims 1 and 6 formatted data into "one of the predetermined [protocols / data formats] supported by the management system." The Examiner rejected these claims as anticipated by U.S. Patent No. 5,893,077 ("Griffin"). Nomadix amended the claims to require formatting into "call accounting record format" and distinguished the prior art on this ground, stating that Griffin "does not provide a teaching of formatting data in call accounting record format." Ex. 25 at 7 [12/09/02 '399 ROA]. Furthermore, Nomadix made clear that its invention – not just what was described in these particular claims – required call accounting records: "The present invention goes beyond 'employing such a protocol'; in that, the gateway device receives data from the computer / hosts and formats (or re-formats) the data into call accounting records." *Id.* at 7 (first emphasis added).

Throughout the prosecution, Nomadix repeatedly emphasized that the "present invention" formats billing data into call accounting records to overcome prior art rejections. For example, after the Examiner rejected a number of the claims as obvious over U.S. Patent No. 5,987,430, Nomadix argued that formatting data into call accounting records would not have been obvious. According to

1   Nomadix,

2         [a]lthough call accounting records are fundamentally based upon calls

3         using phone numbers… phone numbers are not used in

4         Ethernet/Broadband (non-dialup) Internet connections. Such

5         connections are the focus of this invention… The present invention

6         uses special techniques, referred to as location identification to

7         determine where a user's access is coming from and thus who/where

8         should the call account record bill be sent.

9   Ex. 24 at 10 [11/07/03 '399 ROA] (emphasis added). Moreover, Nomadix

10  explicitly stated that this characterization included the claims that used the

11  "predetermined data formats." In the very next paragraph, Nomadix stated that "for

12  the reasons stated above, independent claims 1, 15, and 20" were not obvious, even

13  though claim 20 did not use the term "call accounting records." *Id.* at 11.

14        By clarifying in the file history that the "present invention" is directed toward

15  formatting data into call accounting records, Nomadix limited the scope of

16  "predetermined" protocol and data format to be commensurate with the format of

17  call accounting records. *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1398-99 (Fed.

18  Cir. 2008) (limiting claim where "the present invention" was repeatedly described

19  to include the limitation). "Predetermined protocol" and "predetermined data

20  format" should be construed consistently across all claims in which they appear to

21  mean the same as "call accounting records" and "call accounting record format." [24]

22  *NTP,* 418 F.3d at 1293.

23

24

_____

25  [24]  Nomadix suggests that the doctrine of claim differentiation precludes this
construction in claims 13 and 18. Op. Br. at 42. However, the presumption of
26  claim differentiation can be overcome by disclaimers, such as those found in the
prosecution history. *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*, 287
27  F.3d 1108, 1116 (Fed. Cir. 2002) (presumption of claim differentiation overcome
by clear prosecution disclaimer); *see also Curtiss-Wright Flow Control Corp. v.*
28  *Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) (claim differentiation overcome
by disclosure in specification). Nomadix's disclaimers control here.

## 2.    "physical location" ('399 patent)

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| physical location<br>'399: claims 13, 18 | communication port through which the user's computer accessed the network | No construction necessary |

Nomadix's argument that the ordinary and customary meaning should apply to the term "physical location" once again ignores Nomadix's own narrowing statements during prosecution.  Nomadix now proposes that a user's "physical location" is simply "the place at which a user is located."  Op. Br. at 44.  However, Nomadix unambiguously disavowed such a broad construction to overcome the cited prior art:

> The Examiner cites column 5, lines 21-32 in the Griffin '077 patent to show a teaching of data flowing form [sic] the host/computer to the gateway device including user's location. We do not believe that this passage or any other passage in the Griffin '077 patent teaches a gateway device that has the capability to identify the physical location of the host/computer.  Column 5, lines 21-32 teach a gateway device that tracks a user's access frequency to a network cit [sic] or the user's purchasing profile.  It does not teach a gateway device that has the capability to identify the port from which a user gains access to the network.

Ex. 25 at 8 [12/09/02 '399 ROA] at 8 (emphasis added).  Nomadix also stated that:

> [T]he Griffin '077 patent does not provide a teaching of the novel concept in the present invention whereby the gateway device has the capability to identify the physical location of the host/computer, maintain data representing the physical location of the accessing hosts/computers, format this data into a management system compatible format, communicate this formatted data to the management system, which, in turn, uses the physical location data to

1    bill the user accordingly.  The present application supports such a

2    teaching beginning at page 8; line 6, which details <u>maintaining port</u>

3    <u>related information</u> at the gateway device.

4    *Id*. at 10 (emphasis added).

5    In each of the above statements, Nomadix distinguished the cited art by

6    limiting the "physical location" of the host/computer to the communication port

7    through which the computer accesses the network.  According to the Examiner,

8    Griffin discloses a system for automatically billing a user for access to a computer

9    network, comprising a network gateway device in communication with the

10   computer for maintaining data representative of the user's access.  *See* Ex. 26 at 3

11   [08/27/02 '399 OA]; Ex. 36 at 6:42-57, 7:5-12 [Griffin '077 Patent].  This data

12   included the customer's address information.  *See id.* at 5:21-32.  In distinguishing

13   the Griffin patent, Nomadix could have argued that Griffin failed to maintain data

14   representing "the place at which a user is located," because Griffin merely

15   maintained a billing address and a user might be at a location other than his or her

16   billing address.  Instead, Nomadix equated the "physical location" to an actual

17   communication port.  Nomadix thus made a clear and unmistakable disavowal of

18   scope during prosecution.  *See Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438

19   F.3d 1123, 1136 (Fed. Cir. 2006).

20   Defendants' construction should be adopted because it reflects the proper

21   meaning of "physical location," as narrowed by Nomadix during prosecution.

22                    **3.    "collecting data corresponding to . . ." ('399 patent)**

23   It is necessary to construe the word "collecting" to distinguish claims 6 and

24   18 from other independent claims of the '399 patent that use similar, but

25   significantly different, language.  *See, e.g., Seachange Int'l v. C-Cor, Inc.*, 413 F.3d

26   1361, 1368 (Fed. Cir. 2005) ("The doctrine of claim differentiation stems from the

27   common sense notion that different words or phrases used in separate claims are

28   presumed to indicate that the claims have different meanings and scope.") (internal

quotation marks omitted).  Claims 1, 10, and 13 all recite a gateway device that "maintains" data representative of the user's access, usage, and/or physical location. By contrast, claims 6 and 18 require that the gateway actively "collect" that data. Defendants' construction properly distinguishes "collecting" from "maintaining,"[25] using language taken directly from the patent specification.[26]

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| collecting data corresponding to the user's access to said computer network, including a physical location of the user and the user's network usage, in said network gateway device<br>'399: claim 18 | monitoring and recording "data representative of the user's access to the computer network," including a "physical location" of the user and the "user's network usage", in said network gateway device | No construction is necessary. |

By its plain and ordinary meaning, "collecting" data requires more than just "maintaining" it.  Data is maintained simply by recording it.  Collecting, on the other hand, is more than passive retention, connoting the active accumulation of data.  As used in the '399 patent, "collecting" encompasses both acquisition and retention, both of which the written description explicitly recognizes.  '399 Patent at 6:36-48 ("The gateway device can thus monitor and record information…").  The gateway device <u>monitors</u> the network traffic from the user's computer to determine how, when, and where the user is accessing the network.  It then <u>records</u> the information gathered for the management system's later use.  *Id.*

---

[25] Claim differentiation is a general canon of claim construction.  But the canon "creates only a presumption that each claim in a patent has a different scope."  *See, e.g., Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1115-16 (Fed. Cir. 2002).  This presumption can be overcome by an explicit disclaimer or by the prosecution history.  *Id.*  In this case, there is no evidence to override the presumption that "collecting" and "maintaining" are two different concepts.
[26] Nomadix incorrectly suggests that this Court has already determined that the word "collecting" does not require construction.  Op. Br. at 46.  Second Rule had proposed a construction for "collecting data corresponding to the user's access to said computer network":  "collecting data corresponding to a user's access to the computer network, including the duration of such access, after such access has occurred."  Ex. 29 at 44 [*Second Rule* Op. Br.].  That proposal only concerned the type of data collected, leaving the key term itself ("collecting") undefined.

1       Nomadix repeated this two-part formulation during the prosecution of the

2   '399 patent.  Nomadix stated that "the gateway is able to <u>monitor and track</u>" the

3   user's physical location.  Ex. 25 at 6 [12/09/02 '399 ROA] (emphasis in original).

4   Nomadix further argued that "the novel concept of the present invention" was that

5   the gateway could "identify the physical location of the host/computer" and also

6   "maintain data" representing that location, which would ultimately be transmitted to

7   the management system.  *Id.* at 10.  "Identifying" and "maintaining" is just another

8   way of saying that the gateway device must "monitor and record" the user's

9   physical location.

10      Defendants' proposal honors the difference between "maintaining" and

11  "collecting" in the '399 patent claims themselves and should be adopted.[27]

12                    **4.    "management system" ('399 patent)**

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| management system<br>'399: claims 6, 13, 18 | a management system that is separate from the network gateway device for managing a property's operations and connected to the network gateway device via a physical link | No construction is necessary |

17      The fundamental dispute between the parties is whether this phrase needs to

18  be construed at all.   Defendants' construction clarifies that the claimed

19  "management system" is separate and distinct from the gateway device but

20  physically connected to the gateway device.

21      The description of the invention supports Defendants' construction.

22  According to the '399 patent specification, "[t]he present invention relates… to

23  network gateway devices communicating with management systems or servers,

24  such as hotel property management systems, to facilitate subscriber management

25  and billing."  '399 Patent at 2:45-49.  That the "present invention" comprises both a

26  network gateway device and a management system with which the network

27  gateway devices communicate means that the terms refer to separate and distinct

28  ---

[27] Defendants included the longer phrase to clarify that the act of "collecting" must occur "in said network gateway device," as claims 6 and 18 both require.

1   components.

2        The specification describes the gateway devise as physically separate from

3   the management system.   The specification repeatedly describes the network

4   gateway device as physically connected to the management system through a serial

5   or Ethernet link.   *Id.* at 5:21-23 ("According to one aspect of the invention, the

6   gateway device 12 is in direct communication with the management system 56

7   through a serial connection 57."); 6:6-11 ("Typically, the gateway device 12 is

8   connected via a serial connection 57, Ethernet connection, or LAN to the

9   management system 56.   According to one preferred embodiment the gateway

10  device 12 is connected to the management system 56 via a serial interface.").   This

11  is consistent with the preferred embodiment of FIG. 2, in which "the management

12  system 56 can be a property management system located within a hotel."   *Id.* at

13  5:58-60.   Although the property need not be a hotel, the management system must

14  be physically connected to the gateway device.

15       **5.   "absent additional agents" terms ('399 patent)**

| Claim Term | Defendants' Construction | Nomadix's Construction |
|---|---|---|
| absent additional agents implemented by [the / a user's] computer<br>'399: claims 6, 13, 18 | without the need to implement additional "agents" or to reconfigure the computer in any manner | Nomadix agrees with the Court's prior construction: absent additional special client software implemented by the computer for managing the communication between the computer and the gateway device |

21       The parties dispute whether the Court's prior construction for "absent

22  additional agents" sufficiently addresses the substantive dispute in this case:  what

23  constitutes an "additional" agent.  The '399 patent, like all of the Nomadix patents,

24  requires a "novel gateway device" that provides transparent network access to

25  computers configured for a home network.  Ex. 24 at 9 [11/07/03 '399 ROA].  In

26  the '399 patent, this transparency requirement is expressed by the limitation that the

27  gateway device operate "absent additional agents implemented by the computer."

28

Defendants' Claim Construction Brief
                                          CV-09-08441 DDP (VBKx)

1    '399 Patent, Claim 1.  The parties agree that an agent is "special client software for
2    managing the communication between the client and the gateway device."  *See*
3    AJCCS (Dkt. No. 248), Ex. 6 at 55.  The only dispute is what constitutes an
4    "additional" agent.

5         An "additional" agent is one that reconfigures the computer.  It is undisputed
6    that the user's computer must have agents installed to communicate with the
7    network.  The Nomadix patents assume – and, in many cases, require – that the
8    computer have a web browser.  *See, e.g.*, '894 Patent, claims 1, 5, 6.  But while the
9    patent allows for <u>some</u> agents, it expressly prohibits the gateway device from
10   relying on other, "additional" agents.  It is essential, therefore, to distinguish
11   between permitted, "regular" agents and forbidden, "additional" agents.

12        Defendants' construction is taken directly from statements made by
13   Nomadix's during prosecution of the '399 patent.  It is supported by the
14   specification of the '894 patent, on which Nomadix relied when amending its
15   claims.  It is also consistent with Nomadix's own claim construction arguments in
16   the *Second Rule* case.

17        First, Nomadix added the "absent additional agents" requirement to
18   distinguish its system from the prior art – specifically, U.S. Patent No. 5,987,430 to
19   Van Horne.  Unlike the Van Horne patent, the Nomadix system uses a "novel
20   gateway device" that automatically bills the user "independent of client software <u>or</u>
21   <u>the need to reconfigure the client</u>."  Ex. 24 at 9 [11/07/03 '399 ROA] (emphasis
22   added).  Nomadix further explained that the universal gateway device is "highly
23   beneficial" because it frees the user from the burden of having to reconfigure the
24   computer:

25        [T]he user benefits from being able to access networks without having
26        to implement (and store) special client software <u>or reconfigure the</u>
27        <u>computer in any other manner</u>.

28   *Id.* (emphasis added).  Defendants' construction adopts this language verbatim.

-48-

1    Second, a proper claim construction should align with the purpose,
2  objectives, and stated benefits of the claimed invention.  *See CVI/Beta Ventures,*
3  *Inc., v. Tura LP*, 112 F.3d 1146, 1160 (Fed. Cir. 1997).  Nomadix instructed the
4  Patent Office to look to the '892 and '894 patents for an explanation of the key
5  features of its universal gateway device.  *Id.*  The '894 patent, in particular, explains
6  why a universal network gateway does not require a user to implement "additional
7  agents."   When a computer connects to a traditional gateway, "special software
8  must also typically be loaded onto the user's computer to support reconfiguration."
9  '894 Patent at 1:63-65.  But a universal gateway device provides transparent access,
10  meaning that "the user need not reconfigure their computer and no additional
11  software need be added to the computer for reconfiguration purposes."  *Id.* at 3:45-
12  48; *see also*, '554 Patent at 10:16-18 ("Furthermore, no additional configuration
13  software will have to be added to the source computer.").   Nomadix has
14  consistently and repeatedly explained that the principal benefit of a universal
15  gateway device is that it eliminates the need for the user to install additional
16  software that reconfigures the computer.   Defendants' construction properly
17  captures this feature of the gateway.

18    Finally, Defendants' construction is supported by Nomadix's Reply Claim
19  Construction Brief in the *Second Rule* case.  Ex. 30 at 5-8.  Second Rule had argued
20  that the word "additional" was surplusage with no limiting effect.   Nomadix
21  correctly responded that Second Rule's position was "untenable" and that the word
22  "'additional' must remain a claim limitation."  *Id.* at 5.  Nomadix went on to equate
23  this claim limitation with the ability to connect to the network "without
24  reconfiguration":

25      [T]he specification explains that if a computer is moved from its home
26      network where it was able to access the Internet to a new network with
27      the patented gateway device, then the computer could connect to the
28      new network <u>without reconfiguration</u>.  Even more particularly, the

1    invention facilitates connecting the computer to the new network

2    "without loading any <u>additional</u> software on the computer."

3  *Id.* at 6-7 (first emphasis added and citations omitted).   This is Defendants'

4  argument in a nutshell.

5    In this case, Nomadix never explains what distinguishes an "additional"

6  agent.  It has simply inserted the agreed-upon definition of "agent" into the phrase

7  "absent additional agents implemented by the computer," without addressing the

8  essential issue.  The patent's universal gateway device does not eliminate the need

9  for all agents.   It only eliminates the need for agents that reconfigure the user's

10  computer.  Accordingly, the Court should adopt Defendants' proposed construction.

11  **IV.    CONCLUSION**

12    Defendants respectfully submit that their constructions are the proper

13  constructions based on the intrinsic evidence.  Defendants' constructions address

14  the Nomadix workaround as expressed in the claims of the patents.  Accordingly,

15  the Court should adopt the Defendants' constructions.

16

17

18  Dated:  April 8, 2011                    ORRICK, HERRINGTON & SUTCLIFFE LLP

19

20                                          */s/ I. Neel Chatterjee*
                                            I. Neel Chatterjee
21                                          Fabio E. Marino
                                            Monte M.F. Cooper
22                                          Qudus B. Olaniran
                                            Benjamin J. Hofileña
23                                          Alyssa M. Caridis

24                                          Attorneys for Defendant and Counterclaimant
                                            IBAHN CORPORATION
25

26

27

28

Defendants' Claim Construction Brief
                                            CV-09-08441 DDP (VBKx)

1  Dated:   April 8, 2011           COVINGTON & BURLING LLP

2

3                                   */s/ Michael K. Plimack (with permission)*
                                    Michael K. Plimack
4                                   Robert T. Haslam
                                    Michael P. Wickey
5
                                    Attorneys for Defendants
6                                   HEWLETT-PACKARD COMPANY

7

8  Dated:   April 8, 2011           SIDLEY AUSTIN LLP

9                                   */s/ Lisa A. Schneider (with permission)*
                                    David T. Pritikin
10                                  Hugh A. Abrams
                                    Lisa A. Schneider
11                                  Benedict F. Frey
                                    Paul D. Tripodi II
12                                  Olivia M. Kim
13
                                    Attorneys for Defendant
14                                  WAYPORT, INC.

15

16 Dated:   April 8, 2011           FENWICK and WEST LLP

17                                  */s/ Michael J. Sacksteder (with permission)*
                                    Michael J. Sacksteder
18                                  Darryl M. Woo
                                    David M. Lacy Kusters
19
                                    Attorneys for Defendants
20                                  SUPERCLICK NETWORKS, INC. AND
                                    SUPERCLICK, INC.
21

22

23 Dated:   April 8, 2011           WEIL GOTSHAL & MANGES LLP

24                                  */s/ Nicholas Groombridge (with permission)*
                                    Nicholas Groombridge
25                                  Robert Watkins, III.
26
                                    Attorneys for Defendant
27                                  ARUBA NETWORKS, INC.

28

Defendants' Claim Construction Brief
                                              CV-09-08441 DDP (VBKx)

1   Dated:   April 8, 2011      REED SMITH LLP

2

3                                   */s/ David T. Pollock (with permission)*

John P. Bovich

4                                   David T. Pollock

Michael A. Garabed

5

                                   Attorneys for Defendant

6                                   SOLUTIONINC TECHNOLOGIES LTD.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Claim Construction Brief
CV-09-08441 DDP (VBKx)