John B. Sganga, Jr. (SBN 116,211)
john.sganga@kmob.com
Douglas G. Muehlhauser (SBN 179,495)
doug.muehlhauser@kmob.com
Perry D. Oldham (SBN 216,016)
perry.oldham@kmob.com
Mark Lezama (SBN 253,479)
mark.lezama@kmob.com
Alan G. Laquer (SBN 259,257)
alan.laquer@kmob.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street
Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiff
NOMADIX, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| NOMADIX, INC.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>HEWLETT-PACKARD COMPANY et al.,<br><br>　　　　Defendants.<br><br>AND RELATED COUNTERCLAIMS | Civil Action No.<br>CV09-08441 DDP (VBKx)<br><br>**NOMADIX'S REPLY CLAIM CONSTRUCTION BRIEF**<br><br>Honorable Dean D. Pregerson |

# TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION ........................................................................1

II.   CONSTRUCTION OF DISPUTED CLAIM TERMS ............................1

    A.   Terms related to "home" versus "foreign" networks......................1

        1.   "home" and "foreign" networks ('892, '727 and '009 patents)................................................................1

            a.   home network: Nomadix's construction is correct and understandable; the defendants' is neither ............................................................1

            b.   The defendants' DHCP argument is a red herring................................................................3

            c.   foreign network: Nomadix's construction is correct and understandable; the defendants' is neither ............................................................4

        2.   "the user host device is configured to communicate through a home gateway . . ." ('995 patent) ........................6

            a.   It appears there is no dispute as to the scope of the claims................................................................7

            b.   "home gateway" does not require construction..........8

        3.   "a foreign gateway"  ('995 patent) ........................................9

    B.   Terms that the defendants incorrectly construe as relating to "home" versus "foreign" ('727 and '716 patents) ........................11

        1.   "first network" ('727 patent) ..............................................11

            a.   The claim language does not require a "first" network to be a "foreign" network ............................12

            b.   The prosecution history does not require a "first" network to be a "foreign" network ................14

         2.   "network location of the user host device" ('716 patent) ........................................................................15

            a.   The network location is not limited to a "port".........15

            b.   The user host device need not be "configured with a permanent IP address of the home network" ................................................................17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS
## (*cont'd*)

**Page No.**

c.     The defendants fail to rebut Nomadix's construction ............................................................. 19

3.     "external network location" ('716 patent) ........................... 19

C.     Incompatibility and incorrect configurations ('727 patent) .......... 21

1.     "incompatible private IP address" terms ('727 patent) ....... 21

2.     "incorrectly configured messages" ('727 patent) ............... 24

D.     The '894 patent ...................................................... 25

1.     The order of steps of all claims ('894 patent) ..................... 25

a.     The defendants' construction cannot be correct because it denies the claims their full scope ............. 26

b.     The intrinsic evidence shows that, even on an individual request basis, the claims do not require performing steps in listed order ................... 27

2.     "administrator" ('894 patent) ............................................. 30

E.     The '554 patent ...................................................... 31

1.     "determining access" terms ('554 patent) ........................... 31

2.     "regardless of network configurations" ('554 patent) ......... 34

F.     The '399 patent ...................................................... 36

1.     "management system" ('399 patent) .................................... 36

2.     "absent additional agents" terms ('399 patent) ................... 38

3.     "call accounting record" terms ('399 patent) ...................... 41

4.     "predetermined" terms ('399 patent) ................................... 42

5.     "physical location" ('399 patent) ........................................ 44

6.     "collecting data corresponding to the user's access . . ." ('399 patent) ................................................................... 45

# TABLE OF CONTENTS
## (*cont'd*)

**Page No.**

G.   The '009 patent ...................................................................48

    1.   "single connection . . ." ('009 patent)...................................48

III.   CONCLUSION ...................................................................50

1

**TABLE OF AUTHORITIES**

2

**Page No(s).**

3

4

*3M Innovative Properties Co. v. Avery Dennison Corp.,*

5
    350 F.3d 1365 (Fed. Cir. 2003) ................................................................15

6

*Arlington Indus. v. Bridgeport Fittings, Inc.,*

7
    632 F.3d 1246 (Fed. Cir. 2011) ..............................................................25

8

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP,*

9
    616 F.3d 1249 (Fed. Cir. 2010) ...................................................9, 11, 13

10

*Comark Comm'cns, Inc. v. Harris Corp.,*
    156 F.3d 1182 (Fed. Cir. 1998) ................................................................13

11

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.,*

12
    438 F.3d 1374 (Fed. Cir. 2006) ................................................................37

13

*Elekta Instrument S.A. v. O.U.R. Sci. Int'l,*

14
    214 F.3d 1302 (Fed. Cir. 2000) ..................................................................3

15

*Every Penny Counts, Inc. v. Am. Express Co.,*

16
    563 F.3d 1378 (Fed. Cir. 2009) ........................................................1, 4, 7

17

*Free Motion Fitness, Inc. v. Cybex Int'l,*
    423 F.3d 1343 (Fed. Cir. 2005) ................................................................12

18

19

*Gart v. Logitech, Inc.,*
    254 F.3d 1334 (Fed. Cir. 2001) ................................................................40

20

21

*Gillette Co. v. Energizer Holdings, Inc.,*
    405 F.3d 1367 (Fed. Cir. 2005) ................................................................12

22

*In re Katz Interactive Call Processing Patent Litig.,*

23
    ___ F.3d ___, 97 U.S.P.Q.2d 1737,

24
    2011 U.S. App. LEXIS 3212 (Fed. Cir. 2011) ..................................18, 20, 28

25

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.,*

26
    381 F.3d 1111 (Fed. Cir. 2004) ..................................................................3

27

*Liebel-Flarsheim Co. v. Medrad, Inc.,*

28
    358 F.3d 898 (Fed. Cir. 2004) ...........................................................passim

# TABLE OF AUTHORITIES
### (*cont'd*)

**Page No(s).**

*Linear Tech. Corp. v. ITC,*
  566 F.3d 1049 (Fed. Cir. 2009) ...................................................................6

*McCarty v. Lehigh Valley R.R. Co.,*
  160 U.S. 110 (1895) ...................................................................4, 10

*Merck & Co. v. Teva Pharms. USA, Inc.,*
  395 F.3d 1364 (Fed. Cir. 2005) ...................................................................3

*Purdue Pharma L.P. v. Endo Pharms., Inc.,*
  438 F.3d 1123 (Fed. Cir. 2006) ...................................................................51

*Smith v. Snow,*
  294 U.S. 1 (1935)...................................................................15

*Sulzer Textil A.G. v. Picanol N.V.,*
  358 F.3d 1356 (Fed. Cir. 2004) ...................................................................1

*SunRace Roots Enter. Co., Ltd. v. SRAM Corp.,*
  336 F.3d 1298 (Fed. Cir. 2003) ...................................................................34, 38

*United States v. Telectronics, Inc.,*
  857 F.2d 778 (Fed. Cir. 1988) ...................................................................15

# I.  INTRODUCTION

The defendants consistently propose constructions that would import limitations from the specification and thereby narrow the scope of Nomadix's patent claims.   In contrast, where construction is needed, Nomadix's constructions adhere to the ordinary meaning and aid the jury in understanding the claims.

## II.  CONSTRUCTION OF DISPUTED CLAIM TERMS

As it did in its opening brief, Nomadix addresses the disputed terms in the order they appear in the Amended Joint Claim Construction Statement ("Amended JCCS") (Docket No. 248).

### A.  Terms related to "home" versus "foreign" networks

#### 1.  "home" and "foreign" networks ('892, '727 and '009 patents)

Assuming that a device is configured to connect to a particular network, that network is the device's "home" network.  Nomadix's Opening Br. at 11–12.  Any other network is "foreign."  *Id.*   The defendants fail to explain how these constructions could be wrong.

##### a.  home network: Nomadix's construction is correct and understandable; the defendants' is neither

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| home network<br><br>'892: claim 1<br>'727: claim 20<br>'009: claims 1, 23 | network to which the user device is configured to be connected | network to which the user device is configured to be connected and which corresponds to the home internet [or IP] address |

The defendants agree with Nomadix that, to the extent a device has a home network, its home network is the network to which it "is configured to be connected."   However, the defendants' construction also imports the ambiguous requirement that the network "correspond" "to the home internet [or IP] address." The only justification that the defendants offer for this additional limitation is a single sentence:

1    It will be understood that the term "home" does not relate to a residence, but
2    is the network, gateway or other communication device or system to which
3    the terminal is normally connected and which corresponds to the home
4    internet or IP address.

5    Ex. 1 ('892 patent) at col.6 ll.15–19.[1]  The defendants urge that this sentence sets
6    forth a definition and compels their construction.  Defs.' Br. at 7–8.

7        The defendants are wrong.  First, the sentence does not establish a definition.
8    To act as his own lexicographer, an inventor must assign a special meaning to a
9    term that departs from the ordinary meaning understood by those of skill in the art.
10   *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005);
11   *Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1116–17
12   (Fed. Cir. 2004).  Any intent to depart from that ordinary meaning must be express
13   and unambiguous.  *Merck*, 395 F.3d at 1370; *see also Elekta Instrument S.A. v.*
14   *O.U.R. Sci. Int'l*, 214 F.3d 1302, 1307 (Fed. Cir. 2000).   Here, the inventors do not
15   redefine "home" to have a special meaning, but merely confirm that the term is
16   being used in the sense that "will be understood" by those knowledgeable about
17   computer networks and not in its "residen[tial]" sense, as a layperson might think.
18   Ex. 1 ('892 patent) at col.6 ll.15–19.   In short, the quoted sentence does not
19   constitute a lexicographical statement that must be incorporated wholesale into the
20   construction of "home network."

21       The defendants' argument to the contrary is belied by their own departure
22   from the sentence.   Despite representing that they "took [their] proposed
23   construction straight from the specification," Defs.' Br. at 8, the defendants actually
24   agree that the construction of "home network" properly refers to the network to
25   which the device is "configured to be connected," rather than the network to which
26   the device is "normally connected."  Thus, the defendants themselves do not even

27
28   _____
     [1] All exhibits are attached to the declaration of Mark Lezama filed in support
     of Nomadix's opening brief or to his declaration filed in support of this reply brief.

-2-

1    treat the quoted sentence as definitional.

2        Second, the sentence does not mandate including an ambiguous reference to
3    "the home internet [or IP] address" in the construction of "home network" as the
4    defendants urge.  In quoting the sentence in their brief, the defendants omit the
5    paragraph that precedes it, which makes clear that the cited passage is describing
6    just one embodiment in which there exists a "home address" of a gateway that the
7    user device attempts to locate.  Ex. 1 ('892 patent) at col.6 ll.7–19.  But  none of the
8    pertinent claims of the '892, '727 or '009 patents recites a "home internet [or IP]
9    address," so referring to "**the** home internet [or IP] address" in the construction of
10   "home network" is improper and will only confuse the jury. *Every Penny Counts,*
11   *Inc. v. Am. Express Co.*, 563 F.3d 1378, 1383 (Fed. Cir. 2009) (jurors should not be
12   left with questions as to the scope of the claims).  In addition, using "home" to
13   define "home network" is circular and unhelpful to a jury.  *Cf. id.*  The defendants
14   do not deny these ambiguities but instead argue that Nomadix should "live" with its
15   own wording.  *See* Defs.' Br. at 8.

16       The problem is that the defendants are asking the Court to lift those words
17   out of the context in the specification that explains their meaning and to graft them
18   on to claims that do not recite the same context.  Moreover, because the claims do
19   not even mention a "home internet [or IP] address," requiring the home network to
20   correspond to such an address impermissibly imports a limitation.  *McCarty v.*
21   *Lehigh Valley R.R. Co.*, 160 U.S. 110, 116 (1895) ("if we once begin to include
22   elements not mentioned in the claim . . . , we should never know where to stop");
23   *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (same).

24                  **b.     The defendants' DHCP argument is a red herring**

25       The defendants baldly assert that "Nomadix seeks to ignore the clear
26   language found in the specification so that it may argue that the claims read on
27   systems and methods that utilize DHCP [Dynamic Host Configuration Protocol]."
28   Defs.' Br. at 8.  But the defendants **fail to link DHCP in any way to the claim**

**construction dispute**.  That is, the defendants never explain how adopting their proposed construction over Nomadix's affects whether DHCP falls within the scope of the claims.

Indeed, rather than raising DHCP for any legitimate claim construction purpose, it appears the defendants are attempting to foreshadow an invalidity argument.  Without some explanation of how adopting their proposed construction would affect whether the claims cover DHCP, the topic of DHCP can have no relevance to determining what "home network" means.

### c.   foreign network: Nomadix's construction is correct and understandable; the defendants' is neither

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| foreign network<br><br>'892: claims 1, 5, 8<br>'009: claims 1, 23 | a network other than the home network | network to which the user device is not normally connected and which corresponds to a local internet [or IP] address that is not the home internet [or IP] address |

The Court should adopt Nomadix's construction of "foreign network."  The defendants do not even attempt to explain how "a network other than the home network" could not be a foreign network.  Nor do they address the intrinsic evidence, which describes that when a user leaves the home network that her laptop is configured for, she travels to a "different (foreign)" network.  Ex. 4 ('009 patent) col.1 ll.27–32.

Moreover, the defendants fail to adequately support their own construction.  They claim that they adopt "the express definition" set forth at column 6, lines 15–19 of the '892 patent.  Defs.' Br. at 10 (citing '892 patent).  But the cited passage does not even mention the word "foreign" or the "local internet [or IP] address" that the defendants include in their construction.

The defendants also urge that claim 1 of the '995 patent and claim 1 of the

'892 patent "indicate that 'foreign' network is distinguished from 'home' network by the different IP addresses." Defs.' Br. at 9–10. But claim 1 of the '995 patent does not recite a "foreign network" and claim 1 of the '892 patent does not recite **any** addresses, let alone IP addresses.

The defendants also cite to remarks made during oral argument before the PTO's Board of Patent Appeals and Interferences as part of the reexamination of the '892 patent. Defs.' Br. at 10. The cited statements are: "[t]he foreign network will have an IP address that is unique to it. . . . The foreign network has a different IP address . . . ." *Id.* (internal quotation marks omitted). The defendants' reliance on these remarks is misplaced.

First, it was clear at oral argument that the remarks were intended by the attorney, and were understood by the Board, to only provide a general background and not to be arguments about the scope of the claims. In particular, the attorney concluded his remarks by saying, "[T]hat's the background of what we have here," to which one of the Board judges responded, "Can I just ask a quick question **before you get into your arguments?**" Ex. 15 at 4:14–18 (NMDX0001170) (emphasis added).

Second, even if devices on a foreign network have IP addresses that are different than those on the home network, that does not mean that "IP addresses" must appear in the construction of "foreign network." Just because an apple has seeds does not mean that it is necessary or helpful to use "seeds" to define "apple." *Cf. Linear Tech. Corp. v. ITC*, 566 F.3d 1049, 1055–56 & n.3 (Fed. Cir. 2009) (where additional language was not needed to define "circuit" terms, it was not included in construction). Here, it is enough to say that a network distinct from the home network is "foreign." Including technical details that are not needed to define a "foreign network" only increases the risk of improperly altering the scope of the claims, confusing the jury, or both.

Third, nothing about the remarks made before the Board indicates that the

1    defendants' particular wording is correct or even makes sense.   Indeed, the

2    defendants fail to address any of the ambiguities in their construction that Nomadix

3    pointed out in its opening brief, including:

4    • The claims do not recite a "home internet [or IP] address," so a jury would

5         not understand what the defendants mean by "**the** home internet [or IP]

6         address."   The defendants never explain in their brief what "the home

7         internet [or IP] address" is.

8    • It is unclear what the "local internet [or IP] address" is "local" to, which

9         "local internet [or IP] address" the defendants are referring to and what it

10        means for a network to "correspond to" a single address.

11   The defendants never address these ambiguities.   As a result, instead of resolving

12   the meaning of "foreign network," adopting the defendants' construction would

13   only shift the dispute to the meaning of the construction and leave it for the jury to

14   resolve.   *Cf. Every Penny*, 563 F.3d at 1383 (construction should not leave jurors

15   with questions as to the scope of the claims).

16        **2.      "the user host device is configured to communicate through a**

17                  **home gateway . . ."  ('995 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| the user host device is configured to communicate through a home gateway by using an IP address of the home gateway | No construction is necessary | user device is configured with a permanent IP address to communicate through a home gateway |
| home gateway<br><br>'995: claims 1, 17, 24, 40 | No construction is necessary | gateway to which the user device is configured to be connected and which corresponds to the home internet [or IP] address |

27        The defendants maintain that the Court must construe the phrase "the user

28   host device is configured to communicate through a home gateway by using an IP

1   address of the home gateway" as well as the term "home gateway" within that
2   phrase.  To the contrary, the language of the '995 patent claims is clear and does
3   not require further elaboration.  *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d
4   1554, 1568 (Fed. Cir. 1997).   Nonetheless, after reviewing the defendants'
5   answering brief, it appears that the dispute may be readily resolved.  Accordingly,
6   Nomadix proposes a construction of the full phrase that should be acceptable to the
7   defendants.  There is still no need to construe "home gateway."

8               **a.    It appears there is no dispute as to the scope of the claims**

9         The defendants argue that the "user host device is configured to
10  communicate . . ." phrase must be construed.  The gravamen of the defendants'
11  protests is that, without a construction, it would be unclear whether the user host
12  device is statically set up with an IP address of a gateway or whether the device
13  was dynamically assigned an IP address for a gateway.

14        Nomadix disagrees that this claim language is unclear, disagrees with the
15  defendants' construction for the reasons stated in its opening brief and disagrees
16  with the defendants' reasoning in their answering brief in support of their
17  construction, including their application of caselaw.  However, Nomadix and the
18  defendants have already reached agreement that, in appropriate circumstances,
19  certain user devices recited in some of the claims must be statically configured.

20        If it will resolve the dispute, Nomadix would be willing to agree that, for
21  purposes of this case, "the user host device is configured to communicate through a
22  home gateway by using an IP address of the home gateway" may be construed as:
23  the user host device is statically configured to communicate through a home
24  gateway by using an IP address of the home gateway.[2]

25        This construction should be acceptable to the defendants.  "Static" is better

26  _____

27        [2] Inserting a word, such as "statically" here, into the otherwise unmodified
    claim language is often, if not always, an improper narrowing of the claim.
    Nomadix suggests this approach in this special case in the spirit of compromise and
28  because it appears to be the most expedient way to resolve the dispute.

-7-

than the defendants' proposal of "permanent" because, to a lay juror, "static" will more clearly convey that, while the configuration is not dynamic, it may nonetheless be changed.   Indeed, the parties agree that "user device having a permanent address" in claim 19 of the '727 patent should be construed as "user device having a static IP address."   Amended JCCS at ex. 2 p. 6.   Nomadix's formulation is also preferable because the defendants' construction on its face does not specify that the IP address is that of the home gateway.  *Cf.* Defs.' Br. at 21–22 (defendants claim that their construction should be interpreted to mean that the IP address is that of the gateway).

To be clear, Nomadix's position is that no construction is necessary but that it would agree to the construction above if doing so will resolve the dispute.

### b.   "home gateway" does not require construction

Whether or not the defendants accept Nomadix's proposed construction of the full phrase, there is no need to construe "home gateway" in view of the surrounding claim language.   Nomadix explained this in its opening brief and the defendants do not argue otherwise.   Rather, the defendants appear to insist that "home gateway" must be construed in the '995 patent just because "home network" requires construction in the '892 and '009 patents.  *See* Defs.' Br. at 7, 9.   The defendants' eagerness to construe this phrase disregards the clear context that the surrounding claim language of the '995 patent provides, as well as the maxim that "[c]laim construction begins and ends in all cases with the actual words of the claim."  *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (internal quotation marks omitted).

The first half of the defendants' proposed construction—"gateway to which the user device is configured to be connected"—is already supplied by the claim language of the '995 patent, which provides that "the user host device is configured to communicate through a home gateway."  *E.g.*, '995 patent claim 1.   The defendants do not offer any reason why being configured to communicate through

1  a gateway does not imply being configured to connect to the gateway.   Thus,

2  adopting the defendants' construction would be redundant: "the user host device is

3  configured to communicate through a [gateway to which the user device is

4  configured to be connected . . . ]."

5      As explained in Nomadix's opening brief, the second half of the defendants'

6  construction—"gateway . . . which corresponds to **the** home internet [or IP]

7  address"—is impermissibly ambiguous because the claims do not refer to any

8  "home internet [or IP] address."   *E.g.*, Nomadix's Opening Br. at 15.   The

9  defendants never explain what they mean by "**the** home internet [or IP] address."

10 The defendants' proposed construction is hopelessly confusing and incorrect.

11 Indeed, if the defendants intend for "the home internet [or IP] address" to refer to

12 the "IP address of the home gateway" (which already appears in the claim

13 language), then the second part of the defendants' construction just specifies that

14 the home gateway is a gateway that corresponds to its own IP address, which is

15 tautological and thus unnecessary.   If the defendants intend "the home internet [or

16 IP] address" to mean something other than the home gateway's IP address, then

17 their construction impermissibly narrows the claims by importing a limitation that

18 the claims do not require.   *McCarty*, 160 U.S. at 116 ("if we once begin to include

19 elements not mentioned in the claim . . . , we should never know where to stop").

20    **3.    "a foreign gateway"  ('995 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| a foreign gateway<br><br>'995: claims 1, 17, 24, 40 | a gateway not on a network of the home gateway | gateway to which the user device is not normally connected and which corresponds to a local internet [or IP] address that is not the home internet [or IP] address[3] |

---

[3]  In the Amended JCCS, Waypoint offered an alternate construction, which Nomadix addressed in its opening brief.  *See* Amended JCCS at 3 n.1; Nomadix's Opening Br. at 17–18.  However, neither Waypoint nor the other defendants argue this alternate construction in their brief, so they have waived it.

The parties agree that "foreign gateway" in the '995 patent requires construction.  The defendants never even attempt to argue that Nomadix's construction is wrong.  They do protest that Nomadix's construction is "vague," but do not explain why and fail to challenge Nomadix's construction. Defs.' Br. at 10.

Moreover, the defendants have failed to support their own construction. They address "foreign gateway" along with "foreign network" in a single section of their brief.  *Id.* at 9–10.  The defendants' one-size-fits-all approach ignores the differences between a gateway and network.  A network is "foreign" if it is distinct from the home network.  *E.g.*, Ex. 4 ('009 patent) col.1 ll.27–32.  But a gateway is not "foreign" simply because it is not the home gateway.  What makes a gateway "foreign" is that it is on a different network than the home gateway.  *See, e.g.*, Ex. 3 ('995 patent) col.11, ll.59–65 (describing embodiment of the invention as a router installed at a "remote/foreign network").

The defendants claim that they adopt "the express definition" set forth at column 6, lines 16–20 of the '995 patent. Defs.' Br. at 10 (citing '995 patent).  But, again, the cited passage does not even mention the word "foreign" or the "local internet [or IP] address" that the defendants include in their construction.

Furthermore, the defendants argue that their construction is justified because claim 1 of the '995 patent specifies that "the foreign gateway has an IP address different from the home gateway." Defs.' Br. at 9–10.  But that very claim language demonstrates that the defendants' construction is improper.  To the extent the defendants contend that their construction is somehow tantamount to specifying that "the foreign gateway has an IP address different from the home gateway," as the claims already require, then the defendants' construction is improper because it renders that claim language superfluous.  *Becton*, 616 F.3d at 1257.  And to the extent that the defendants' construction signifies something else about the foreign gateway's IP address, the construction is improper because it imports new

1  limitations into the claims and would once more be hopelessly confusing.

2       Finally, the defendants again fail to address the problems with their

3  construction that Nomadix pointed out in its opening brief.  Nomadix's Opening

4  Br. at 17 (taking issue with new limitation "the home internet [or IP] address" and

5  with ambiguities caused by "local" and "normally").

6  **B.**    **Terms that the defendants incorrectly construe as relating to "home"**

7         **versus "foreign" ('727 and '716 patents)**

8       Many claims in the '727 and '716 patents apply not only to user devices that

9  are configured for home networks, but also to those that are not so configured.  *See*

10  Nomadix's Opening Br. at 18–19.  The defendants' attempt to fit these claims into

11  a home versus foreign network framework disregards the differences among

12  Nomadix's inventions and improperly limits these claims to specific embodiments.

13      **1.**    **"first network" ('727 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| first network<br><br>'727: claims 19, 20 | No construction is necessary | network to which the user device is not normally connected and which corresponds to a local internet [or IP] address that is not the home internet [or IP] address |

20       Blurring the distinctions between Nomadix's inventions, the defendants seek

21  to equate "first network" with "foreign network."  Defs.' Br. at 10–13.  The

22  defendants fail to justify their departure from the "common patent-law convention"

23  that ordinal phrases like "first" and "second" are used "to distinguish between

24  repeated instances of an element or limitation."  *Free Motion Fitness, Inc. v. Cybex*

25  *Int'l*, 423 F.3d 1343, 1348 (Fed. Cir. 2005) (internal quote marks omitted); *see also*

26  *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1373 (Fed. Cir. 2005).

27  Instead, the defendants rely on two deeply flawed arguments.

28

### a.    The claim language does not require a "first" network to be a "foreign" network

First, the defendants urge that the language of claim 20 requires construing "first network" in claim 19 to mean a foreign network.  To the contrary, claim 20 compels the exact opposite conclusion.

Claim 20 recites: "The method of claim 19 wherein the user device is configured to communicate over a home network having network settings incompatible with the first network . . . ."  In contrast, claim 19 simply recites "a first network" and does not require the user device to be configured for a home network.

The parties agree that "home" and "foreign" are relative concepts.  In particular, whether a network is "home," "foreign" or neither depends on the device in question.  The same network can be a home network for one device (because the device is configured for that network), a foreign network for another device (because that device is configured for a different network) and neither a home nor foreign network for yet another device (because that device is not configured for any particular network).  *Cf.* Defs.' Br. at 8 (conceding that some devices "have no concept of 'home'").

Because claim 19 does not specify whether the user device is configured for a particular network, let alone a network different from the "first network," construing "first network" to be a "foreign network" would impermissibly import a limitation into claim 19.  *Kara Tech. Inc. v. Stamps.com, Inc.*, 582 F.3d 1341, 1345 (Fed. Cir. 2009).  Claim 20 confirms this.  Claim 20 specifies that "the user device is configured to communicate over a home network having network settings incompatible with the first network."  Because claim 19 is silent on this point, this language in claim 20 is presumed to further limit the scope of claim 19.  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004);  *Comark Comm'cns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998).  Indeed,

construing "first network" to mean "foreign network" would render language in claim 20 superfluous and therefore the defendants' construction is improper. *Comark*, 156 F.3d at 1187; *see also Becton*, 616 F.3d at 1257.

Oddly, the defendants espouse the opposite reasoning: i.e., that "first network" in claim 19 must be construed to mean "foreign network" because dependent claim 20 requires the first network to be a foreign network. Defs.' Br. at 11. It is true that claim 20 requires the first network to be a foreign network, but the defendants mistake the significance of this point. In claim 20, the first network has to be a foreign network **not** because "first network" by itself means "foreign network" but because claim 20, unlike claim 19, recites that "the user device is configured to communicate over a home network having network settings incompatible with the first network." The defendants' argument turns the doctrine of claim differentiation on its head. *Liebel-Flarsheim*, 358 F.3d at 910 ("[T]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim"; the presumption "is at its strongest" when "the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim.").

Finally, the defendants posit that "if 'first' meant 'home,' there would be no need for 'intercepting user device messages . . .' or 'modifying incorrectly configured messages transmitted by the user device . . .' as claim 19 of the '727 patent requires." Defs.' Br. at 11. This argument is also unavailing. Nomadix does not contend that "first" means "home"—rather, Nomadix only contends that, without more, a "first" network need not be a foreign network. Thus, the defendants' argument is based on a flawed premise. In any event, although claim 19 requires "intercepting user device messages" and "modifying incorrectly configured messages," neither of these limitations implies anything about whether the user device is configured for a home network or not. For example, the parties agree that "intercepting user device messages" simply means "receiving and

-13-

processing user device messages targeted for another device," which says nothing about whether the user device has a home network.  Amended JCCS at ex. 2, p. 6.

### b.   The prosecution history does not require a "first" network to be a "foreign" network

The defendants also urge that the prosecution history of the '727 patent supports their construction.  To the contrary, the prosecution history shows that "first network" does **not** mean "foreign network."

Indeed, claims 19 and 20 originally recited a "foreign network," but the applicants changed every instance of "foreign network" to "first network."[4]  Ex. 16 ('727 patent file history) at NMDX0013550.  The applicants made clear that this amendment to the claims broadened the term in question.  In particular, they explained that, in describing a foreign network, the specification was describing **an example** of a "first network" within the meaning of the amended claim:  "The specification describes . . . a first network **such as** a remote or foreign network." *Id.* at NMDX0013559 (emphasis added).  It is improper to limit the claims to the specific examples described in the specification.  *Kara Tech.*, 582 F.3d at 1345.

The defendants argue that because the claims at one time recited a "foreign network" they should now be limited to a "foreign network," even though each instance of "foreign network" was changed to "first network."  Defs.' Br. at 12–13. The defendants also argue their construction is justified because the change from "foreign" to "first" followed a rejection based on 35 U.S.C. § 112.

The defendants' arguments are foreclosed by controlling precedent.  In *3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365 (Fed. Cir. 2003), after a § 112 indefiniteness rejection, one of the patent claims was broadened during prosecution to omit a "sequentially" embossed limitation.  350

---

[4] The Patent Office then erroneously issued the '727 patent with references to "foreign network" in claims 19 and 20.  The applicants repaired this through a certificate of correction.  *See* Ex. 2 ('727 patent) Dec. 12, 2006 Certificate of Correction.

F.3d at 1372.  The Federal Circuit held that the claim was not restricted by the limitation it no longer recited.  *Id.*  The court stated:  "The fact that 3M broadened its claims in response to an indefiniteness rejection and dropped the sequential limitation is perhaps unusual, **but it is entirely permissible, and the plain language of the claim as issued must control**."  *Id.* (emphasis added).  See also *Smith v. Snow*, 294 U.S. 1, 16 (1935) ("It is of no moment that in the course of the proceedings in the Patent Office the rejection of narrow claims was followed by the allowance of the broader Claim 1."); *United States v. Telectronics, Inc.*, 857 F.2d 778, 783 (Fed. Cir. 1988) (language that was added to, but then removed from, a claim could not limit the claim).

"First" does not mean "foreign" and does not require construction.

## 2.    "network location of the user host device" ('716 patent)

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| network location of the user host device<br><br>'716: claim 1 | No construction is necessary.  However, if the Court is inclined to construe the term, Nomadix proposes:<br><br>a location at which the user host device is connected to the network | connection port through which the user host device configured with a permanent IP address of the home network accesses the network |

The defendants argue that (a) the network location must be a "connection port" and (b) that the user host device must be "configured with a permanent IP address of the home network."  Each of these propositions directly conflicts with the intrinsic record.

### a.    The network location is not limited to a "port"

The defendants argue that the specification of the '716 patent "defines" the user host device's network location as a specific communication port.  Defs.' Br. at 36.  But the defendants fail to identify any "definition" in the specification.  Instead, they rely on the following portion of the specification describing Figure 1:

1    Referring again to FIG. 1 **in describing another embodiment of the**
2    **invention**, a computer system 10 including a gateway device 12 is depicted
3    in block diagram form. . . . **For example**, the computers 14 **can be** plugged
4    into ports that are located in different rooms of a hotel, business, or a multi-
5    dwelling unit. Alternatively, the computers 14 **can be** plugged into ports in
6    an airport, an arena, or the like.

7    Ex. 7 ('716 patent) col.19 l.65 – col.20 l.7 (emphases added).

8        Two things are clear from this passage.  First, this part of the specification
9    does not set forth any definition of "network location."  Indeed, the term does not
10   even appear in this passage.  Second, Figure 1 and the quoted text only describe
11   **particular embodiments**.  It is improper to limit the claims to specific
12   embodiments. *Kara Tech.*, 582 F.3d at 1345.

13       The intrinsic evidence indisputably establishes that a connection port is only
14   one of several embodiments of a network location.  For example, the specification
15   explains that "a source computer attempting to access a network via the gateway
16   device 12 may be identified [by] one or more attributes that include a . . . particular
17   location (**e.g.,** a communications port in a hotel room)."  Ex. 7 ('716 patent) col.14
18   ll.1–6 (emphasis added).  Even more definitively, claims 25–35 affirmatively
19   provide that a network location can be any of the following:  a hotel room,
20   apartment address, unit in a multi-resident dwelling, room in an apartment building,
21   floor within a building, building, port, airport kiosk, and retail outlet.

22       The network location is a port in just one of these examples—claim 33.
23   Indeed, because claim 1 does not expressly recite claim 33's limitation that the
24   network location is a port, claim differentiation gives rise to a strong presumption
25   that claim 1 does not contain that limitation. *Liebel-Flarsheim*, 358 F.3d at 910
26   (presumption "is at its strongest" when "the limitation that is sought to be 'read
27   into' an independent claim already appears in a dependent claim").  That
28   presumption is conclusively confirmed by the other dependent claims, which

variously recite that the network location is not a port but a room, address, unit, floor, building, kiosk or retail outlet.  Thus, in claim 1, the network location cannot be restricted to a port.

The defendants attempt to evade this ineluctable conclusion, arguing that "[t]he recited 'building' is the building containing the specific port, the recited 'floor within a building' is the floor containing the port in question, and so on." Defs.' Br. at 36.  But that is not what the claims say.  Apart from claim 33, none of the dependent claims quoted above even mentions a "port."

The defendants' construction cannot be reconciled with these dependent claims, which provide that the network location "is" a hotel room, "is" a building, and so on.  Simply put, a network location cannot simultaneously be a connection port **and** a room, address or building.  (For that matter, the network location cannot be both a port and the "building containing the specific port," so the defendants' own argument precludes their construction.)

 Finally, to the extent the defendants' construction requires a physical port that the user host device is plugged into, their construction excludes wireless embodiments disclosed in the specification.  *E.g.*, Ex. 7 ('716 patent) col.13 ll.4–10 (access concentrator 16 in Figure 1 may be "a wireless access point (WAP) for signals transmitted via a wireless network").  Absent an unambiguous disavowal of claim scope, excluding such embodiments is improper.  *See In re Katz Interactive Call Processing Patent Litig.*, ___ F.3d ___, 97 U.S.P.Q.2d 1737, 1753, 2011 U.S. App. LEXIS 3212, at *52 (Fed. Cir. 2011) ("[T]here is a strong presumption against a claim construction that excludes a disclosed embodiment . . . .").

### b.   The user host device need not be "configured with a permanent IP address of the home network"

In another attempt to pigeonhole Nomadix's different inventions into one hole, the defendants urge that the user host device is configured for a home network—indeed, not only configured for a home network, but configured with a

-17-

permanent IP address of that network.  The defendants' sole argument for importing this limitation is that claim 1 recites a "network-packet-translation module" configured to modify certain IP addresses in packets.  Defs.' Br. at 36–37.  The defendants assert that this limitation "would be completely unnecessary if the user host device were not configured with a permanent IP address."  *Id.* at 37.

The defendants are wrong.  Tellingly, the defendants do not provide *any* support for their hypothesis that address translation is only used if a device is configured with a "permanent IP address."  And, in fact, that hypothesis directly conflicts with the intrinsic evidence.

The '716 patent expressly describes embodiments where devices are dynamically configured, such as through DHCP.  For example, Figure 1 expressly depicts that a DHCP server (24) may be used with the claimed inventions.   In describing Figure 1, the '716 patent states:

> In the embodiment shown in FIG. 1, **the computer system 10 employs dynamic host configuration protocol (DHCP) service**, which is a protocol well known to those of skill in the art and currently implemented in many computer networks. . . .  **The DHCP service can be provided by an external DHCP server 24 or it can be provided by an internal DHCP server located within the gateway device.**

Ex. 7 ('716 patent) col.21 ll.1–11 (emphases added).  As the defendants concede, devices that are configured via DHCP have neither a home network nor a permanent/static IP address.  Defs.' Br. at 4, 8:11.

Moreover, as the defendants themselves argue, Figures 11a and 11b illustrate an embodiment of the address modification that the network-packet-translation module of claim 1 is configured to perform.  The '716 patent expressly states that Figures 11a and 11b can apply even when the user device is configured for DHCP.  In particular:

> The host computer 112 will generate network packets using the current

1    configuration stored in the host computer 112 . . . as shown in step 1 [of

2    Figure 11a].  This configuration information is either manually configured in

3    the host computer 112 **or obtained using DHCP**.

4    Ex. 7 ('716 patent) col.28 ll.12–16 (emphasis added).  Thus, the defendants are

5    simply wrong in asserting that the "network-packet-translation module" limitation

6    of claim 1 "mandates that the user host device [] be configured with the permanent

7    IP address of the device's 'home' network."  Defs.' Br. at 36.  By importing "home

8    network" and "permanent IP address" limitations, the defendants' construction

9    excludes, without justification, expressly disclosed embodiments where translation

10    is performed on packets sent by devices configured to use DHCP.  *Kara Tech.*, 582

11    F.3d at 1345; *In re Katz Interactive*, 97 U.S.P.Q.2d at 1753, 2011 U.S. App. LEXIS

12    3212 at *52.

13            **c.**       **The defendants fail to rebut Nomadix's construction**

14          Finally, the defendants do not dispute Nomadix's construction.  If the Court

15    is inclined to construe this term, it should give it its ordinary meaning of "a location

16    at which the user host device is connected to the network."

17         **3.**     **"external network location" ('716 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| external network location<br><br>'716: claims 1, 55 | No construction is necessary. However, if the Court is inclined to construe the term, Nomadix proposes:<br><br>a network location external to the network location of the user host device | location for a network to which the user device is not normally connected and which corresponds to a local internet or IP address that is not the home internet [or IP] address |

25         To mask the impropriety of their construction of "external network location,"

26    the defendants try to frame the dispute as simply whether the construction "should

27    refer to the IP address of the user device."  Defs.' Br. at 37.  Indeed, the defendants

28    suggest that the difference between their construction and Nomadix's is just the

1   degree of usefulness and precision.  *Id.* at 38.  But the two constructions do not bear

2   any resemblance to one another—and the defendants' construction is simply

3   wrong.

4        With their construction, the defendants continue their effort to blur the

5   distinctions between Nomadix's varied inventions.  Indeed, the defendants admit as

6   much, arguing that "the '716 patent claims the same gateway device disclosed in

7   the Transparent Router Patents."  Defs.' Br. at 38.  In particular, consistent with

8   their improper construction of "network location of the user host device," the

9   defendants once again try to impose a "home" versus "foreign" framework on the

10  claims.  But the defendants do not identify any disavowal of claim scope that would

11  justify limiting the claims to this specific embodiment.

12       Instead, the defendants repeat the same specious argument they made for

13  "network location of the user host device":  namely, that the translation module

14  limitation of claim 1 requires a home versus foreign framework.  Defs.' Br. at 37.

15  But for the reasons explained above with respect to "network location," the claims

16  do not exclude devices that use DHCP.  As the defendants concede, user devices

17  that use DHCP "have no concept of 'home.'"  *Id.* at 8:11.  Therefore, imposing a

18  home/foreign framework would impermissibly narrow the claims, particularly since

19  the claims never even mention "home" or "foreign."  *Cf. Kara Tech.*, 582 F.3d at

20  1347–48.

21       The defendants also cite to column 12, lines 49–57 of the '716 patent to

22  justify their assertion that "the '716 patent claims the same gateway device

23  disclosed in the Transparent Router Patents," and thus to justify their importation of

24  "home" / "foreign" limitations into claim 1 of the '716 patent.  Defs.' Br. at 38.

25  But that portion of the specification reads:

26       **One embodiment of such a gateway device** has been described in U.S.

27       patent application Ser. No. 08/816,174 (referred to herein as the Gateway

28       Device Application), the contents of which are incorporated herein by

-20-

reference.  Briefly, the gateway device 12 facilitates transparent computer 14 access to the online services 22 or networks 22, such that the computers 14 can access any networks via the device 12 regardless of their network configurations.

Ex. 7 ('716 patent) col.12, ll.49–57 (emphasis added).  The specification expressly states that it is describing just "[o]ne embodiment."  Claims may not be limited to specific embodiments.  *Kara Tech.*, 582 F.3d at 1345.

Furthermore, contrary to the defendants' assertions, the claim language does **not** "plainly state[]" that an external network location "cannot be one on the user device's base or 'home' network."  Defs.' Br. at 37.  In fact, "home" does not appear in claim 1 at all.  Nor does the "the plain language of the claim show[] that IP addresses are critical to defining the external network location."  *Id.* at 38.  In fact, claim 1 does not even refer to any IP address associated with the external network location.

Finally, the defendants fail to address the many problems with their construction that Nomadix identified in its opening brief.  *See* Nomadix's Opening Br. at 22–23 (identifying at least 5 imported limitations and at least 4 ambiguities).

C.   **Incompatibility and incorrect configurations ('727 patent)**

1.    **"incompatible private IP address" terms ('727 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| user device having an incompatible private IP address | user device configured with a private IP address not compatible with the network | User device configured with a permanent IP address from the home network |
| incompatible private IP address<br><br>'727: claim 11 | private IP address not compatible with the network | a unique IP addresses that can never match the unique private IP address of the user device |

In yet another attempt to treat Nomadix's differing inventions as just one

invention, the defendants once more try to foist a home versus foreign framework on a claim that does not even mention "home" or "foreign."   In particular, with their construction of "incompatible private IP address" in claim 11 of the '727 patent, the defendants ask the Court to change "private" to "permanent" and "incompatible" to "from the home network."   The defendants' construction is contrary to the intrinsic evidence.

The defendants concede that a "private" IP address has an ordinary meaning to one of skill in the art:  it is an IP address that falls within particular address ranges reserved for private networks.  Defs.' Br. at 14 n.13; *see also, e.g.*, Ex. 17 (RFC 1918) at 4 (identifying "three blocks of the IP address space for private internets").  The defendants also concede that their construction equates a "private" IP address to a "permanent" or static IP address.  Defs.' Br. at 15.  But whether an IP address is statically assigned has no bearing on whether it falls within the range of addresses reserved for private networks and vice versa.   Thus, by their own concessions, the defendants' construction does not supply the ordinary meaning of "private."  But none of the four established exceptions justifies this departure from the ordinary meaning.  *See* Nomadix's Opening Br. at 9 (citing four exceptions to ordinary-meaning rule).

The defendants' citation to the prosecution history is unavailing.  *See* Defs.' Br. at 15 (citing Mar. 9, 2006 response to office action).  In making the cited statements, the applicants merely identified for the Patent Office sample excerpts of the specification that provided written description support for "incompatible private IP address."   Ex. 16 ('727 patent file history) at NMDX0013555 ("The specification describes, **for example**, . . .") (emphasis added).  In identifying where the specification provides written description support, the applicants did not use "expressions of manifest exclusion or restriction" and so could not have unambiguously disavowed claim scope so as to limit a "private" IP address to a "permanent" IP address.  *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA,*

1  *Inc.*, 620 F.3d 1305, 1315 (Fed. Cir. 2010).

2      The defendants' only argument for construing an "incompatible" private IP

3  address to be  an address "from the home network" is that the specification

4  supposedly "only provides support for a user device configured with a unique or

5  permanent IP address from its 'home' network." Defs.' Br. at 16.  In essence, the

6  defendants argue that "incompatible" must be construed as "from the home

7  network" because, in their view, that is the only embodiment disclosed in the

8  specification.  But the Federal Circuit's en banc opinion in *Phillips* forecloses that

9  argument: "we have expressly rejected the contention that if a patent describes only

10  a single embodiment, the claims of the patent must be construed as being limited to

11  that embodiment."  *Phillips*, 415 F.3d at 1323; *see also Liebel-Flarsheim*, 358 F.3d

12  at 906.

13      The defendants' construction is improper because it imports a limitation

14  requiring the user device to be configured for "the home network."  But nothing in

15  claim 11 requires a "home network"—the word "home" does not even appear in the

16  claim.  In contrast, claim 20 recites that the user device of that claim "is configured

17  to communicate over a home network."  Because this same claim language does

18  not appear in claim 11, there is a presumption against limiting the "user device" of

19  claim 11 in an identical manner, since doing so would render the limitation of claim

20  20 superfluous.  *Cf. Arlington Indus. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246,

21  1254 (Fed. Cir. 2011) (applying claim differentiation to avoid importing "split"

22  limitation from one independent claim into another).

23      It is unclear whether the defendants have disavowed their alternate

24  construction of "incompatible private IP address" ("a unique IP addresses that can

25  never match the unique private IP address of the user device").  *See* Defs.' Br. at 14

26  n.14.  In any event, they offer no support for that construction, nor do they even

27  attempt to rebut Nomadix's arguments against it.  *See* Nomadix's Opening Br. at

28  25.

The defendants argue that Nomadix's proposed construction is unhelpful for merely construing "incompatible" to mean "not compatible." Defs.' Br. at 16. The defendants overlook that Nomadix's construction assists in understanding that the incompatibility is with respect to a network. For the reasons set forth in Nomadix's opening brief, the Court should adopt Nomadix's construction. Nomadix's Opening Br. at 24.

### 2. "incorrectly configured messages" ('727 patent)

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| incorrectly configured messages<br><br>'727: claim 19 | No construction is necessary | messages addressed to an incorrect address. |

The defendants seek to redefine "incorrectly configured messages" to be limited to just one type: "messages addressed to an incorrect address." The defendants fail to explain how any of the four exceptions to the ordinary-meaning rule justifies this narrowing construction and only confuse the issue with misleading arguments.

First, the defendants suggest that Nomadix bears some burden to establish that "incorrectly configured messages" has an ordinary meaning. Defs.' Br. at 17. That misstates the legal standard. The rule is that claim terms must be given their ordinary meaning unless one of four narrow exceptions applies. *See* Nomadix's Opening Br. at 9. As the parties seeking a plainly narrowing construction, it is the defendants who must explain which of the four exceptions applies.

Second, the defendants' construction contradicts the plain language of the claims by limiting "incorrectly configured messages" to only messages that are "addressed **to** an incorrect address." Thus, defendants seek to limit the incorrectly configured messages to only those whose incorrect configuration is due to their destination address. This would exclude messages that are incorrectly configured

1 due to their source address.  But the claim language indicates that incorrectly

2 configured messages must include messages that are incorrectly configured due to

3 their source address.  Specifically, claim 19 expressly recites that "modifying

4 incorrectly configured messages . . . includes substituting the permanent address of

5 these messages with a router address as the **source address**."  According to the

6 ordinary meaning of the claim language, a construction cannot be right if it

7 excludes messages that are incorrectly configured to due to their source address.

8 The defendants string together a series of loosely connected and unsupported

9 arguments to conclude otherwise.  Defs.' Br. at 17:26–18:18.  But the plain

10 language of the claim forecloses their conclusion.

11 Finally, the defendants propose a new construction in their answering brief:

12 "messages addressed to an incorrect MAC address."  Defs.' Br. at 19 n.15.  But this

13 construction is even narrower than their first construction and would exclude even

14 more preferred embodiments.  For example, it would exclude a preferred

15 embodiment covered by claim 20, in which messages are sent to a "correct" MAC

16 address because a gateway on the first network responds to an ARP request for the

17 home gateway.  Compare Ex. 2 ('727 patent) claim 20 with col.12 ll.7–26.  As

18 such, the defendants' construction is improper.  *Kara Tech.*, 582 F.3d at 1345; *In re*

19 *Katz Interactive*, 97 U.S.P.Q.2d at 1753, 2011 U.S. App. LEXIS 3212 at *52.

20 **D.    The '894 patent**

21 **1.    The order of steps of all claims ('894 patent)**

22

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| [order of steps]<br><br>'894: claims 1–11 | No construction is necessary | The steps of all the claims must be performed in the order listed |

23

24

25

26 The parties dispute whether the language used in the claims of the '894

27 patent requires that all steps in the claims must be performed in the order recited.

28

## a.     The defendants deny the claims their full scope

Some of the steps in claim 1 apply to multiple original destination address access requests and others apply to an individual request.  For example, the first two steps recited apply to multiple requests: "receiving . . . all original destination address access requests . . ." and "determining . . . which of the original destination address requests requires redirection."  In contrast, the remaining steps, such as "storing" and "modifying," apply to individual requests.

As Nomadix pointed out in its opening brief, the defendants' proposal to construe claim 1 so that its steps "must be performed in the order listed" cannot be correct because it would absurdly narrow the claim to require that **all** requests be received before, e.g., determining whether any required redirection.  Nomadix's Opening Br. at 29–30.  In response, the defendants disavowed the plain import of their proposed construction, saying that they "have never claimed the gateway must receive <u>all</u> requests before it can determine whether <u>any</u> of them require redirection."  Defs.' Br. at 27.  Thus, the defendants apparently agree that it would be incorrect to limit the claim to only those embodiments where multiple requests must be received before performing any determining or other steps.

But the defendants go too far because they now argue that the scope of the claim completely excludes such multi-request embodiments.  The defendants argue that the steps in the claimed method must be applied in listed order to each individual request, and that the steps "will be repeated over and over again for all of the incoming requests."  *Id.* at 27–28.  As they make clear in their arguments, the defendants' proposed construction would limit the recited steps to apply only to one individual request at a time, and thus would improperly exclude embodiments wherein multiple requests are received before the receiving step completes, and would also exclude embodiments that determine among multiple requests which of them requires redirection before the determining step completes.  In accordance with the ordinary meaning of the claim language, the scope of claim 1 plainly

includes these multi-request embodiments.  *E.g.*, claim 1 ("determining . . . which of the original destination address request**s** requires redirection") (emphasis added).

Defendants' proposed construction would also improperly exclude multi-request embodiments in the context of claim 6, because, as claimed, the gateway device "receives the original destination address requests" and "determines if redirection of any of the original destination address requests is required."  The ordinary meaning of claim 6 plainly includes embodiments in which the gateway device receives multiple requests before it then determines whether any of them requires redirection.  Defendants' proposed construction—even as amended by their arguments—should be rejected because it excludes embodiments that are within the proper scope of the claims.

### b. The intrinsic evidence shows that the claims do not require performing steps in listed order

The defendants argue that claim 1 requires that each of its seven steps be performed in the order recited.  Defs.' Br. at 25–26.  But the defendants fail to explain how the claim requires this rigid ordering.  If the claim language truly required every step to be performed in recited order, then the defendants would presumably have been able to explain how each successive step depends unambiguously on the immediately preceding step.  But the defendants could only craft a successive-steps argument "by way of illustration" that begins at "responding " and fails to address four of the seven steps.  *Id*. at 26.

Defendants address the ordering of the "storing" step by arguing that until the gateway determines whether redirection is required "the gateway does not know" whether the "storing" step is to be performed.  *Id*.  The defendants just misinterpret the claim language by inferring conditions that depend on some unclaimed "knowledge" of a gateway.  However, when the "storing" step is treated in accordance with its ordinary meaning, it becomes clear that the "storing" step can occur anywhere in at least the first four steps.  These steps are listed below:

- **receiving**, at a gateway device, all original destination address access requests originating from a computer;

- **determining**, at the gateway device, which of the original destination address requests require redirection;

- **storing** the original destination address if redirection is required;

- **modifying**, at the gateway device, the original destination address access request and communicating the modified request to a redirection server if redirection is required;

As a first example, and contrary to defendants' rigid ordering position, the claim language itself allows "storing" to occur before the "determining." This change in ordering would result, for example, from an embodiment that simply stores each of the original destination addresses immediately after it is received. The "determining" can then be done following the "storing." Performed in this "receiving—storing—determining" order, there can be no question that the steps would ensure that "storing the original destination address" is done "if redirection is required." It does not matter if the determination of whether redirection is required occurs subsequently because the original destination address would still be stored "if redirection is required," which fully satisfies the claim language.

As a second example, the "storing" step can also occur before the "receiving" step. This is true because, in typical communication between a computer and a gateway device, the gateway uses the original destination address to open a connection—<u>before</u> it receives an (HTTP) original destination address request. This is explained in the specification:

More specifically, the gateway device . . . receives the user's HTTP request for a web page . . . .   It will be appreciated, however, that **to receive the HTTP request the gateway device . . . must initially open a Transmission Control Protocol (TCP) connection to a server in line with the user-requested internet address**.

-28-

Ex. 5 ('894 patent) col.9 ll.15–25 (emphasis added), ll.35–38 (gateway pretends to be destination address long enough to complete handshake for opening connection). Because, to establish the connection, the gateway device already has the destination address before it receives the HTTP request, the gateway device can store the destination address before receiving the HTTP request.[5]   Storing the destination address in this manner is merely another way to perform the method recited in claim 1, and again will ensure that destination addresses are stored "if redirection is required" —even if that is determined in a later step.  Nothing in the language of claim 1 restricts the scope of the method to exclude the storing step from being performed as the first step or the second step or, as recited, the third step.

As still another example, the storing step can also occur after the modifying step (step four).  The defendants dispute this ordering and argue that once the modifying the step is performed, the original destination address would be overwritten and would hence be gone, and thus could no longer be stored.  Defs.' Br. at 28.  But the defendants mischaracterize the claim language by pretending that "modifying . . . the original destination address access request" requires modifying the original destination address, as opposed to the request.  *Id*.  The scope of the modifying step is not limited to modifying only the original destination address.

As yet another example that illustrates defendants' improper narrowing, claim 1 also covers a series of steps where the original destination address is stored more than once, such as both before and after the modifying step (step four).  In this example, Nomadix would be entitled to identify the second act of "storing"— the one occurring after the modifying step—as the one that satisfies the claimed step of "storing."  And, in this example, even if the modifying step were to overwrite the original destination address, it would already have been stored, and storing it again after the modifying step satisfies the storing step as claimed.

---

[5] For the same reasons, the "determining" step could be performed before the "receiving" step.

These examples of embodiments that fall within the scope of claim 1 also apply to the gateway recited in claim 6.  The defendants' proposed construction would improperly narrow claims 1 and 6 to exclude these embodiments from scope of the claims.  The defendants offer no argument whatsoever on the order of the limitations added to claims 1 and 6 by dependent claims 2–5 and 7–11. Accordingly, for the reasons provided here and in Nomadix's opening brief, the Court should reject the defendants' proposed construction and not require any particular order for performing the additional limitations of these dependent claims.

## 2.  "administrator" ('894 patent)

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| administrator<br><br>'894: claims 1, 5, 6 | No construction is necessary | a person who administers the gateway device |

Defendants seek to narrow the claim term "administrator" to mean "a person who administers the gateway device."  Defendants' proposed construction improperly imports narrowing limitations by merely citing to the specification and pointing to exemplary embodiments that have particular limitations does not justify importing such limitations into the claims to narrow their scope.  *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1305 (Fed. Cir. 2003).  In addition, the defendants rely on citations that fail to even support their proposed construction.  For example, the defendants cite to a statement in the patent specification referring to a "network administrator."  Defs.' Br. at 29.  But defendants' proposed construction narrows the scope of administering to a "gateway device" and would exclude the disclosed embodiment of administering a "network."  The citation only shows that defendants' proposed construction is improperly limiting.  Defendants also cite to prior briefing by Nomadix referring to "network operators like hotels."  *Id.*  Again, the citation refers to a "network" and not a "gateway device," and once again fails to support defendants' proposed

construction.  If anything, this citation would indicate that "a hotel" could also be an administrator, which shows that the defendants' attempt to narrow the administrator to "a person" is also improper.  Indeed, the claim language nowhere requires an administrator to be "a person."

Additionally, "administrator" only appears in the claims in the phrase "administrator-specified" redirected destination address.  That address bears on a response of a redirection server.  '894 patent, claim 1.  Because the redirection server is not necessarily located in the gateway device, defendants are wrong in proposing that the administrator must administer the gateway device.  That the redirection server is not necessarily located in the gateway device is made clear by claim 9, which depends from claim 6 and adds the limitation that the redirection server is located within the gateway device.  By claim differentiation, claim 6 does not require the redirection server to be located within the gateway device.  *Liebel-Flarsheim*, 358 F.3d at 910.

Because the defendants have provided no exception to the prohibition against importing limitations into a patent claim, the Court should reject defendants' narrowing construction.

**E.    The '554 patent**

    **1.    "determining access" terms ('554 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| determines the access rights of the source, wherein access rights define the rights of the source to access destination sites via the network<br><br>'554: claim 10 | No construction is necessary | once the source is authenticated to access the network, determines the rights of the source to access particular destination sites via the network based upon the identity of the source and the content and/or destination requested |

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| determining the access rights of the source based upon the identification of the source, wherein the access rights define the rights of the source to access destination sites via the network<br><br>'554: claim 17 | No construction is necessary | once the source is authenticated to access the network, determining the rights of the source to access particular destination sites via the network based upon the identity of the source and the content and/or destination requested |

Defendants seek to import limitations into claims 10 and 17 of the '554 patent, but provide no persuasive basis to limit the scope of these claims. First, while the two claim terms at issue both begin with "determining the access rights of the source," the defendants propose to limit this "determining" so that it can only occur "once the source is authenticated to access the network." Neither claim 10 nor claim 17 includes any language that would so limit the recited "determining," and in fact neither claim includes any language about a source being "authenticated." '554 patent, claims 10 and 17. Defendants have not explained how any recognized exception to the prohibition against importing narrowing limitations supports their proposed constructions.

Defendants' proposed narrowing goes even further. The defendants' constructions additionally require that the recited determination of access rights must be "based upon the identity of the source and the content and/or destination requested." No language in either of claims 10 or 17 suggests that any determination of access rights is based on "content" or "destination requested." And nothing in claim 10 suggests that any "identity of the source" plays any role in determination of access rights. Defendants even concede that claim 10 does not include determining access rights based on "identity of the source." Defs.' Br. at 31 n.21. Again, defendants' attempt to limit the scope of Nomadix's claims with

1 no acceptable justification.  *Texas Instruments Inc. v. Int'l Trade Comm'n*, 988

2 F.2d 1165, 1171 (Fed. Cir. 1993).

3   Defendants' proposed constructions suffer from the additional flaw of

4 assigning the same meaning to two differently-worded claim terms.  Instead of ever

5 addressing the real problem, namely the heavy presumption that claim terms are to

6 be given their ordinary meaning, *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d

7 1359, 1366 (Fed. Cir. 2002), the defendants respond by arguing that they have

8 overcome the presumption of claim differentiation.  Defs.' Br. at 31 n.21.  But the

9 defendants have not even come close to overcoming that presumption.  When

10 applied in the context of two independent claims, like claims 10 and 17 here, claim

11 differentiation refers to a presumption that the two claims differ in scope.

12 *Arlington*, 632 F.3d at 1254.  Defendants argue that the specification contains clear

13 disclosure that the determining of access rights must be based on "identity of the

14 source" and "the content and/or destination requested."  Defs.' Br. at 31 n.21.

15 According to the defendants, the disclosure is so clear that these are the required

16 bases that the disclosure "overrides" the presumption of claim differentiation and

17 thus requires that exactly the same scope be assigned to claims 10 and 17 even

18 though they use different words to describe determining access rights.  *Id*.

19 Defendants' argument is flatly belied by the specification.

20   First, contrary to defendants' argument, the specification describes

21 embodiments that use other bases for determining access rights, including "type of

22 services requested," "protocol being transmitted," "objective criteria, such as a

23 specific time" or "other dynamic information determined by the network provider."

24 Ex. 6 ('554 patent) col.11 ll.48–56, col.12 ll.5–10.  Second, defendants are

25 incorrect in arguing that the specification requires that access rights always be

26 determined based on at least *two* criteria, namely an "identity of the source" and at

27 least one of "the content" and "the destination requested."  Indeed, the specification

28 identifies numerous authorization criteria that can each be used on its own.  *See id.*

-33-

1  at col.12 ll.10–11 (listing criteria individually and indicating they can additionally
2  be used as "a combination of attributes").  Plainly, the specification does not clearly
3  describe that access rights are always determined based on "identity of the source"
4  and "the content and/or the destination requested," or even based on using two or
5  more criteria, and therefore the defendants have fallen well short of overcoming the
6  presumption of claim differentiation.  Finally, the defendants have identified no
7  persuasive reason why the claim terms at issue should not be given their ordinary
8  meaning.  *See SunRace Roots*, 336 F.3d at 1302–08 (reversing trial court's
9  narrowing construction when nothing in the intrinsic evidence warranted departure
10  from giving the disputed claim term its ordinary meaning that was consistent with
11  and suggested by claim differentiation).

12        **2.        "regardless of network configurations" ('554 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| regardless of network configurations  '554: claims 10, 17 | No construction is necessary. However, if the Court is inclined to construe the term, Nomadix proposes:  regardless of network address settings | regardless of the hardware, MAC addresses, IP addresses, and networking protocols used by the network and the source computer |

19        The parties dispute the meaning of "network configurations" in claims 10
20  and 17 of the '554 patent.  For numerous reasons, Nomadix disagrees with
21  defendants' attempt to replace "network configurations" with numerous imported
22  and narrowing limitations.

23        First, defendants argue that the patent claims provide little guidance
24  regarding the meaning of the disputed term.  Defs.' Br. at 32.  Defendants are
25  wrong.  In fact, in its opening brief, Nomadix explained, in substantial detail,
26  exactly how the claim language surrounding "regardless of network configurations"
27  provides context that bears importantly on the meaning of this phrase.  Nomadix's
28  Opening Br. at 36–37.  Defendants fail to even acknowledge Nomadix's argument,

1    much less rebut it.

2          Second, nowhere in the four pages of briefing they devote to this claim term

3    do defendants ever explain how or why "regardless of network configurations"

4    should be interpreted to mean "regardless of <u>the hardware</u> . . . ."  The Court should

5    reject that construction.

6          Third, to try to support including "networking protocols" in their

7    construction, defendants mischaracterize the prosecution history.  Defendants rely

8    heavily on statements Nomadix made during prosecution explaining why a patent

9    to Sitaraman does not describe Nomadix's invention.  Defs.' Br. at 32–33.  The

10   description in the Sitaraman patent relates to "application protocols," and

11   Nomadix's statements concerned a "protocol layer" which, according to Sitaraman,

12   supported communication with clients that use "specific application protocols."

13   Ex. 18 ('554 patent file history) at NMDX0015319; *see also* Ex. 19 (Sitaraman)

14   col.6 l.21.    Despite citing portions of these very same statements, defendants

15   blatantly mischaracterize them, arguing that they address "networking protocols"

16   rather than "application protocols."   Defs.' Br. at 33.   Defendants also

17   mischaracterize statements made by the examiner.  In particular, defendants assert

18   that the examiner stated that the Sitaraman patent described "adding protocol

19   handlers to accommodate any new <u>networking protocols</u> encountered," when, in

20   fact, the examiner never said anything about "networking protocols," and rather

21   expressly referred to "application protocol[s]."  *Compare* Defs.' Br. at 33 *with* Ex.

22   18 at NMDX0015346.  When the mischaracterizations are set aside, the defendants

23   have failed to support a construction that includes "networking protocols."

24         Fourth, to try to support including "MAC addresses" in their construction,

25   defendants rely on text that appears only in Figure 9A of the '892 patent, which is

26   incorporated by reference into the '554 patent.  Defs.' Br. at 35.  But the defendants

27   improperly take the text from Fig. 9A out of context.  In its entirety, step 4 of the

28   Fig. 9A flowchart reads "receiving all packets regardless of MAC address."  '892

-35-

1    patent, figure 9A.  The context of "receiving all packets" differs from the context of

2    providing access to a network, and nothing warrants taking the phrase "regardless

3    of MAC address" out of the specific context in which it was used and importing it

4    into the disputed claim terms.  Beyond this disparity in context, it would still be

5    improper to import a limitation from one embodiment disclosed in one figure.  *Gart

6    v. Logitech, Inc.*, 254 F.3d 1334, 1342 (Fed. Cir. 2001).  The defendants have failed

7    to support a construction that includes "MAC addresses."

8         As a final matter, defendants agree with Nomadix that "network

9    configurations" includes "network address settings."  Defs.' Br. at 35.  If the Court

10   is inclined to construe this phrase, it should adopt Nomadix's construction.

11   **F.    The '399 patent**

12        **1.    "management system" ('399 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| management system<br><br>'399: claims 1, 4, 6, 8, 13, 16, 18, 21[6] | No construction is necessary | a management system that is separate from the network gateway device for managing a property's operations and connected to the network gateway device via a physical link |

19        In their answering brief, the defendants do not dispute Nomadix's allegation

20   that their construction improperly imports limitations into the claims.  Instead, the

21   defendants point to various portions of the specification allegedly consistent with

22   their proposed construction.  Defs.' Br. at 46.  This is insufficient: the case law is

23   clear that, absent a clear disavowal of claim scope, it is improper to limit the scope

24   of the claims through claim construction.  *See, e.g.*, *Spine Solutions*, 620 F.3d at

25   1315 ("an express disclaimer sufficient to limit the scope of the claims . . . requires

---

[6]    Consistent with the parties' Joint Claim Construction Statement, Nomadix submits that the present dispute applies to the term "management system" as recited by claims 1, 4, 6, 8, 13, 16, 18, and 21.  *See* Amended JCCS at ex. 9.

expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope") (citations omitted).  As the defendants have not even attempted to identify any such disavowal, their limiting construction is improper.

Additionally, the defendants' construction—which would require the management system to manage a property's operations and be both physically linked to and separate from the gateway—is unsupported by the claim language. Nothing in the claims requires that the recited "management system" manage a property's operations.  To the contrary, various dependent claims specifically recite that "said management system is a hotel property management system," making "management system" presumptively broader than a system related to property management.  Claim 4; *see also* claims 8, 16, 21; *Liebel-Flarsheim*, 358 F.3d at 910 (the presumption that a limitation is not found within the independent claim "is at its strongest" where "the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim").  Also, nothing in the claims requires a physical link between the management system and the gateway.  Independent claims 6 and 18 are silent as to the nature of communications between the management system and gateway, and claims 1 and 13 recite only that the management system and gateway are "connected."  As the specification makes clear, this connection encompasses communication "by any means well known to those of skill in the art for transmitting network access and usage data to management systems," and is in no sense limited to physical links.  Ex. 8 ('399 patent) col.7, ll.28–31.  Finally, nothing in the claim language requires that the management system be separate from the gateway.

The defendants' construction is also unsupported by the specification.  In fact, each of the portions of the specification cited by the defendants is expressly limited to a particular embodiment, and therefore cannot limit the claims.  *See* Ex. 8 ('399 patent) col.5, ll.21-23 ("According to <u>one aspect of the invention</u> . . ."); *id*. col.6, ll.6-11 ("<u>Typically</u>, the gateway device 12 is connected . . . According to <u>one</u>

1  preferred embodiment . . . "); *id*. col.5, ll.58-60 ("In the embodiment of Fig. 2 . .

2  ."). The specification identifies Figure 2, which the defendants contend is

3  consistent with their construction, as being "for illustrative purposes only, and []

4  not intended to limit the scope of the present invention." *Id*. col.5 ll.17-20.

5  The defendants have shown no basis for limiting the scope of the claims.

6  The Court should reject the defendants' construction of "management system."

7  **2.    "absent additional agents" terms ('399 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| absent additional agents implemented by the computer<br><br>'399: claims 1, 13 | Nomadix agrees with the Court's prior construction (for the corresponding term from claim 6):<br><br>absent additional special client software implemented by the computer for managing the communication between the computer and the gateway device | without the need to implement additional "agents" or to reconfigure the computer in any manner |
| absent additional agents implemented by a user's computer<br><br>'399: claims 6, 18 | Nomadix agrees with the Court's prior construction:<br><br>absent additional special client software implemented by the computer for managing the communication between the computer and the gateway device | without the need to implement additional "agents" or to reconfigure the user's computer in any manner |

The defendants agreed with Nomadix to adopt the Court's prior construction

of "agent" as special client software—specifically, special client software for

managing communication between the computer and the gateway device. In light

of this agreement, the meaning of "absent additional agents" is straightforward: as

the Court previously concluded, "absent additional agents" means absent any

additional special client software for managing communication between the

1  computer and the gateway device.  But the defendants are not satisfied with this

2  construction and seek to further construe "absent additional agents" to mean

3  "without the need . . . to reconfigure the computer in any manner."  As a result, the

4  defendants would narrow the claim to exclude things that are not software at all.

5      The defendants' construction does not match their arguments.  While their

6  arguments treat reconfiguring the computer as a function of the special client

7  software, their proposed construction separates reconfiguration from software

8  altogether.  The defendants expressly argue that "[a]n 'additional' agent is one that

9  reconfigures the computer."  Defs.' Br. at 48.  Similarly, the defendants assert that

10 their construction captures "eliminat[ing] the need for the user to install <u>additional</u>

11 <u>software</u> that reconfigures the computer."  *Id.* at 49 (emphasis added).  These

12 arguments are inconsistent with the defendants' proposal to define reconfiguration

13 as being "in any manner," apart from and beyond software.  The defendants'

14 arguments are, however, entirely consistent with Nomadix's construction.

15     In view of the agreed-upon construction of "agent," none of the prosecution

16 history statements that the defendants cite changes the meaning of "absent

17 additional agents": absent additional special client software for managing the

18 communication between the computer and the gateway device.  That meaning

19 coincides precisely with the statements made during prosecution to distinguish U.S.

20 Pat. No. 5,987,430 ("Van Horne").    Ex. 11 ('399 prosecution history) at

21 NMDX0010773-74.  Any resulting disavowal was limited to software, and did not

22 extend to reconfiguration that is not part of running or adding special client

23 software for managing the communication between the computer and the gateway

24 device.  *Id.*  Indeed, when Nomadix distinguished Van Horne, it cited to portions of

25 Van Horne that describe reconfiguration carried out by client software.  *Id.*

26 (arguing that Van Horne discloses that "the user runs the client software in order to

27 establish a communication link . . . to the [network]" and thus "provides no

28 teaching of a gateway device that can manage communication with a client absent

1    special client software"); *id.* at NMDX0010774 (citing to Van Horne, Fig. 8 and

2    accompanying text); *see also* Ex. 20 (Van Horne) col. 9 l.49 – col.11 l.2 (describing

3    client software as reconfiguring a client for network communication).

4            The defendants also contend that their construction is supported by the

5    specifications of the '894 and '554 patents.  Defs.' Br. at 49.  However, the

6    disclosure of the '894 and '554 patents confirms that reconfiguration is only that

7    which is included in special software added to the client computer.  *E.g.*, Ex. 6

8    ('554 patent) col.10, ll.16-18 ("Furthermore, no <u>additional configuration software</u>

9    will have to be added to the source computer."); Ex. 5 ('894 patent) col.1, ll.63-65

10   ("special software must also typically be loaded onto the user's computer to

11   support reconfiguration").  Significantly, the defendants can point to no disclosure

12   in the '399 patent or any of the patents incorporated by reference that relates to

13   reconfiguration unrelated to additional client software.

14           Finally, the defendants attack Nomadix's proposed construction as being

15   inconsistent with positions taken in the *Second Rule* litigation.  The defendants

16   argue that Nomadix equated the phrase "absent additional agents" with the ability

17   to connect to a network "without reconfiguration."  Defs.' Br. at 49.  However, in

18   Nomadix's *Second Rule* claim construction brief, it represented that the claimed

19   gateway allowed a computer to connect to a new network "without

20   reconfiguration" in that the gateway facilitates a connection without loading any

21   additional software onto the computer.  Defs.' Br., Ex. 30 at 6–7.  This is consistent

22   with Nomadix's current position, which is that "absent additional agents" means

23   absent additional special client software.

24   / / /

25   / / /

26

27

28

-40-

### 3.   "call accounting record" terms ('399 patent)

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| call accounting record format<br><br>'399: claims 1, 6 | Nomadix agrees with the Court's prior construction:<br><br>a format that can be used to organize data related to telephone calls | a format that can be used to organize data related to telephone calls that includes fields corresponding to charged amount and phone number called |
| a call accounting record<br><br>'399: claims 15, 20 | Nomadix agrees with the Court's prior construction:<br><br>a protocol that can be used to organize data related to telephone calls | a protocol that can be used to organize data related to telephone calls that includes fields corresponding to charged amount and phone number called |

The defendants contend that the recited "call accounting record format" must include fields for a charged amount and phone number called. Contrary to Nomadix's previous understanding of the defendants' position, the defendants now acknowledge that data <u>within</u> these fields need not correspond to an actual charged amount and called number. In particular, the defendants point to the specification's disclosure that data stored within call accounting record fields can be "mock" data that is not used by the system: "a mock field, such as a mock telephone number, may be included [in the call accounting record] so that the property management system receives the entire record it is programmed to receive." Defs.' Br. at 40 (citing '339 patent, col.8 ll.61-65). Thus, the defendants agree with Nomadix that the data stored within the fields of the call accounting record need not actually correspond to a charged amount and called number.

In an effort to compromise, Nomadix can agree in principle to the defendants' proposed construction, so long as the jury is instructed that the required fields relate only to format and do not require the gateway to insert an actual charged amount or telephone number into the fields. Nomadix understands this to be consistent with the defendants' position. For clarity, the defendants' proposed

construction should be modified to read "a format that can be used to organize data related to telephone calls, <u>wherein the format</u> ~~that~~ includes fields corresponding to charged amount and phone number called."

### 4.   "predetermined" terms ('399 patent)

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| predetermined protocol<br><br>'399: claims 1, 13, 15 | No construction is necessary | a protocol that can be used to organize data related to telephone calls that includes fields corresponding to charged amount and phone number called |
| predetermined data formats<br><br>'399: claim 18 | No construction is necessary | a format that can be used to organize data related to telephone calls that includes fields corresponding to charged amount and phone number called |

The defendants assert that "predetermined protocol" and "predetermined data formats" should be limited to a call accounting record format. To support this contention, the defendants rely exclusively on the prosecution history of the '399 patent. However, nothing in the prosecution history constitutes an "expression[] of manifest exclusion or restriction, representing a clear disavowal of claim scope" that would be sufficient to limit the claims. *Spine Solutions*, 620 F.3d at 1315.

The defendants point first to a December 2002 office action response, in which independent claims 1 and 6[7] were amended to overcome an anticipation rejection in view of the Griffin patent. As amended, claims 1 and 6 recited formatting data into a call accounting record format; the applicants explained that, in "[t]he present invention . . . the gateway device receives data from the computers/hosts and formats (or re-formats) the data into call accounting records."

_____

[7] The examiner's rejection was directed to then-pending claims 1 and 7, which were renumbered upon issuance as claims 1 and 6, respectively. For clarity, Nomadix will refer to claims that were at issue during prosecution according to the claim numbers that were assigned upon issuance.

1   Ex. 11 ('399 prosecution history) at NMDX0010450, 10455.   The applicants

2   argued that Griffin did not anticipate claims 1 and 6, as amended, because Griffin

3   did not disclose formatting data into call accounting record format.

4       The defendants assert that this characterization limits the "predetermined"

5   terms recited by claims 1, 13, 15, and 18 to a call accounting record format.  Defs.'

6   Br. at 42.  The defendants are mistaken on multiple fronts.  First, the examiner's

7   rejection that prompted the call accounting record amendment—and, therefore, the

8   applicants' remarks relating to that amendment—was not directed to claims 13, 15,

9   or 18.  In fact, these claims were not even added until the December 2002 response.

10  Ex. 11 ('399 prosecution history) at NMDX0010456-10458 (adding new claims 15-

11  23, which issued with amendments as claims 13-21).  Additionally, none of claims

12  13, 15, and 18 recites a call accounting record.  Nomadix made clear that these

13  claims were not so limited, but were instead broadly directed to "[formatting] data

14  into a management system compatible format."  Ex. 11 ('399 prosecution history)

15  at NMDX0010453.  Thus, no basis exists for imputing the statements regarding

16  amended claim 1 to any of claims 13, 15, and 18.

17      Additionally, given that the amended claim 1 recited a "predetermined

18  protocol" as well as a "call accounting record format," the applicants' statement

19  that the invention of claim 1 involved formatting data into call accounting records

20  did not operate as a disclaimer with respect to the separate "predetermined" term.

21  Different terms in a claim are presumed to carry different meanings, *see CAE

22  Screenplates*, 224 F.3d at 1317; the applicants' statements with respect to one term

23  cannot be used to redefine another.  Therefore, nothing in the December 2002

24  response constitutes the type of disavowal sufficient to narrow claim scope.

25      The defendants also rely on the November 2003 response, in which all

26  independent claims were amended to recite the "absent additional agents"

27  limitations.  The examiner had rejected all claims as obvious in view of the Van

28  Horne patent, and Nomadix challenged this obviousness rejection on at least two

-43-

1   independent grounds.  First, Nomadix argued that Van Horne failed to teach a
2   gateway that could manage communication with a client absent additional agents,
3   as recited by the amended independent claims. Ex. 11 ('399 prosecution history) at
4   NMDX0010773-74.   Additionally, the applicants argued that it would not have
5   been obvious to format data into call accounting record format, as recited by
6   independent claims 1 and 6.  *Id*. at NMDX0010774.  The applicants did not make
7   any remarks relating to the "predetermined" limitations of claims 15 and 20, nor
8   did they state that these limitations were equivalent to a call accounting record.
9   Nothing in the November 2003 response approaches the type of unambiguous
10  disavowal of claim scope that the defendants' construction would require.

11      The defendants have failed to establish the existence of any disavowal that
12  would be sufficient to limit the "predetermined" terms to "call accounting record."
13  As is evident from the claim language, some claims of the '399 patent recite a call
14  accounting record and others recite a "predetermined" protocol and data format.
15  Therefore, the Court should reject the defendants' construction.

16      **5.    "physical location" ('399 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| physical location<br><br>'399: claims 13, 18 | No construction is necessary | communication port through which the user's computer accessed the network |

21      The defendants wrongly allege that Nomadix is proposing a construction for
22  "physical location."   Nomadix's position is, and has consistently been, that
23  "physical location" has a plain and ordinary meaning.   The jury will not be
24  confused about the meaning of this term, and no construction is necessary.

25      The defendants do not dispute that their construction for "physical location"
26  would import limitations into the claims.  Instead, relying on statements made in
27  the December 2002 response, they argue that Nomadix has "unambiguously
28  disavowed" a construction in line with the ordinary meaning of this term.  Defs.'

-44-

1   Br. at 43.  Again, the defendants are mistaken.  The defendants point to Nomadix's

2   statement that the Griffin patent "does not teach a gateway device that has the

3   capability to identify the port from which a user gains access to a network."  Ex. 11

4   ('399 prosecution history) at NMDX0010451.  But this is not an admission that the

5   term "physical location" is limited to a port.  Rather, this statement was made in the

6   context of the argument that Griffin did not anticipate because it failed to disclose,

7   *inter alia*, "a gateway device that has the capability to identify the physical location

8   of the host/computer."  *Id*.  Griffin's failure to disclose a port was merely one

9   example of physical location that Griffin failed to disclose.  Nomadix's statement is

10   not an "expression[] of manifest exclusion or restriction" sufficient to constitute a

11   clear disavowal of claim scope.  *Spine Solutions*, 620 F.3d at 1315.

12        The defendants also rely on Nomadix's statement that disclosure relating to

13   "maintaining port related information" provides support for the physical location

14   limitations in the specification.  Defs.' Br. at 43-44; Ex. 11 ('399 prosecution

15   history) at NMDX0010453.  But this statement does no more than recognize that

16   the specification teaches an embodiment that includes a communication port.

17   Again, this cannot qualify as a clear disavowal of claim scope.

18        Here, Nomadix never characterized the communication ports as being a

19   necessary feature of any of the claims.  To the contrary, the intrinsic evidence

20   shows that a user's physical location can be <u>any</u> location, including a room, an

21   apartment address, and a building.  *See* Nomadix Opening Br. at 44-45 (citations).

22   The statements made during prosecution do not constitute the type of "clear

23   disavowal" of scope that the defendants' construction would require.

24       **6.**     **"collecting data . . ." ('399 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|---|---|---|
| collecting data corresponding to the user's access to said computer | No construction is necessary | monitoring and recording "data representative of the user's access to the |

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| network, including a physical location of the user and the user's network usage, in said network gateway device<br><br>'399: claim 18 | | computer network," including a "physical location" of the user and the "user's network usage", in said network gateway device |

In the Joint Claim Construction Statement filed with the Court, the parties identified the limitation recited by claim 18 as being the only disputed term relating to "collecting data."  Amended JCCS at ex. 9, pp. 57-58, 61.  Now, in the midst of claim construction briefing, the defendants seek to construe an additional limitation from claim 6.  To be clear, Nomadix's understanding is that the only disputed "collecting data" limitation is that recited by claim 18.

As Nomadix explained in its opening brief, the defendants' construction improperly redefines both "corresponding to" and "collecting" in a manner that is inconsistent with the terms' ordinary meaning.  The defendants do not even attempt to rebut Nomadix's argument with respect to "corresponding to"; the response brief ignores this term entirely and fails to provide any support for redefining the term to mean "representative of."   Therefore, the Court should reject the defendants' construction of this term and adopt Nomadix's position, that "corresponding to" is readily understood and does not require construction.

With respect to "collecting," the defendants contend that construction is necessary to distinguish this term from "maintaining," which appears in other asserted claims.  This is nonsensical.  Both "collecting" and "maintaining" are common terms readily understood according to their ordinary meaning—the jury will understand the distinction between these terms without the Court's assistance.

Not only have the defendants failed to identify any need to construe "collecting," they have failed to identify any support for their proposed

-46-

1    construction.  The defendants assert that "collecting" must be defined to require

2    "more than just 'maintaining.'"  Defs.' Br. at 45.  However, the defendants cite

3    nothing to support this contention.  "Collecting" does not require maintaining at all:

4    quite simply, collecting and maintaining are distinct and unrelated terms whose

5    definitions are independent of each other.

6          The defendants next argue that "collecting" must include both monitoring

7    and recording.  Defs.' Br. at 45.  The defendants cite to column 6, lines 36–48 of

8    the '399 patent for this proposition.  *Id.*  However, nothing in this passage relates to

9    "collecting."   Instead, the passage discloses only that the gateway performs

10   monitoring and recording operations.   Ex. 8 ('399 patent) col.6 ll.36-37 ("The

11   gateway device 12 can thus monitor and record information . . .").  Certainly, an

12   operation is not made equivalent to "collecting" simply because it is performed by

13   a gateway.  Thus, the specification fails to provide any special definition or

14   disavowal sufficient to limit the scope of the claims.

15         Finally, the defendants cite to Nomadix's statement during prosecution that

16   "[i]n an alternate embodiment of the invention, the gateway device is able to

17   monitor and track the usage of physical locations . . ."  Defs.' Br. at 45; Ex. 11

18   ('399 prosecution history) at NMDX0010449.  But this statement, which discusses

19   monitoring and tracking, does not even relate to the defendants' proposed

20   construction of monitoring and recording.   Additionally, the statement was

21   expressly directed to a particular embodiment.  There is no connection between this

22   statement and claim 18, and there is nothing that could be considered a broad

23   disavowal of claim scope.  Because the defendants have failed to identify any

24   disavowal of claim scope that would permit their limiting construction, the Court

25   should reject the defendants' construction and decline to construe this term.

26

27

28

**G.     The '009 patent**

    **1.     "single connection . . ." ('009 patent)**

| Term | Nomadix's Construction | Defendants' Construction |
|------|------------------------|--------------------------|
| single connection between the device and the computer

'009: claims 1, 23 | No construction is necessary | connection between the device and the computer that does not copy data between two sessions or use application buffering |

      The defendants' proposed construction is not directed towards the "single connection" term at all.  What the defendants are actually construing are the recited "splicing" limitations: the defendants' position is that "splicing the connections," as recited by claims 1 and 23, does not involve copying data or using application buffering.  However, the parties did not identify "splicing" in the Joint Claim Construction as a term in dispute.  Therefore, that term is not properly at issue.

      In addition to being an improper attempt to construe a term that is not at issue, the defendants' proposed construction for "single connection" is simply wrong.  The defendants contend that the passage at column 3, lines 37-47 of the '009 patent limits the claimed "single connection" to a connection that does not copy data between two sessions.  Defs.' Br. at 23.  In this passage, the '009 patent discloses that "[r]ather than copying data between [] two sessions, the present invention transfers the session flow control functions to the endpoints to effectively splice the connections together while maintaining the end-to-end semantics."  Ex. 4 ('009 patent) col.3, ll.39-43.  Viewed in the context of the entire disclosure, it is evident that this passage relates to a particular embodiment.  Indeed, the specification makes clear that a lack of copying is merely one preferred embodiment and, as such, cannot be used to limit the scope of the claims.  *Id.* col.19, ll.2-4 ("the connection is <u>preferably spliced</u> by directly manipulating the packet without having to copy its contents or payload"); *Phillips*, 415 F.3d 1323

("we have repeatedly warned against confining the claims to [specific] embodiments").  The language of the claims also indicates that the recited "single connection" does not necessarily exclude copying of data.  Dependent claim 5, for example, recites that "splicing the connections comprises directly modifying subsequently intercepted packets without copying the packet payload."  The implication of claim 5 is that claim 1 does not already exclude copying.

Other portions of the '009 patent confirm that the column 3 disclosure upon which the defendants rely relates only to specific embodiments.  For example, although claims 1 and 23 are silent regarding the "end-to-end semantics" described at column 3, claim 34 recites "splicing the connection such that end-to-end semantics are maintained"—further indicating that the column 3 passage relates only to certain embodiments.  Additionally, the '009 patent specifies that "the words used in the specification are words of description rather than limitation, and it is understood that various changes may be made without departing from the spirit and scope of the invention."  Ex. 4 ('009 patent) col.21, ll.38-41.

The defendants also argue that the column 3 passage limits the "single connection" to one that does not use application buffering.  The passage cited by the defendants states that "[t]o splice the connections, the configuration manager modifies the message header and retransmits the message so there is no need for application buffering."  Ex. 4 ('009 patent) col.3, ll.44-47.  Again, this disclosure does not provide a clear disavowal of claim scope that would be necessary to limit the claims.  Additionally, the disclosure in column 3 relates only to particular embodiments.  The specification identifies other embodiments in which buffering plainly does occur.  *Id.* col.7, ll.23-25 ("Communication packets are routed through RAM 96 and stored in appropriate packet buffers 114 for processing.").

In short, nothing in the '009 patent constitutes an "expression[] of manifest exclusion or restriction" sufficient to represent "a clear disavowal of claim scope" with respect to either copying data or using application buffering.  *Spine Solutions*,

620 F.3d at 1315.  The Court should reject the defendants' proposed construction, and decline to construe the readily-understandable term "single connection."

## III.  CONCLUSION

For the reasons detailed above, the Court should adopt Nomadix's claim constructions.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated: April 29, 2011            By: /s/ *Douglas G. Muehlhauser*
                                     John B. Sganga, Jr.
                                     Douglas G. Muehlhauser
                                     Perry D. Oldham
                                     Mark Lezama
                                     Alan G. Laquer

                                     Attorneys for Plaintiff
                                     NOMADIX, INC.

10787593

-50-