O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOMADIX, INC., ) | Case No. CV 09-08441 DDP (VBKx) |
| ) | |
| Plaintiff, ) | **CLAIM CONSTRUCTION ORDER** |
| ) | |
| v. ) | [Plaintiffs' Opening Claim |
| ) | Construction Brief Filed on June |
| HEWLETT-PACKARD COMPANY, a ) | 11, 2010; Counterclaimant's |
| Delaware corporation; ) | Opening Claim Construction Brief |
| WAYPORT, INC., a Delaware ) | Filed on March 4, 2011; second |
| corporation; IBAHN ) | Markman hearing held on September |
| CORPORATION, a Delaware ) | 9, 2011] |
| corporation; GUEST-TEK ) | |
| INTERACTIVE ENTERTAINMENT ) | |
| LTD., a Canadian ) | |
| corporation; GUEST-TEK ) | |
| INTERACTIVE ENTERTAINMENT, ) | |
| INC.; a California ) | |
| corporation; LODGENET ) | |
| INTERACTIVE CORPORATION, a ) | |
| Delaware corporation; ) | |
| LODGENET STAYONLINE, INC., a ) | |
| Delaware corporation; ARUBA ) | |
| NETWORKS, INC.; a Delaware ) | |
| corporation; SUPERCLICK, ) | |
| INC., A Washington ) | |
| corporation; SUPERCLICK ) | |
| NETWORKS, INC., a Canadian ) | |
| corporation, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

     Plaintiff Nomadix, Inc. is the owner of U.S. Patent Numbers
6,130,892 ("the '892 Patent"); 7,088,727 ("the '727 Patent");

7,554,995 ("the '995 Patent"); 6,636,894 ("the '894 Patent"); 7,194,554 ("the '554 Patent"); 6,868,399 ("the '399 Patent"); 6,789,110 ("the '110 Patent"); 7,689,716 ("the '716 Patent"); and 6,875,009 ("the '009 Patent").  The technology at issue generally facilitates network access, e.g. access to the Internet, by mobile computers and is widely used at hotels, airports, and public locations.

More specifically, the '892 Patent, '995 Patent, '099 Patent, and the '727 Patents permit users to access the Internet even though their computers are not configured for the particular network they are visiting.  These patents resolve such issues as, for example, when a laptop is configured to connect to only a certain "home" network or, alternatively, to a "proxy server," but has moved to a "foreign" network.  These patents aid with connectivity so that, for example, a business traveler using a company laptop can readily use a hotel's network without manually reconfiguring their laptop for the foreign network.

The '894 Patent, '554 Patent, and '716 Patent concern the ability of a network operator to control and customize network access.  For example, the '894 Patent involves the use of a gateway to redirect a computer to a login web page (e.g., a hotel login page).  This technology permits network operators to, among other things, grant network access to guests only after they agree to pay for the service.  The '399 Patent relates to network usage charges and helps facilitate the billing by a network operator of network users by, for example, formatting the network usage data to look like a telephone call record.

Nomadix alleges that Defendants have infringed these eight

patents.

Counterclaimant iBAHN Corporation ("iBAHN") is the owner of U.S. Patent Numbers 6,934,754 ("the '754 Patent"); 6,996,073 ("the '073 Patent"); and 7,580,376 ("the '376 patent"). The iBAHN Patents all describe and claim techniques for providing high-speed network access in hotels, conference centers, and other venues. iBAHN alleges that Nomadix has infringed these three patents.

**I.   THE CLAIM CONSTRUCTION PROCESS**

A patent infringement analysis involves two steps: (1) determining the meaning and scope of the patent claims asserted to be infringed; and (2) comparing the properly construed claims to the accused device. See generally Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996). The first step in this sequence is presently before the Court.

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). The construction of a particular patent claim term presents a question of law, to be decided by the Court. Markman, 517 U.S. at 391.

The starting point for claim construction is a disputed term's ordinary meaning. Phillips, 415 F.3d at 1313. Ordinary meaning, in the patent claim construction context, is the meaning that a person of ordinary skill in the art would attribute to a claim term in the context of the entire patent at the time of the invention, i.e., as of the effective filing date of the patent application. ICU Med., Inc. v. Alaris Med. Sys., Inc., 558 F.3d 1368, 1374 (Fed. Cir. 2009).

The claims, of course, do not stand alone; a person of ordinary skill in the art "is deemed to read [a] claim term not only in the context of the particular claim in which the disputed term appears, <u>but in the context of the entire patent, including the specification</u>." <u>Phillips</u>, 415 F.3d at 1313-14 (emphasis added). Accordingly, the specification is "the <u>primary basis</u> for construing the claims" in light of the "statutory requirement that the specification describe the claimed invention in full, clear, concise, and exact terms." <u>Id.</u> at 1315 (internal quotation marks omitted) (emphasis added).

In determining the proper construction, the claim language, specification, and prosecution history – together referred to as the "intrinsic evidence" – are of paramount importance. <u>Id.</u> at 1315 ("[T]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history."(internal quotation marks omitted)). Consistent with this principle, courts have recognized that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. <u>Id.</u> at 1316. In such cases, the inventor's lexicography governs. <u>Id.</u> In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. <u>Id.</u>

While the court interprets claim terms in light of the specification, it should generally not "import[] limitations from the specification into the claims absent a clear disclaimer of claim scope." <u>Andersen Corp. v. Fiber Composites, LLC</u>, 474 F.3d 1361, 1373 (Fed. Cir. 2007). "[T]he distinction between using the

4

specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice." Phillips, 415 F.3d at 1323. In walking this "tightrope," Andersen, 474 F.3d at 1373, the court hews to the question of "how a person of ordinary skill in the art would understand the claim terms." Phillips, 415 F.3d at 1323.

Consideration of intrinsic evidence will resolve any claim term ambiguity in most circumstances. See id. at 1313-14. Where it does not, however, the court may consider certain "extrinsic evidence." See id. at 1317. Expert testimony, for example, may provide helpful background on the technology at issue, explain how an invention works, or establish that a claim term has a particular meaning in the relevant field. See id. at 1319. Dictionaries and treatises may also be helpful in this regard. Id. at 1318. Precedent counsels against reliance on dictionary definitions at the expense of the specification, however, because such reliance "focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." Id. at 1321; see also Nystrom v. Trex Co., 424 F.3d 1136, 1145 (Fed. Cir. 2005).

The court's ultimate goal is to construe the disputed terms in a manner consistent with the way the inventor defined them and a person of ordinary skill in the art would understand them. "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Phillips, 415 F.3d at 1316 (internal quotation marks omitted).

///

## II. CONSTRUCTION OF CLAIM TERMS

### A. Patents asserted by Nomadix

### 1. '399 patent

1. "management system"

| NOMADIX'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| No construction necessary | a management system that is separate from the network gateway device for managing a property's operations and connected to the network gateway device via a physical link | No construction |

Nomadix states that the term "management system" does not require clarification because it can be readily understood according to its ordinary meaning.  Defendants would describe the term as a system that is (1) separate from the gateway device; (2) utilized for "managing a property's operations"; and (3) connected to the gateway device by a "physical link."  In support of their position that the management system must be physically connected to the network gateway, Defendants rely on language from the specification.  That language, however does not require the limitations Defendants seek.

The '399 Patent specification states that the "network gateway devices communicat[e] with management systems," ('399 Patent 2:45-49); that "[a]ccording to <u>one aspect</u> of the invention, the gateway device is in direct communication with the management system," ('399 Patent 5:21-23 (emphasis added)); and that "[<u>t</u>]<u>ypically</u>, the gateway device [] is connected . . . to the management system . . .

6

." ('399 Patent 6:6-11 (emphasis added)). None of the language that Defendants cite requires that the management system <u>must</u> be physically connected to the gateway device. The court will not import a limitation from a preferred embodiment into the claim terms. See <u>Andersen</u> 474 F.3d at 1373. The court declines to adopt Defendants' proposed construction of "management system." The court agrees with Nomadix that no construction is required.

### 2. "absent additional agents implemented by the computer" & "absent additional agents implemented by the user's computer"

| NOMADIX'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| absent additional special client software implemented by the computer for managing the communication between the computer and the gateway service | Defendants do not oppose Nomadix's construction | absent additional special client software implemented by the computer for managing the communication between the computer and the gateway device |

Defendants do not oppose Nomadix's construction. The court, therefore, adopts Nomadix's proposed construction for the "absent additional agents" terms.

### 3. "physical location"

| NOMADIX'S CONSTRUCTION | DEFENDANTS' CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| No construction necessary | communication port through which the user's computer accessed the network | No construction |

The '399 Patent claims, among other things, a system to bill a

7

user "wherein the gateway device maintains data representative of the user's physical location and usage of the computer network." ('399 Patent 11:43-55.) Defendants would construe "physical location" as a "communication port through which the user's computer accessed the network."

Defendants' construction is contrary to both the specification and the prosecution history. The specification discloses that the "gateway device [] includes the ability to recognize . . . the location of computers attempting to access the network," and then proceeds to offer that such a "user/subscriber's location" as, e.g., a "room number." ('399 Patent 4:36-39, 7:35-37.) The prosecution history also supports a broader construction of "physical location" than the one Defendants propose. In an incorporated patent application, "location" is defined, for example, as "a hotel room, a specific address, etc." (Lezama Decl., Ex. 12, '093 application, at NMDX0011436.)

Defendants' construction limits the scope of the claim to one disclosed embodiment. "The claims, not specification embodiments, define the scope of patent protection." <u>Kara Technology v. Stamps.com, Inc.</u>, 582 F.3d 1341, 1348 (Fed. Cir. 2009). The court will not limit the claim to a single embodiment. The court rejects Defendants' proposed construction and concludes that no construction of the term "physical location" is necessary.

> 4. "Collecting data corresponding to the user's access to said computer network, including physical location of the user and the user's network usage, in said network gateway device"

| NOMADIX'S CONSTRUCTION | HEWLET-PACKARD'S CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| No construction necessary | monitoring and recording "data representative of the user's access to the computer network," including a "physical location" of the user and the "user's network usage," in said network gateway device | No construction |

Defendants argue that the term "collecting data corresponding to the user's access . . . in said network gateway device" requires construction in order to distinguish, for purposes of the '399 Patent claims, "collecting" from "maintaining." Nomadix maintains that the term does not require construction.

Defendants position is based on a difference in verb choice in the claims of the '399 Patent. Claims 1, 10, and 13 describe a gateway device that "maintains" data representative of the user's access, usage, and/or physical location. (See, e.g., '399 Patent 11:23-25.) Claims 6 and 18 describe a gateway device that "collects" data. (See, e.g., '399 Patent 10:64-65.) Based on this difference, Defendants propose that a gateway device that "collects" data is properly limited to one that both monitors the network traffic and then records that information. (Defendant's Claim Construction Brief 45:19-20.)

The court agrees that maintaining data and collecting it are distinct and that these two terms are distinct. Beyond this point, the court finds no support in the specification or prosecution

9

1  history for the definition of "collecting" that Defendants propose.
2     Defendants cite to a passage that describes the function of
3  the gateway device; however the fact that the gateway device
4  preforms monitoring and recording does not mean that those
5  functions are equivalent to "collecting."  Furthermore, the fact
6  that it was asserted during the prosecution history that in an
7  embodiment of the invention, the gateway device can "monitor and
8  track" usage does not mean that a gateway, which collects data,
9  <u>monitors</u> and <u>records</u> as Defendants suggest.
10     The disputed term is readily understood when given its
11 ordinary meaning, and Defendants proposed construction is
12 unsupported and would only add confusion.  The court does not
13 construe the term.
14 **2. '009 PATENT**
15    1. "single connection between the device and the computer"

| NOMADIX'S CONSTRUCTION | SOLUTION INc.'S CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| No construction necessary | connection between the device and the computer that does not copy data between two sessions | connection between the device and the computer that does not copy data between two sessions |

    Nomadix argues that "single connection" has an ordinary and
readily understood meaning and that, therefore, no construciton is
necessary.  Defendant Solution Inc. argues that the difference
between two connections and one connection is quite complicated,
and that construction is necessary because of the "intentional
disclaimer, or disavowal of claim scope by the inventor."
<u>Phillips</u>, 415 F.3d at 1316.  The court agrees.

10

The disputed term arises in the context of Claim 1 and 23 of the '099 Patent. Claim 1 describes:

> A method for providing connectivity to a foreign network for a device having network settings configured for communication over a home network without reconfiguring the network settings of the device, the method comprising:
> . . . .
> splicing the connections between the device and the configuration adapter, and between the configuration adapter and the computer, to form <u>a single connection between the device and the computer</u> such that the device and the computer communicate packets with each other over the single connection without the network settings of the device being reconfigured.

('099 Patent 21:42-49, 22:10-17 (emphasis added.)  Nomadix added "single connection" to overcome a prior art rejection.  In the Examiner's statement for reasons of allowance, the Examiner recognized that one of the things that was not disclosed or suggested in a prior art was specifically the "splicing the connections . . . to form a single connection between the device and the computer . . ." ('099 Patent, Oct. 12, 2004 Notice of Allowability.)

In understanding the significance of forming a "single connection, the court looks to the '099 Patent's specification.  In the "SUMMARY OF THE INVENTION," Nomadix explains that the invention provides for a system whereby:

> whether or not the client is configured to use a proxy service, a connection is established between the client and the configuration manager, and between the configuration manager and the origin server. <u>Rather than copying data between these two sessions, the present invention</u> transfers the session flow control functions to the endpoints to effectively splice the connections together while maintaining the end-to-end semantics.

('099 Patent 3:37-45.)  Here, Nomadix refers to "the present invention" and distinguishes it from prior art due to its elimination of the need to copy data.  "When a patent . . . describes the features of the 'present invention' as a whole, this description limits the scope of the invention."  Verizon Services Corp. v. Vonage Holdings Corp., 503 F.3d 1295, 1305 (Fed. Cir. 2007); see also SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1343 (Fed. Cir. 2001) ("[T]he characterization of the coaxial configuration as part of the 'present invention' is strong evidence that the claims should not be read to encompass the opposite structure.").  Based on the claim language and Namadix's disclaimer that the "present invention" eliminates the need for copying, the court agrees that the term "single connection between the device and the computer" requires construction, and the court adopts Solution Inc.'s proposed construction.

**B. Patents asserted by iBAHN**

**1. '754 PATENT**

       1. "network access node"*

| NOMADIX'S CONSTRUCTION | iBAHN's CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| | | |

| the point where user traffic enters and exits the communications network[1] | the point where user traffic enters and exits a communications network[2] | the point where user traffic enters and exits a communications network |

* term also in dispute for '073 and '376 patents

At the September 9, 2011, Markman hearing, the parties narrowed their disputed construction of "network access node" to either, as Nomadix proposed, "the point where user traffic enters and exits _the_ communications network," or, as iBAHN proposed, "the point where user traffic enters and exits _a_ communications network." (See Transcript at 94:3-95:25, September 9, 2011, Markman hearing (emphasis added).)

Because iBAHN's construction is supported by intrinsic evidence and the Patents' claim language, the court adopts the counterclaimant's construction.

The term "network access node" is found in the '754 Patent, the '073 Patent, and the '376 Patent. These iBAHN patents generally describe a method for providing network and Internet access via a plurality of network access nodes. For example, Claim 1 of the '754 Patent claims: "A method for providing Internet access to a first computer via a first one of a plurality of network access nodes in a network using a plurality of globally unique IP address . . . ." ('754 Patent 14:5-10.)

The connection is "via" and there are a "plurality" of

---

[1] Nomadix proposed this construction at the September 9, 2011, Markman hearing.

[2] iBAHN proposed this construction at the September 9, 2011, Markman hearing.

"nodes." The plain language of the claim does not require that a network access node communicate with only "the", i.e. a single and identifiable network. (See '754 Patent, Abstract, explaining that the Patent describes a method for "providing access to <u>a</u> network via a first one of a plurality of network access nodes".) The court adopts iBAHN's proposed construction.

### 2. "an Internet transaction"

| AGREED UPON CONSTRUCTION |
|---|
| An internet transaction, such as sending or receiving a web page, an email, a text message or a tweet. |

The parties agreed at oral argument to the following construction of the term "an Internet transaction": an internet transaction, such as sending or receiving a web page, an email, a text message or a tweet. (See Transcript at 104:3-9, September 9, 2011, Markman hearing.)

### 3. "associating a first one of the globally unique IP addresses with the first network address for conducting an Internet transaction"

| NOMADIX'S CONSTRUCTION | iBAHN's CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| in order to conduct an Internet transaction, assigning to the first globally unique IP address **from a pool of available** addresses and removing it from **the pool** | assigning a first one of the globally unique IP addresses from the pool of such addresses with the first local IP address in order to conduct an Internet transaction | No construction |

The parties dispute whether "associating" a globally unique IP

14

address with a first network address requires "removing it from the pool." Nomadix maintains that it does, and iBAHN argues that the address is simply assigned, not removed.

iBAHN's proposed construction is consistent with the claim language and the specification. For example, the '754 Patent's Claim 1 states that Internet access is provided by "associating a first one of the globally unique IP addresses with the first network address for conducting an Internet transaction." ('754 Patent 14:16-19.) There is no indication in the claim language that the address is somehow "removed" or unavailable. (See also '754 Patent 3:11-16, 3:24-37, 6:24-35 explaining that the address is temporarily associated with the local IP address associated with the guest computer.)

The only suggestion that the globally unique IP addresses that are associated with guest computers are unavailable for use by other computers until the transaction is completed is in the context of a preferred embodiment. ('754 Patent 4:18-20, 6:23-28.) Since Nomadix's requirement of removal from the "pool of available address" would limit the claims to a single embodiment, the court rejects Nomadix's proposal.

Because neither proposed construction would reduce confusion and because the claim term is clear from its plain and ordinary language, the court concludes that no construction is necessary.

    4. "disassociating the first one of the globally unique IP addresses from the first network address [upon termination of the Internet transaction]"

| NOMADIX'S CONSTRUCTION | iBAHN's CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|

| | | |
|---|---|---|
| returning the first globally unique IP address to the pool of available addresses so that it is no longer assigned to the first local IP address | No construction necessary. However, if the term requires any construction, it should be "upon termination of the Internet transaction, reassigning the first one of the globally unique IP addresses into the pool of such addresses for use by any network address" | No construction. |

    iBAHN argues that the term "disassociating the first one of the globally unique IP addresses from the first network address upon termination of the Internet transaction," requires no construction and is readily understood by both a person of ordinary skill in the art and a jury.  (iBAHN's Reply Claim Construction Brief 18:24-28.)  The court agrees.

    Nomadix would impose a limitation on the globally unique IP address that it cannot be a shared resource.  As the court explained above in its construction of the term  "associating a first one of the globally unique IP addresses with the first network address for conducting an Internet transaction," such a reading of the Patent is unsupported by the claim language or intrinsic evidence.  The '754 Patent is clear in Claim 1 that upon "disassociating the first globally unique IP address from the first network address upon termination of the Internet transaction," the first globally unique IP address is then "available for association with <u>any</u> of the network addresses."  ('754 Patent, Claim 1 (emphasis added).)  Because the term is self defining and construction would create not reduce confusion, the court does not

16

construe the term.

**2. '073 PATENT**

1. "network having a plurality of users associated therewith"*

| NOMADIX'S CONSTRUCTION | iBAHN's CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| network having a plurality of users who have been granted access to the network | No construction necessary. However, if the term requires any construction, it should be "network with multiple users associated with the network" | No construction. |

* term also in dispute for '376 patent

The parties dispute what is meant by a "network having a plurality of users associated therewith." Nomadix maintains that construction would be helpful for the jury and that the nature of the association between the users has an important bearing on the scope of the claims. (Nomadix's Reply Claim Construction Brief 21:9-18.) iBAHN states that the term does not require construction. The court agrees.

The only support Nomadix offers for its construction is language from Claim 1 of Patent '073 that identifies two sets of users, a first set that is the "plurality of users" associated with the network and a second set that is a subset of the first; and a suggestion from the specification that security measures are inherent in any user association with a network. (<u>Id.</u> 21:19-22:24.) The language from Claim 1 does indeed identify a "plurality of users" that are using the conference services provided by the invention, and there is also at least one subset of users that are referred to as "selected users" who are "using the

17

group identification tag." ('073 Patent 15:54-65.) The fact that users are divided into subsections does not limit users to ones that have been "granted access." Similarly, whether or not the Patent specification contemplates security for the network does not limit the Patent to users that are "granted access."

Without more, the court is not persuaded that the "plurality" of network users are only those that have been affirmatively granted access. The court notes that "granted access" would also add not reduce confusion. Because no such limitation is found in the claim language or specification, the court declines to construct the term.

2. "conference"*

| NOMADIX'S CONSTRUCTION | iBAHN's CONSTRUCTION | COURT CONSTRUCTION |
|---|---|---|
| an assembly of persons at common geographic location | No construction necessary. However, if the term requires any construction, it should be "a group of selected users" | No construction |

* term also in dispute for '376 patent

The parties dispute what it means for a specific group of selected users to be "attendees of [a] conference." ('073 Patent, Claims 1,10; '376 Patent, Claim 2.) The dispute with respect to the term "conference," is whether the term is necessarily limited to a specific geographic location. iBAHN maintains that it is not and argues that the term need not be construed. Nomadix would include a limitation that "conference" refers to an assembly of persons at a common geographic location. In support of its position, Nomadix looks to the specification which states that "embodiments of the

18

1  rpesent invention may be used to provide special levels of service
2  to specific user groups such as, for example, the attendees of a
3  conference at a hotel property." (Nomadix' Reply Claim
4  Construction Brief 24:23-26 (citing '073 Patent 14:22-25).)
5      The court is not persuaded that the limitation Nomadix seeks
6  is proper. The plain language of the relevant claims states
7  nothing that requires the gather of selected users at a common
8  geographic location. The specification simply requires that the
9  "technique described" could be utilized to restrict content so that
10 it is only accessible to "specific identifiable groups." ('073
11 Patent 15:23-26.) Indeed, both of the Patents at issue are devoid
12 of any reference to a geographic limitation on the group of
13 selected users. Absent contravening evidence from the
14 specification or prosecution history, plain and unambiguous claim
15 language controls the construction analysis, and it is generally
16 improper to import a limitation from an embodiment into the claims.
17 <u>DSW, Inc. v. Shoe Pavilion, Inc.</u>, 537 F.3d 1342, 1347 (Fed. Cir.
18 2008). Here, neither the Patents' specifications nor claims
19 support the geographic limitation Nomadix proposes. The court
20 declines to construe the term.

21 **IV.   CONCLUSION**

22     For the reasons set forth above, the court adopts the claim
23 constructions described above.
24 IT IS SO ORDERED.
25 Dated: October 24, 2011

                                    DEAN D. PREGERSON
                                    United States District Judge