John B. Sganga, Jr. (SBN 116,211)
john.sganga@kmob.com
Douglas G. Muehlhauser (SBN 179,495)
doug.muehlhauser@kmob.com
Perry D. Oldham (SBN 216,016)
perry.oldham@kmob.com
Mark Lezama (SBN 253,479)
mark.lezama@kmob.com
Alan G. Laquer (SBN 259,257)
alan.laquer@kmob.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street
Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

Attorneys for Plaintiff
NOMADIX, INC.

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| NOMADIX, INC., | Civil Action No. CV09-08441 DDP (VBKx) |
| Plaintiff, | |
| v. | **NOMADIX, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION** |
| HEWLETT-PACKARD COMPANY et al., | |
| Defendants. | Honorable Dean D. Pregerson |
| AND RELATED COUNTERCLAIMS | |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

Page No.

I.    INTRODUCTION ................................................................................ 1

II.   NOMADIX HOLDS LEGAL TITLE TO EACH OF THE
      PATENTS ......................................................................................... 3

      A.    U.S. Patent Nos. 6,130,892, 7,088,727 and 7,554,995 ................. 3

      B.    U.S. Patent No. 6,857,009 ............................................................. 4

      C.    U.S. Patent No. 6,868,399 ............................................................. 4

      D.    U.S. Patent No. 6,636,894 ............................................................. 5

      E.    U.S. Patent No. 7,194,554 ............................................................. 5

      F.    U.S. Patent No. 7,689,716 ............................................................. 5

III.  THE UNIVERSITY HAS NEVER HELD LEGAL TITLE
      TO ANY OF NOMADIX'S PATENTS ............................................. 6

      A.    The Patent Policy Agreement Fails to Convey Legal
            Title to the University .................................................................... 7

      B.    The Inventions Were Conceived and Developed
            Independent of the University ........................................................ 10

      C.    Even If the University's Patent Policy Applied to the
            Inventions of the Patents in Suit, the Motion Would
            Still Be Improper ........................................................................... 14

      D.    Defendants Mischaracterize the Non-Assertion Letter ................. 15

IV.   DEFENDANTS CANNOT BLAME NOMADIX FOR
      THEIR OWN DELAY IN SEEKING DISCOVERY FROM
      DR. KLEINROCK .............................................................................. 16

V.    CONCLUSION ................................................................................... 17

# TABLE OF AUTHORITIES

Page No.

*Abraxis Bioscience, Inc. v. Navinta LLC*,
    625 F.3d 1359 (Fed. Cir. 2010)..................................................................8

*Arachnid, Inc. v. Merit Indus., Inc.*,
    939 F.2d 1574 (Fed. Cir. 1991)..................................................................8

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
    222 F. Supp. 2d 423 (S.D.N.Y. 2002)........................................................6

*Board of Trustees of the Leland Stanford Junior Univ. v. Roche
    Molecular Sys., Inc.*,
    487 F. Supp. 2d 1099 (N.D. Cal. 2007) ....................................................6

*Board of Trustees of the Leland Stanford Junior Univ. v. Roche
    Molecular Sys., Inc.*,
    583 F.3d 832 (Fed. Cir. 2009)...............................................................8, 9

*Board of Trustees of the Leland Stanford Junior Univ. v. Roche
    Molecular Sys., Inc.*,
    131 S. Ct. 2188 (2011) ......................................................................6, 9, 10

*DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*,
    517 F.3d 1284 (Fed. Cir. 2008)..................................................................8

*IpVenture, Inc. v. Prostar Computer, Inc.*,
    503 F.3d 1324 (Fed. Cir. 2007)...............................................................8, 9

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
    No. 2:10cv128, 2011 U.S. Dist. LEXIS 90021 (E.D. Va.
    Aug. 12, 2011)..............................................................................................6

*Shukh v. Seagate Tech., LLC*,
    No. 10–404, 2011 WL 4947608 (D. Minn. 2011) ...................................10

*SiRF Tech., Inc. v. Int'l Trade Comm'n*,
    601 F.3d 1319 (Fed. Cir. 2010)..................................................................6

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)................................................................10

TABLE OF AUTHORITIES
(continued)

Page No.

OTHER AUTHORITIES

35 U.S.C. § 261.................................................................................................6

# I.  INTRODUCTION

Defendants argue that the University of California has present ownership rights in each of the patents Nomadix has asserted in this case, and they argue further that because the University is not joined as a party, the case should be dismissed based on a lack of standing.  Defendants' argument, however, goes nowhere because Defendants have failed to offer any evidence that the University owns—even jointly—any of the patents in suit.

The record on this motion conclusively demonstrates the following three points:

- Nomadix holds legal title to each of the patents in suit as proven by the full and complete assignment records publicly recorded; thus, title in the patents presumptively rests with Nomadix;

- Patent rights can only be assigned by a signed writing, and Defendants have failed to come forward with any signed writing that conveys ownership of any of Nomadix's patents to the University; and

- The University's patent policy upon which Defendants rely heavily includes only an agreement to assign and the well-settled and governing law that is binding upon this Court makes it abundantly clear that the University's patent policy itself cannot and does not convey to the University legal title to any patent.

These three points cannot be reasonably refuted, and consequently, Defendants have failed to show that the University of California owns—even jointly—any of the patents Nomadix has asserted.  That failure is fundamental on this motion, and the Court need look no further to conclude that this motion must be denied.  Indeed, it is hard to see how any objectively reasonable investigation could result in a genuine belief that the University of California owns the patents that Nomadix has asserted.

Moreover, the record also shows that Nomadix's inventions were made independent of the University.   As Defendants well know, Dr. Leonard Kleinrock testified to that point in his deposition.   Rather than give due consideration to Dr. Kleinrock's testimony and the fact that it is fully consistent with the documentary record, the Defendants disregard his testimony and engage in an unfortunate character assassination of Dr. Kleinrock by coming before this federal court and arguing that he must not be telling the truth.   Dr. Kleinrock is now 77 years old and one of our nation's preeminent and most achieved scientists.   Dr. Kleinrock has had no affiliation with Nomadix for over six years, and other than their zealous desire for different facts, Defendants offer no motive or anything else to support that Dr. Kleinrock would disregard his sworn oath to tell the truth.   Defendants subjected Dr. Kleinrock to a lengthy and grueling deposition wherein Dr. Kleinrock repeatedly explained that he and Dr. Short had come up with Nomadix's initial inventions independent of University work and facilities.   Dr. Kleinrock even remembered and testified to the exact street address of Nomadix's facilities where the inventions originated. But Defendants simply ignore Dr. Kleinrock's spot-on testimony and argue that he could not remember where the inventions originated.

To bring this motion, Defendants failed to respect both law and fact. Defendants rely upon a non-controlling dissent to persuade this Court to disregard the settled law that an agreement to assign does not convey legal title to a patent.   And Defendants gave no respect at all to the testimony of Dr. Kleinrock that shows that Nomadix's inventions were independent of the University in the first place.   For these reasons and others as explained in detail below, the Court should deny this motion.

## II.  NOMADIX HOLDS LEGAL TITLE TO EACH OF THE PATENTS

Nomadix long ago demonstrated that it has standing by producing the assignments for each of the patents in suit that evidence a complete chain of title from the inventors to Nomadix, Inc.  The chain of title for the patents in suit is further confirmed by the patents themselves, each of which lists Nomadix, Inc. as the assignee on the cover.  (See Exs. 4–11.)  The assignment documents have been publicly recorded and are included in Exhibit A to the Muehlhauser Declaration filed concurrently herewith.  The chain of title for each patent is described below.

### A.     U.S. Patent Nos. 6,130,892, 7,088,727 and 7,554,995

The '892, '727 and '995 patents all descend from U.S. Patent Application No. 08/816,174, which was filed on March 12, 1997.  The inventors of the '174 application and the '892, '727 and '995 patents were Dr. Joel Short and Dr. Leonard Kleinrock.  (Ex. 4 at NMDX0000001; Ex. 5 at NMDX0012476; Ex. 6 at NMDX0016196.)

In July 1997, Drs. Short and Kleinrock assigned the '174 application and its inventions to Nomadix, LLC.  (Ex. A at NMDX0025079–82.)  The assignment included all rights, title and interest in and to any patent applications based on the '174 application, its inventions or improvements thereon and any patents issuing from such applications.  (Id. at NMDX0025081.)  In December 1999, Nomadix, LLC assigned all rights, title and interest in and to the '174 application and such related applications to Nomadix, Inc.  (Id. at NMDX0025089–93.)  As such, Nomadix holds the entire legal title to the '892, '727 and '995 patents.

In addition to the assignment of the '174 application from which each of these patents claim priority, separate confirmatory assignments were also executed for the later applications that issued as the '892, '727 and '995 patents. Drs. Short and Kleinrock assigned to Nomadix, LLC any rights, title and

-3-

interest in and to Application No. 09/041,534, which issued as the '892 patent, and Nomadix, LLC then assigned the '534 application to Nomadix, Inc. (*Id.* at NMDX0025083–88, NMDX0025089–93.)[1] Drs. Short and Kleinrock assigned their interest in Application No. 09/684,937, which became the '727 patent, to Nomadix, Inc. (*Id.* at NMDX0025159–61.)  That assignment of the '937 application also conveyed all continuations from the '937 application, and therefore included Application No. 11/097,925 from which the '995 patent issued. (*Id.* at NMDX0025171–72.)

**B.    U.S. Patent No. 6,857,009**

The application that became the '009 patent was Application No. 09/694,577, which was filed on October 23, 2000 and claims priority to the provisional Application No. 60/161,138.  (Ex. 7 at NMDX0047125.)   The inventors of the '009 patent and the '138 provisional application were Manuel Ferreria, Barry Robbins, Ken Caswell, and Joel Short. (*Id.*)   These four inventors assigned their interest in the '577 application to Nomadix, Inc. in October 1999, by assigning the entire right, title and interest in and to the inventions set forth in the '138 provisional application, including the right to patents for the inventions in the '138 provisional application as well as rights of priority in the '138 provisional application.  (Ex. A at N-10cv381-000290–93.)

**C.    U.S. Patent No. 6,868,399**

The application that issued as the '399 patent was Application No. 09/693,061, which was filed on October 20, 2000.  (Ex. 8 at NMDX0010032.) The inventors of the '399 patent were Joel Short and Denis Perelyubskiy.  (*Id.*) Messrs. Short and Perelyubskiy assigned their interests in the '061 application to Nomadix, Inc. in December 2000 and January 2001, respectively.  (Ex. A at

---

[1] Nomadix, Inc. granted a security interest in the '892 patent to Comerica Bank in November 2000, which was released in October 2003.  (Ex. A at NMDX0025094–101; NMDX0025102–05.)

1  NMDX0025153–58.)

2  **D.     U.S. Patent No. 6,636,894**

3         The application that issued as the '894 patent was Application No.

4  09/458,569, which was filed on December 8, 1999.  (Ex. 9 at NMDX0044754.)

5  The inventors of the '894 patent were Joel Short, Frederic Delley, Mark Logan,

6  and Florence Pagan.  (*Id.*)  These four inventors assigned their interests in the

7  '569 application to Nomadix, Inc. in April 2000.  (Ex. A at NMDX0025127–

8  47.)[2]

9  **E.     U.S. Patent No. 7,194,554**

10        The application that became the '554 patent was Application No.

11  09/693,060, which was filed on October 20, 2000.  (Ex. 10 at NMDX0014677.)

12  The inventors of the '554 patent were Joel Short, Florence Pagan, and Josh

13  Goldstein.   (*Id.*)   These three inventors assigned their interests in the '060

14  application in December 2000.  (Ex. A at NMDX0025165–70.)

15  **F.     U.S. Patent No. 7,689,716**

16        The application that issued as the '716 patent was Application No.

17  11/427,143, which was filed on June 28, 2006 as a continuation of the '060

18  patent that became the '554 patent.  (Ex. 11 at NMDX0608926.)  The inventors

19  of the '716 patent were Joel Short, Florence Pagan, and Josh Goldstein.  (*Id.*)

20  These three inventors assigned their interests in the '143 application in

21  December 2000, by assigning the '060 application as well as all continuations

22  from the '060 application.  (Ex. A at NMDX0025165–70.)

23

24

25

26

27        [2] As with the '892 patent, Nomadix, Inc. granted a security interest in the
'569 application to Comerica Bank in November 2000, which was released in
28  October 2003.  (Ex. A at NMDX0025094–101; NMDX0025102–05.)

## III.  THE UNIVERSITY HAS NEVER HELD LEGAL TITLE TO ANY OF NOMADIX'S PATENTS

When a plaintiff comes forward with evidence that it is the assignee of a patent, title presumptively rests with the plaintiff and it is the defendant's burden to overcome this presumption to defeat the plaintiff's standing.  *See Board of Trustees of the Leland Stanford Junior Univ. v. Roche Molecular Sys.*, 487 F. Supp. 2d 1099, 1111 n.4 (N.D. Cal. 2007)[3]; *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 514 n.50 (S.D.N.Y. 2002); *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, No. 2:10cv128, 2011 U.S. Dist. LEXIS 90021, at *33–34 (E.D. Va. Aug. 12, 2011).  The Federal Circuit has recently endorsed this approach, finding that when assignments to the plaintiff have been publicly recorded, the party challenging the assignments has the burden to rebut the plaintiff's standing.  *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1327-28 (Fed. Cir. 2010).  Thus, Defendants have the burden to rebut Nomadix's chain of title.

By statute, patent rights can only be assigned by a written agreement.  *See* 35 U.S.C. § 261 ("Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing.").  While Nomadix has presented publicly recorded, written assignments for each of the patents in suit demonstrating its ownership, Defendants have not come forward with any written agreement that transfers ownership rights in the patents in suit to the University.

Defendants' motion rests on a Patent Policy Agreement (Exs. 1–2) between Dr. Short and the University.  But Defendants' reliance on that

---

[3] The Supreme Court indicated its agreement with the district court's views on the burden of proof when the Supreme Court stated that "we deal only with Roche's claim to co-ownership ***to rebut Stanford's standing*** to bring an infringement action." *Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, 131 S. Ct. 2188, 2193 n.1 (U.S. 2011) (*Roche II*) (emphasis added).

agreement is ineffectual for at least three reasons. First, the agreement contains mere promissory language that, pursuant to controlling Federal Circuit precedent, was insufficient to transfer legal title in any patent to the University. For this reason alone, Defendants' motion fails.

Second, by its own terms, the agreement does not apply to inventions that were developed independent of the University. And, third, the agreement includes several conditions precedent which Defendants have not shown were met.

**A.     The Patent Policy Agreement Fails to Convey Legal Title to the University**

Defendants' motion fails because the Patent Policy Agreement never transferred legal title in any patent to the University.

The Patent Policy Agreement states:

> I agree that every possibly patentable device, process, plant, or product, hereinafter referred to as "invention," which I conceive or develop while employed by University, or during the course of my utilization of any University research facilities or any connection with my use of gift, grant, or contract research funds received through the University, shall be examined by University to determine rights and equities therein in accordance with the Policy, and I shall promptly furnish University with complete information with respect to each.
>
> In the event any such invention shall be deemed by University to be patentable, and University desires, pursuant to determination by University as to its rights and equities therein, to seek patent protection thereon, I shall execute any documents and do all things necessary, at University's expense, to assign to University all rights, title and interest therein and to assist

-7-

1   University in securing patent protection thereon.  The scope of this

2   provision is limited by California Labor Code section 2870, to

3   which notice is given below.

4   (Ex. 1.)    Under controlling precedent, this language does not effect an

5   immediate transfer of legal title.  At most, it constitutes a mere agreement to

6   assign if certain conditions precedent are met.  Indeed, Defendants concede that

7   the Patent Policy Agreement includes an "agreement to assign."  (Defs.' Br. at

8   17.)

9        "[T]he question of whether contractual language effects a present

10  assignment of patent rights, or an agreement to assign rights in the future, is

11  resolved by Federal Circuit law."  *Board of Trustees of the Leland Stanford*

12  *Junior Univ. v. Roche Molecular Sys.*, 583 F.3d 832, 841 (Fed. Cir. 2009)

13  (*Roche I*).   The Federal Circuit has consistently held that mere promissory

14  language does not convey an ownership interest in patent rights.  *Abraxis*

15  *Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364–65 (Fed. Cir. 2010);

16  *Roche I*, 583 F.3d at 841; *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*,

17  517 F.3d 1284, 1290 (Fed. Cir. 2008); *IpVenture, Inc. v. Prostar Computer,*

18  *Inc.*, 503 F.3d 1324, 1327 (Fed. Cir. 2007); *Arachnid, Inc. v. Merit Indus., Inc.*,

19  939 F.2d 1574, 1579 (Fed. Cir. 1991).

20       An instructive example is the Federal Circuit's ruling in *IpVenture*.

21  There, the defendants moved to dismiss for lack of standing based on an

22  agreement between one of the inventors and his employer at the time the patent

23  application was filed, Hewlett Packard.  The HP agreement provided that the

24  inventor agreed to disclose all inventions made while employed by HP, to

25  assign them to HP, and to execute all documents and cooperate with HP to

26  obtain patent protection.  503 F.3d at 1326.  Just as Defendants urge this Court

27  to do, the district court held that California law does not distinguish between an

28  assignment and an agreement to assign, and dismissed the case.  *Id.* at 1327.

-8-

The Federal Circuit vacated this dismissal, noting that its precedents distinguish between present language ("does hereby grant" and "hereby conveys, transfers and assigns") and future language ("will be assigned").   Because the HP agreement used future language, HP was not an assignee by virtue of the agreement, and the dismissal was vacated.  *Id.*  The Federal Circuit further supported its decision by pointing out that HP had entered an agreement with IpVenture that, just like the University's Non-Assertion Letter in this case, acknowledged that it had no rights in the patent.  *Id.* at 1326–27.

In this case, the plain language of the Patent Policy Agreement demonstrates that it did not contemplate any immediate assignments, only the possibility of future assignments: "In the event any such invention shall be deemed by University to be patentable, and University desires . . . to seek patent protection thereon, I shall execute any documents and do all things necessary . . . to assign . . . ." (Ex. 1.)  The agreement plainly fits the mold of *IpVenture* and *Roche I*, in which the Federal Circuit held that "the contract language 'agree to assign' reflects a mere promise to assign rights in the future, not an immediate transfer of expectant interests."  *Roche I*, 583 F.3d at 841 (citing *IpVenture*, 503 F.3d at 1327).

Defendants do not dispute that the Patent Policy Agreement is an "agreement to assign." (Defs.' Br. at 17.)  Rather, Defendants ask the Court to disregard the firmly established precedent distinguishing agreements to assign from actual assignments, suggesting that it somehow may no longer be valid law. (Defs.' Br. at 17–18.)  Yet Defendants cite no precedential authority that is contrary to this long line of consistent rulings from the Federal Circuit.  Defendants argue that the Supreme Court's comments in *Board of Trustees of the Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, 131 S. Ct. 2188 (U.S. 2011) (*Roche II*), undercut the Federal Circuit's rulings.  The Supreme Court in *Roche II* affirmed the Federal Circuit's ruling in *Roche I*.  131

1    S. Ct. at 2199.   The Supreme Court did not review the Federal Circuit's

2    interpretation of the assignment agreements, and therefore that aspect of the

3    Federal Circuit's decision remains good law.  *Id.* at 2194 n.2.  The dissent by

4    Justice Breyer, on which Defendants rely, does not carry precedential weight

5    and is described by Justice Breyer himself as his "tentative" views.  *Id.* at 2205.

6    In the aftermath of *Roche II*, attempts to rely on Justice Breyer's dissent to

7    overcome the Federal Circuit's precedents have been rejected.  *Shukh v. Seagate*

8    *Tech., LLC*, No. 10–404, 2011 WL 4947608, at *2–4 (D. Minn. 2011).

9         In short, a long line of Federal Circuit precedent dictates that a mere

10   agreement to assign does not constitute a present assignment of legal title.

11   Defendants' protests notwithstanding, that is still the law.  *Cf. Uniloc USA, Inc.*

12   *v. Microsoft Corp.*, 632 F.3d 1292, 1321 (Fed. Cir. 2011) (Federal Circuit's

13   holdings remain binding as precedent until changed by the Supreme Court or the

14   Federal Circuit sitting en banc).  As a result, the Patent Policy Agreement did

15   not grant the University legal title to any patents, much less Nomadix's patents.

16   **B.    The Inventions Were Conceived and Developed Independent of the**

17   **University**

18        Not only does the Patent Policy Agreement fail to vest legal title to any

19   patents in the University, the patents in suit do not even fall within the

20   agreement's scope.  The agreement expressly states that it does not apply to

21   inventions that were developed independent of the University:

22                                NOTICE

23   This agreement does not apply to an invention which qualifies

24   under the provisions of Labor Code section 2870 of the State of

25   California which provides that (a) Any provisions in an

26   employment agreement which provides that an employee shall

27   assign, or offer to assign, any of his or her rights in an invention to

28   his or her employer shall not apply to an invention that the

1      employee developed entirely on his or her own time without using

2      the employee's equipment, supplies, facilities, or trade secret

3      information except for those inventions that either: (1) Relate at the

4      time of conception or reduction to practice of the invention to the

5      employer's business, or actual or demonstrably anticipated research

6      or development of the employer, (2) Result from any work

7      performed by the employee for the employer.  (b) To the extent a

8      provision in an employment agreement purports to require an

9      employee to assign an invention otherwise excluded from being

10      required to be assigned under subdivision (a), the provision is

11      against the public policy of this state and is unenforceable.

12 (Ex. 1.)

13      Dr. Kleinrock testified at his deposition that the inventions in the patents

14 in suit were developed at Nomadix's offices, independent of any research done

15 for or at the University.  (Ex. 12 (Kleinrock Tr.) at 62, 179–80, 182.)  The

16 documentary evidence is consistent with this testimony, including the Non-

17 Assertion Letter and Dr. Kleinrock's contemporaneous notes.  (Exs. 3, 28.)

18      In response to this clear and uncontroverted testimony, Defendants argue

19 that Dr. Kleinrock must be lying.  (Defs.' Br. at 19.)  As an initial point, Dr.

20 Kleinrock is a disinterested third party witness.  He has no stake in the outcome

21 of this case and has had no involvement with Nomadix since at least 2006.  (Ex.

22 12 (Kleinrock Tr.) at 42–43.)  He has no incentive to give false testimony under

23 oath.  Moreover, Defendants' blithe assertions that Dr. Kleinrock's statements

24 were "perhaps knowingly false" and "may constitute fraudulent inducement"

25 (Defs.' Br. at 12, 19) are all the more remarkable in light of Dr. Kleinrock's

26 preeminence as a scientist and engineer.  Dr. Kleinrock's achievements have

27 earned him numerous accolades, including the nation's highest honor for

28 science and engineering, the National Medal of Science.  (Ex. B at 1–2.)  That

-11-

1   award was conferred on Dr. Kleinrock in 2007 for "fundamental contributions

2   to the mathematical theory of modern data networks, including the functional

3   specification of packet switching which is the foundation of the Internet

4   Technology." (*Id.* at 2.) Defendants' attempts at character assassination are

5   unsupported and should be disregarded.

6        Moreover, Defendants' assertion that Dr. Kleinrock is not trustworthy is

7   incredible given their misrepresentations of his testimony. Defendants argue in

8   their brief that "[Dr.] Kleinrock could not identify a specific time or place at

9   which the ideas for the inventions were generated, but attempted to deny that the

10  ideas occurred while they were at UCLA." (Defs.' Br. at 8.) But Dr. Kleinrock

11  did describe where the ideas were conceived, and was even able to recall the

12  street address:

13       Q. But you can't pinpoint where you were when the DAT was

14          conceived, or can you?

15       A. Well, it was in the Nomadix environment. When that happened

16          and -- the loca- -- the office, it  was the first one in Santa Monica.

17          That's 739 B, I believe, was the address, on 10th Street. Those

18          were our first offices.

19       Q. Okay. And is it your recollection that you had the discussion,

20          the first discussion regarding DAT, at those offices in Santa

21          Monica?

22       A. I believe. But it's been a long time.

23       Q. Okay. But -- so you don't recall one -- specifically one way or

24          the other?

25       A. I'm pretty sure it was at those offices.

26       Q. And what makes you believe it was at those offices as opposed

27          to –

28       A. Because we were not discussing this notion of DAT prior to

1      forming the company and imagining what it is we could do to

2      create a product of value that would fill a need and for which we

3      had the potential solution.

4  (Ex. 12 at 180.)

5      Defendants attempt to confuse the issue of when the inventions were

6  conceived and developed by treating all work relating to a nomadic router as if

7  it were the patented inventions.  But Nomadix's patented inventions cannot be

8  simplified to the development of a nomadic router.  As Dr. Kleinrock explained

9  in his deposition, "the term 'Nomadic Router' is a generic term" and its

10 meaning "depends on the context."  (Ex. 12 at 52.)  Dr. Kleinrock also

11 explained at several points during his deposition that the research that was

12 supported through the University or the Department of Defense was

13 fundamentally different than the commercial work Nomadix undertook.  For

14 example, Dr. Kleinrock testified that the "things that we found in the

15 TRAVLER and the WAMIS work was a Nomadic router with certain

16 functionality, which is not the subject of the patent that we applied for."  (*Id.* at

17 247–48.  *See also id.* at 184–90, 207–13.)

18     Defendants have offered zero evidence to link any work done at the

19 University to the inventions covered by Nomadix's patents.  Nomadix has

20 asserted *eight* different patents, each covering significantly different technology.

21 Defendants gloss over this fact, arguing in a vague and superficial manner that

22 Nomadix's patents all concern "auto-configuration." (Defs.' Br. at 9–10.)  Even

23 if that were true, Defendants have failed to show that the specific technology

24 described in Nomadix's patents was developed at the University or using

25 University resources.  As just a few examples, Defendants have failed to cite

26 any evidence that the University was involved in ARP packet interception;

27 address translation; transparent support for proxy services; browser redirection;

28 login pages with location-specific information; user profile databases; or

1  integration with management systems for billing.

2  **C.    Even If the University's Patent Policy Applied to the Inventions of**
3  **the Patents in Suit, the Motion Would Still Be Improper**

4  Because the factual record shows that Nomadix's patents were developed
5  independent of the University's facilities and funds, the Patent Policy
6  Agreement on which Defendants rely does not even apply to the patents in suit.
7  (*See* Ex. 1, § Notice.)  But even if the patents in suit somehow fell within the
8  agreement's scope, the Court should still deny Defendants' motion because they
9  have made no showing that the conditions precedent in the agreement were met.

10  The Patent Policy Agreement states:

11  In the event any such invention shall be deemed by
12  University to be patentable, and University desires, pursuant to
13  determination by University as to its rights and equities therein, to
14  seek patent protection thereon, I shall execute any documents and
15  do all things necessary, at University's expense, to assign to
16  University all rights, title and interest therein and to assist
17  University in securing patent protection thereon.

18  (Ex. 1.)  This clause lists three conditions precedent to an obligation to assign:
19  that an invention is deemed by the University to be patentable, that the
20  University makes a determination that it has rights or equities in the invention,
21  and that the University desires to seek patent protection on the invention.
22  Defendants have come forward with no evidence whatsoever that these
23  conditions precedent were met for any of the patents in suit.  Indeed, the
24  evidence Defendants have presented supports only the conclusion that the
25  University determined that it did not have any rights in Nomadix's patents.
26  (*See, e.g.*, Ex. 3.)

27  Because the patents in suit were independently developed and, in any
28  event, the conditions precedent in the Patent Policy Agreement were never met,

-14-

1   there never arose any circumstances that might have triggered any obligation on
2   Dr. Short's part to assign any rights in the patents in suit to the University.

3   **D.      Defendants Mischaracterize the Non-Assertion Letter**

4              As if repetition will make it true, Defendants state over and over that the
5   Non-Assertion Letter "expressly acknowledges" that the University has
6   ownership rights in the patents. (Defs.' Br. at 1, 10, 12, 15, 17.)  It does no such
7   thing, either expressly or by implication.  It is difficult to comprehend why
8   Defendants continuously assert something that is so readily demonstrated to be
9   false.  If the University's ownership rights were expressly acknowledged, as
10  Defendants claim, there would be a written statement in the letter reciting that
11  the University has ownership.  That is what "expressly acknowledges" means.
12  But there is no such statement in the Non-Assertion Letter.  To the contrary, the
13  Letter specifically avoids taking a position on whether the University ever had
14  rights, stating that "the disclaimer relates only to rights the University *may have*
15  *had* in these patents. . . ."  (Ex. 3 (emphasis added).)

16             The very purpose of the Non-Assertion Letter is to clarify that the
17  University does not have and is not claiming to have an ownership interest in
18  the patents.  The position Defendants advocate would create the absurd result
19  that a disclaimer of patent ownership *obligates* the disclaiming entity to
20  participate in litigation involving that patent.  Such a rule makes no sense,
21  serves no purpose, and is not the law.

22             That the University never had ownership rights is further reinforced by
23  the fact that the conditions for the non-assertion set forth in the Letter are "that
24  no University funds or facilities were used to develop the invention and that it is
25  outside the scope of your employment with the Regents."  (Ex. 3.)  These
26  conditions parallel the provisions of the California Labor Code section 2870
27  reproduced in the University's Patent Policy.  (*See* Ex. 1 § Notice.)  In other
28  words, the non-assertion of rights is conditional on the very circumstances that

-15-

1    mean that the University never had any rights in the invention to begin with.
2    Accordingly, it is fallacious for the Defendants to argue that the Non-Assertion
3    Letter represents an acknowledgement that the University had ownership rights.

4    **IV.  DEFENDANTS CANNOT BLAME NOMADIX FOR THEIR OWN**
5    **DELAY IN SEEKING DISCOVERY FROM DR. KLEINROCK**

6         As Defendants acknowledge, Dr. Kleinrock is a named inventor on
7    several of the patents in suit and Nomadix listed him on its initial disclosures at
8    the outset of this case.  (Defs.' Br. at 10 n.8.)    Defendants were therefore on
9    notice from the very beginning of the litigation that Dr. Kleinrock was a
10   potential fact witness, yet they chose to wait until October 2011, two years after
11   this case was filed, to serve a subpoena on Dr. Kleinrock.  (Ex. C.)   That
12   subpoena requested that Dr. Kleinrock "bring with [him] to the deposition" a
13   variety of documents.  (*Id.*)   Thus, Defendants have nobody to blame but
14   themselves that they did not receive Dr. Kleinrock's documents until just before
15   Dr. Kleinrock's deposition.  (Defs.' Br. at 11 n.9.)

16        Defendants apparently now believe that Nomadix should have searched
17   Dr. Kleinrock's documents in response to discovery requests directed to
18   Nomadix.  (Defs.' Br. at 10 n.8.)  But Dr. Kleinrock has not been affiliated with
19   Nomadix for at least the last five years.  (Ex. 12 (Kleinrock Tr.) at 43.)  For the
20   entire duration of this litigation, Dr. Kleinrock has not been an employee, agent,
21   officer, or owner of Nomadix.   There would be no basis for Defendants to
22   request that Nomadix search Dr. Kleinrock's files, and Defendants have never
23   suggested until this motion that Nomadix should do so.

24        Defendants also assert that Nomadix "hid the extent of this [alleged
25   ownership] problem until after the close of the fact discovery period."  (Defs.'
26   Br. at 20.)   Nomadix did not hide anything.   Nomadix has been diligent in
27   searching for and producing the categories of documents that Defendants have
28   requested.

-16-

1   Defendants' complaints are baseless and simply reflect the schedule by
2   which they chose to conduct discovery.  More importantly, nothing can distract
3   from the fact that Defendants have failed to put forth any evidence that the
4   University ever obtained legal title to any of the patents in suit.

5   **V.  CONCLUSION**

6   In summary, Nomadix has set forth the assignments proving it holds legal
7   title to each of the patents in suit.  Defendants have failed to proffer any
8   evidence that the University ever obtained a present assignment of any rights or
9   legal title in or to any of Nomadix's patents.  Accordingly, Defendants' motion
10  must be denied.

11

12

13                              Respectfully submitted,

14                              KNOBBE, MARTENS, OLSON & BEAR, LLP

15

16

17  Dated: January 16, 2012      By: /s/ *Douglas G. Muehlhauser*
18                                  John B. Sganga, Jr.
                                    Douglas G. Muehlhauser
19                                  Perry D. Oldham
                                    Mark Lezama
20                                  Alan G. Laquer

21                                  Attorneys for Plaintiff
                                    NOMADIX, INC.
22

23  12583166

24

25

26

27

28

-17-